## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 7** |
| **NEW ENGLAND CONFECTIONERY** | ) **(conversion pending)** |
| **COMPANY, INC.,** | ) |
| | ) **Case No. 18-11217-MSH** |
| **Debtor.** | ) |
| | ) |

### DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (A) AUTHORIZING POSTPETITION FINANCING, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE PRIORITY, (C) AUTHORIZING USE OF CASH COLLATERAL AND PROVIDING FOR ADEQUATE PROTECTION, (D) MODIFYING THE AUTOMATIC STAY, AND (E) SCHEDULING A FINAL HEARING

### (Emergency Determination Requested)

New England Confectionery Company, Inc., the debtor and debtor in possession (sometimes referred to herein as "NECCO" or the "Debtor") in the above-captioned bankruptcy case (the "Case"), hereby moves the Court (the "Motion") for entry of an interim order (the "Interim Order") substantially in the form attached hereto as Exhibit A, and following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the "Final Order" and, with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Massachusetts (the "Local Rules"):

> (I)     authorizing the Debtor to obtain postpetition secured super-priority financing from the Lender (as defined below) in a principal amount outstanding at any time equal to the lesser of (x) one million five hundred thousand dollars ($1,500,000) or (y) the amount shown, for any week in the Approved Budget, as

the "DIP Ending Balance (Maximum Outstanding DIP Balance)" for such week (the "Maximum Amount"), on the same terms and conditions as set forth in the Revolving Credit Agreement (defined below) subject to and as supplemented by the Interim Order,[1] together with all documents and instruments required to be delivered or executed pursuant thereto or in connection therewith, including, without limitation, the Approved Budget (as defined below), in each case as hereafter amended, supplemented or otherwise modified from time to time with Lender's express written consent (the "Postpetition Financing Agreement") and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(II)    authorizing for the Debtor to (a) subject to the terms and provisions hereof, continue to use Cash Collateral (as defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (defined below), and (b) provide adequate protection to the prepetition lender, ACAS, LLC (formerly known as American Capital, Ltd., successor by merger with American Capital Financial Services, Inc.) (the "Lender") under the Prepetition Loan Documents (as defined below):

(III)    to scheduling, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the proposed Interim Order annexed; and

(IV)    to scheduling, pursuant to Bankruptcy Rule 4001, a Final Hearing for this Court to consider entry of a final order approving the Motion.

In support of the Motion, the Debtor relies on and incorporates by reference the Declaration of Michael McGee, filed in support of the Debtor's various first day applications and motions (the "McGee Declaration"), filed with the Court concurrently herewith.  In further support of the Motion, the Debtor, by and through its undersigned proposed attorneys, respectfully represent as follows:

---

[1] To the extent the terms and provisions set forth in the Revolving Credit Agreement and the Interim Order conflict, the Interim Order controls. Lender's rights, remedies and protections shall include those set forth in the Revolving Credit Agreement and those additional rights, remedies and protections set forth in the Interim Order.

- 2 -

## JURISDICTION, VENUE AND AUTHORITY

1.   The United States Bankruptcy Court for the District of Massachusetts (the "Court") has jurisdiction over these Case and the Motion pursuant to 28 U.S.C. §§ 157 and 1334.   This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.   The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363 and 364, Bankruptcy Rules 2002, 4001 and 9014 and MLBR 4001-2.

## BACKGROUND

4.   On April 3, 2018 (the "Involuntary Date") an involuntary petition pursuant to Chapter 7 Bankruptcy Code was filed against the Debtor (the "Involuntary Petition").   On April 17, 2018 (the "Conversion Date), the Debtor consented to the entry of an order for relief and filed a motion seeking to convert the case to a case under Chapter 11 (the "Conversion").

5.   The Debtor continues to operate its business during the present involuntary "gap period" consistent with its normal practices, and upon the granting of the Conversion intends to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no trustee, examiner, or statutory committee has been appointed in the Case.

- 3 -

6.   No requests have been made for the appointment of a trustee or an examiner in this Case, and no official committee has yet to be appointed by the Office of the United States Trustee.

**Company History**

7.   The Debtor, while formally incorporated in 1901, traces its history and roots to a local Massachusetts candy company that began operating in 1847, and is considered one of -- if not the -- oldest continuous company producing candy in the United States.  It is best known for its Necco Wafers, and production of the Clark Bar, Haviland Thin Mints and Sweetheart Conversation Hearts.

8.   As of the date hereof, the Debtor employs approximately 230 full-time employees, mostly in its headquarters in Revere, Massachusetts, of which nearly 85% belong to a labor union.

9.   All of the Debtor's stock is presently owned by NECCO Holdings, Inc.  The stock of NECCO Holdings, Inc. is owned by Lender.

**Capital Structure and Debt Obligations**

10. As of the Involuntary Date, the Debtor had incurred a substantial amount of debt, with total liabilities exceeding $152 million of which just over $107 million constitutes the Secured Debt (as defined below).

11. On December 21, 2007, the Lender, and its affiliate as agent for the Lender, and the Debtor entered into the following credit agreements:

    A.     Credit Agreement, entered into on December 21, 2007, between the Debtor, as borrower, and American Capital Financial Services, Inc., as Lender's agent, as subsequently revised and amended,

concerning certain loans made by Lender to the Debtor (the "<u>Term Loans</u>").

B.  Pledge and Security Agreement entered into on December 21, 2007, whereby the Debtor, as borrower, granted to Lender, in its capacity as agent, for the benefit of Lender, a lien on and security interest in all of its assets, including all accounts receivable, deposit accounts, inventory and proceeds thereof (the "<u>Term Loan Collateral</u>").  The Lender subsequently perfected its security interest in the Term Loan Collateral by filing a UCC-1 Financing Statement against the Debtor.

C.  Deposit Account Control Agreement entered into on October 10, 2014, between Lender, NECCO and Eastern Bank, pursuant to which Lender perfected its interest in NECCO's deposit account at Eastern Bank.

12. On August 8, 2008, the Debtor, as borrower, and Core Business Credit, LLC ("<u>Core</u>") as lender, entered into that certain Loan and Security Agreement, as subsequently revised and amended, a copy of which including all amendments is attached hereto as <u>Exhibit B</u> (the "<u>Revolving Credit Agreement</u>") for revolving loans made by Core to the Debtor (the "<u>Revolving Line of Credit</u>").  On August 8, 2008, Core assigned its rights under the Revolving Credit Agreement to Core Business Funding, LLC, which on November 1, 2010, further assigned its rights under the Revolving Credit Agreement to the Lender.  As security for the Revolving Line of Credit, the Debtor granted Core a lien on all of its personal property, as subsequently perfected by the filing of a UCC-1 Financing Statement against the Debtor.

13. On October 10, 2014, the Lender, the Debtor, and Eastern Bank executed a Deposit Account Control Agreement, pursuant to which Lender perfected its interest in the Debtor's deposit account at Eastern Bank.  Lender maintains a perfected first-priority security interest in the Debtor's deposit accounts, both by reason of the

Deposit Account Control Agreement and by reason of the status of funds in such accounts as proceeds of accounts receivable and inventory in which Lender has a first-priority security interest.

14. As of the Involuntary Date, the Debtor owed the Lender an amount not less than $85,745,025 million on account of the Term Loans and $21,362,907 million on account of the Revolving Line of Credit (the "Secured Debt").  Other than printers leased from Canon (printers) and forklifts leased from HYG Financial Services (provided that the Debtor believes that these creditors' security is either under-secured, unperfected, or both), the Lender is the only other secured creditor of record as of the Involuntary Date.

**Events Leading to the Debtor's Involuntary Petition and Voluntary Conversion**

15. As a result of various events of default, including but not limited to payment defaults, the Lender, prior to the Involuntary Date, provided the Debtor with a notice of default and accelerated all amounts due and owing under the Term Loans and the Revolving Credit Agreement, and notified the Debtor that it no longer had any obligation to advance funds under the Revolving Line of Credit.

16. In the period leading up to the Involuntary Date, the Debtor was in an over-advance position with the Lender and was in payment default.  Additionally, the Debtor was unable to keep current with its trade vendors.  In addition, several trade vendors brought suit against the Debtor, including seeking attachments of the Debtor's bank accounts and accounts receivable, which, when granted, further constrained the Debtor's liquidity and ability to operate. These attachments have since been dissolved as a result of the filing of the Involuntary Petition.

**Sale Process Prior to the Involuntary Date**

17. Beginning in September 2017, the Debtor commenced a sales process, retaining Threadstone Advisors LP ("Threadstone") as its investment banker, who, on the Debtor's behalf solicited multiple proposals for the acquisition of substantially all of its Assets. Threadstone identified 45 potential strategic and financial purchasers of the Assets and provided them with substantial information regarding the Debtor's Assets, operations, and projections for future growth. As a result of that process, nine (9) potential acquirers submitted proposals to acquire the Assets. From among them, the Debtor and Threadstone identified CI-N Acquisition LLC, an affiliate of Gordon Brothers, as having presented the highest and best offer to purchase the Debtor's assets as a going-concern.

18. The Debtor and Threadstone pushed forward to effectuate the sale, however, in light of the Debtor's on-going financial defaults and ensuing litigation with the Debtor's trade creditors, the Debtor was not able to complete the sale prior to the Involuntary Date.

19. In light of the Debtor's default under the Prepetition Obligations and all the financial issues facing the Debtor, the Lender filed a complaint against the Debtor in Massachusetts Superior Court and sought the imposition of a receivership over the Debtor's assets, to which the Debtor consented. It was contemplated that the receiver would seek to consummate the sale of the Debtor's assets. However, before that could occur, the Involuntary Petition was filed against the Debtor by its trade creditors.

20. In light of the Involuntary Petition, which halted the Debtor's efforts to sell the business to the proposed purchaser pursuant to a state receivership as originally

contemplated, the Debtor has decided to convert this case to a Chapter 11 proceeding in order to maintain the existing operations of the business, in a manner that will enable it to consummate the sale pursuant to Section 363 of the Bankruptcy Code.

**Need for Debtor in Possession Financing**

21. The filing of the Involuntary Petition has exacerbated the Debtor's financing needs, increased the costs associated with existing operations, and delayed its proposed sale of the assets as the means of maintaining a going-concern enterprise that will continue to employ its employees and produce its products. The Debtor has an immediate need for financing in order to be able to pay critical expenses of operation and complete a going concern sale of its assets.

22. Together with this Motion, the Debtor is seeking the authority of the Court to maintain its current operations for a period of time sufficient to revive the proposed sale of the company through a Section 363 sale process pursuant to a motion to sell substantially all of the assets of the Debtor, which in the exercise of its reasonable business judgment, represents the best means to maximize the value of the Debtor's brand and its business.

23. The Debtor will be filing a motion seeking approval for an expedited sale of its assets. In order to maximize the realization of net value by the Debtor's estate, the sale will provide for the proposed buyer to take over the cost and decision-making authority associated with production of further inventory, as of a specified transition date. Thus, it is essential for the sale to be consummated promptly, to minimize costs to the Debtor's estate by shifting those continuing operating costs to the proposed purchaser, and thereby maximizing the net value of any existing assets and the proceeds of the sale.

- 8 -

Until the sale is approved and the buyer assumes production and related costs, the Debtor will have substantial continuing expenses for payroll, materials and other operating expenses.  The proposed postpetition financing is essential to enable the Debtor to fund these expenses, as well as other administrative expenses.

24. To meet its objectives, the Debtor has entered, subject to this Court's approval, into the DIP Facility, pursuant to which the Debtor will receive a senior secured debtor-in-possession line of credit that should provide them with sufficient liquidity to navigate through the proposed sale process.

## RELIEF REQUESTED

25. By this Motion, pursuant to Bankruptcy Code sections 105, 361, 363, and 364 and Bankruptcy Rules 4001(b) and (c), the Debtor requests that this Court enter interim and final orders authorizing the Debtor to incur postpetition debt and grant adequate protection and security to the Lender in its capacities as the DIP lender and a secured prepetition lender and agent.

**The Postpetition Financing Terms**

26. The Lender has agreed to lend funds to the Debtor in accordance with the terms and provisions of the Revolving Credit Agreement (subject to and as supplemented by the terms of conditions provided in the Interim Order), in a principal amount not to exceed the Maximum Amount notwithstanding any Borrowing Base limitations on availability set forth in the Revolving Credit Agreement.  Such funds may be used solely for the purposes set forth in the Approved Budget, which is attached to this Interim Order as Exhibit A hereto (the "Approved Budget"),  and as provided for in this

Interim Order.  In connection therewith, the Debtor and the Lender have agreed and

stipulated to the following terms and conditions, which the Debtor asks the Court to

approve an order providing that:

(a)    The Debtor may exceed the Budget on a line-item or cumulative basis only with the advance consent of the Lender in Lender's sole discretion;

(b)    In accordance with the Revolving Credit Agreement, which shall govern all postpetition borrowings by the Debtor hereunder, subject to and as supplemented by the terms of interim and final orders entered by the Court, Lender shall have a first priority Lien on any bank account(s) maintained by the Debtor (which Lien shall be deemed perfected without the need for Lender to take any action, provided that Lender may in its discretion take such actions as it deems appropriate to further evidence such perfection), and Lender shall be entitled to sweep funds from such account(s) on a daily basis or as otherwise provided for under the Revolving Credit Agreement, provided that such swept funds shall be applied by Lender to Postpetition Obligations (as defined in the Interim Order) and not to the Prepetition Obligations (as defined in the Interim Order). Notwithstanding the foregoing, Lender shall not be obligated to sweep funds in the Debtor's accounts.  Any funds in Debtor's accounts that are not swept by Lender, and any other funds of the Debtor wherever located, shall be used only in accordance with the Approved Budget and this Interim Order;

(c)    Notwithstanding that the terms and conditions of the Revolving Credit Agreement apply to the Postpetition Financing Agreement, (i) any representation or warranty set forth in the Revolving Credit Agreement that would be untrue solely as a result of the Debtor's bankruptcy filing or the entry of the Interim Order shall not constitute an Event of Default under the Postpetition Financing Agreement, (ii) no Event of Default as defined in the Revolving Credit Agreement that occurred or existed solely prior to the Involuntary Date shall constitute an Event of Default with respect to the Postpetition Financing Agreement, and (iii) Debtor's failure to deliver to Lender certain Financial Statements and Projections as required by Section 7.6 of the Revolving Credit Agreement shall not constitute an Event of Default under the Postpetition Financing Agreement; however, notwithstanding the foregoing, the following events shall each constitute an Event of Default with respect to the Postpetition Financing Agreement:

(i)    any Event of Default under the Revolving Credit Agreement arising on or after the entry of any interim or final order entered by the Court;

(ii)   any failure by the Debtor to timely pay any Postpetition Obligations to the Lender upon the Maturity Date (defined below) or when otherwise due;

(iii)  any representation or warranty made by Debtor in connection with the Postpetition Financing Agreement that is or was untrue in any material respect as of the date on which it was made;

(iv)   the use of proceeds of the Postpetition Financing Agreement or any Cash Collateral other than strictly in accordance with the Approved Budget, except to the extent Lender has expressly consented to such use of funds prior to such use;

(v)    failure of the Debtor in any material respect to satisfy its reporting requirements in connection with the Approved Budget, as provided for or contemplated by in the Revolving Credit Agreement or in any order of the Court issues in conjunction with this Motion;

(vi)   denial by this Court of a motion for sale of all or substantially all of the Debtor's assets (or of a sale procedures motion in connection therewith) that has been consented to by Lender;

(vii)  appointment of a chapter 11 trustee for the Debtor, conversion of this Case to a case under chapter 7 of the Bankruptcy Code, or the dismissal of this case; appointment of an examiner for the Debtor;

(viii) entry of an order granting relief from the automatic stay to any party (other than one sought or consented to by Lender) permitting such party to take any action against the Debtor or any property of the estate;

(ix)   entry by the Court of any order (other than one sought or consented to by Lender) modifying,

terminating or shortening the period during which the Debtor has the exclusive right to propose or to solicit acceptances of a Chapter 11 plan;

(x)    commencement of any litigation by the Debtor or by any person acting or purporting to act by, through, or on behalf of the Debtor or its estate, against Lender or any person or entity affiliated with Lender; and

(xi)   if Debtor is enjoined, restrained or in any way prevented by any legislative, administrative or regulatory action, or by any court order (other than an order of this Court consented to  by  Lender) from continuing to conduct all or any material part of its business; or

(xii)  failure by the Debtor to abide by any of its obligations set forth in any order the Court issues in conjunction with this Motion or the Interim Order;

(d)    Upon an Event of Default, the Lender shall have no obligation to provide any further financing or other advances or financial accommodations to the Debtor and shall have the right to request from this Court an emergency hearing, on three business days' notice, to seek relief from automatic stay (including without limitation for the purposes of exercising any or all rights and remedies available with respect to the Prepetition Collateral or the Postpetition Collateral, whether under the Postpetition Financing Agreement, the Prepetition Loan Documents (as defined in the Interim Order), any other prepetition or postpetition agreements with the Debtor, the Interim Order, or applicable law) and any other relief as is just and proper, *provided, however,* that if the automatic stay is no longer in effect as to Lender, Lender may exercise all such rights and remedies without further order of this Court.

27.    The Debtor seeks authority to borrow up to the Maximum Amount under the DIP Facility.  The DIP Facility will mature 45 days following the entry of the Interim Order or upon an earlier Event of Default (referred to in the proposed Interim Order as the "Termination Date"), unless Lender extends such date in writing in its sole

discretion.  As security for the DIP Facility, the Debtor proposes to grant to the Lender, a first-priority priming lien on all its assets (the "Lien") (excepting, however, avoidance actions under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code other than claims for recovery of any unauthorized disposition of Postpetition Collateral) with priority over all other liens and security interests in all of the Debtor's assets, subject only to a carve out (the "Carve Out") for the Debtor's professionals as well as for accrued but unpaid fees of the United States Trustee pursuant to 28 U.S.C. § 1930.  The Debtor also proposes to grant the Lenders, a super-priority administrative claim, subject to the Carve Out, as further security for the repayment of the advances to be made under the DIP Facility.

28.     The Debtor proposes that no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the Approved Budget) by the Debtor or any other person or entity shall be imposed or charged against the Lender's claims, or the Postpetition Collateral, under Section 506(c) of the Bankruptcy Code or otherwise, and the Debtor, on behalf of its estate, successors and assigns (including any trustee in this case or in any successor case), will waive any and all such rights for the benefit of the Lender (subject to the entry of a Final Order).  Notwithstanding anything in this Motion, no costs or expense of administration or other charge, lien, assessment or claim (including, without limitation, any amounts set forth in the Approved Budget) shall constitute a claim against the Lender, its claims or its collateral under section 506(c) of the Bankruptcy Code or otherwise and no such consent to such a claim shall be implied by the Lender from any other action or inaction by Lender.

- 13 -

29. The Debtor seeks authorization on an interim basis to borrow up to the Maximum Amount under the DIP Credit Agreement for the purposes set forth in the Budget and to remit Cash Collateral for repayment of amounts outstanding under the Prepetition Senior Credit Agreement pending the Final Hearing.

30. To the extent HYG Financial Services, Canon, and Kraft Power Corporation presently held valid and perfected subordinate liens prior to and immediately following the Involuntary Date, they would retain such liens, provided however, the Debtor believes that these creditors' security is either under-secured, unperfected, or both.   Accordingly, these creditors would not qualify as junior secured creditors and would have no subordinate interest in the Debtor's collateral used to secure the DIP Facility.

## **BANKRUPTCY RULE 4001 CONCISE STATEMENT**

31. The Lender has agreed to advance funds under the existing Revolving Credit Agreement on a post-petition basis subject to the terms set out herein and the approval of the Court.   Below is a summary of the terms of the proposed debtor-in-possession financing to be authorized (the "DIP Facility"):[2]

| (a) | Borrower: | New England Confectionery Company, Inc. |
|-----|-----------|------------------------------------------|
| (b) | DIP Lender: | ACAS, LLC |

---

[2]    The summary of the terms and conditions of the DIP Facility and the proposed orders set forth in this Motion are intended solely for informational purposes and are qualified in their entirety by the Revolving Credit Agreement and DIP Orders.  In the event there is any conflict between this Motion and the DIP Orders, the DIP Orders will control in all respects.  Capitalized terms used in the following chart, but not defined therein have the meanings ascribed such terms in the Revolving Credit Agreement and the DIP Order, as applicable.

- 14 -

| (c) | Guarantor: | N/A |
|---|---|---|
| (d) | Purpose: | (a) to fund general corporate purposes relating to the Borrower's post-petition operations, subject to the Budget, (b) to pay chapter 11 expenses, including allowed professional fees subject to the terms and conditions contained in the Approved Budgets as defined in the proposed Interim Order, and (c) to pay all fees and expenses due to Lender under the DIP Facility (including, without limitation, all professional fees and expenses (including legal, financial advisory, appraisal, valuation, and sale-related fees and expenses)), including those incurred in connection with the preparation, negotiation, documentation and court approval of the DIP Facility (whether incurred before or after the date of the commencement of the Case). |
| (e) | Amount of DIP Facility: | Principal amount outstanding at any time equal to the lesser of (x) one million five hundred thousand dollars ($1,500,000) or (y) the amount shown for any week in the Approved Budget, as the "DIP Ending Balance" for such week (the "Maximum Amount") |
| (f) | Interest Rate: | All loans and advances under the DIP Facility shall bear interest at the non-default interest rate in effect pursuant to the Revolving Credit Agreement.  As of April 17, 2018, the non-default interest rate is Libor + 5.11%. From and after the occurrence of a postpetition Event of Default (as defined in the proposed Interim Order), all such loans and advances shall bear interest at the Default Rate (as such term is defined and calculated in the Revolving Credit Agreement). |
| (g) | Facility Fees: | • Unused Line Fee – a monthly fee equal to 0.375% per annum multiplied by the amount by which the Revolving Credit Limit exceeded the sum of the average daily outstanding amount of Revolving Loans during the immediately preceding calendar month, or such shorter period.<br>• Collateral Monitoring Fee – a monthly fee in the amount of $2,000.00 for each calendar month, or portion thereof, which shall be prorated for any partial calendar month. |

- 15 -

| (i) | Closing Date: | Upon entry of the Interim Order |
|---|---|---|
| (j) | Conditions Precedent to Lending: | For advances under the Postpetition Financing Agreement within the first twenty days (20) following entry of the Order (collectively, the "Interim Conditions"): |

For advances under the Postpetition Financing Agreement within the first twenty days (20) following entry of the Order (collectively, the "Interim Conditions"):

(a) All documentation relating to the Postpetition Financing Agreement shall be in form and substance satisfactory to Lender;

(b) The Court shall have entered an Interim Order approving the Postpetition Financing Agreement in form and substance acceptable to Lender;

(c) Lender shall be satisfied that all Postpetition Obligations are secured by valid, enforceable and non-avoidable first priority priming liens and security interests;

(d) There has been no Event of Default under the Postpetition Financing Agreement or any Court order related thereto, and no event that, with the passage of time or the giving of notice, could become an Event of Default;

(e) the Debtor shall not have sold any of its assets, outside the ordinary course of business, without Lender's consent; and

(f) If the Debtor has consummated a sale of all or substantially all of its assets in a transaction, and pursuant to documentation, that is acceptable to Lender (an "Approved Sale"), all proceeds from such Approved Sale shall have been paid to Lender for application first to the Postpetition Obligations, with any proceeds that exceed the amount of Postpetition Obligations ("Excess Proceeds") having been applied to the Prepetition Obligations.

For advances under the Postpetition Financing Agreement after the date that is twenty (20) days from

|   |   | entry of the Order:<br><br>(a)   All of the Interim Conditions have been, and remain, satisfied in all respects;<br><br>(b)   The Court shall have entered a Final Order approving the Postpetition Financing Agreement in form and substance acceptable to Lender; and<br><br>(c)   The Debtor shall have consummated an Approved Sale and all proceeds from such Approved Sale shall have been paid to Lender for application first to the Postpetition Obligations, with any Excess Proceeds having been applied to the Prepetition Obligations. |
|---|---|---|
| (l) | Budget and Financial Reporting: | The thirteen (13) week weekly operating budget of the Debtor, which shall be subject to approval by Lender. |
| (m) | Cash Dominion: | The Debtor remains subject to an executed and delivered deposit account control agreement. Lender shall have a valid and perfected first priority priming lien on all cash in the Debtor's accounts, and  may, if it so elects, obtain deposit account control agreements for such accounts. |
| (n) | Sale Proceeds: | The Debtor shall be required to utilize the proceeds from the sale of any of its assets to repay the Post-Petition Obligations (as defined in the Interim Order) advanced under the DIP Facility. |
| (o) | Maturity Date: | 45 days from the entry of the Interim Order, or earlier upon the occurrence of an Event of Default |
| (p) | Lien and Superpriority Claim; Priority: | All obligations of the Debtor in respect of the DIP Facility shall be (i) entitled to super-priority administrative expense claim status pursuant to § 364(c)(1) of the Bankruptcy Code with priority over all administrative expenses of the kind that are specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code ("Superpriority Claims"), subject only to the Carve Out; and (ii) secured, pursuant to §§ 364(c)(2) and (c)(3) and § 364(d) of the Bankruptcy Code by a security interest and lien on the DIP Collateral, subject to the Carve Out. |

| (q) | Collateral: | Subject to the Carve Out, all obligations owed to the Lender, shall be secured by the Postpetition Collateral (as defined in the proposed Interim Order), which shall include all assets (whether tangible, intangible, real, personal or mixed) of Debtor, whether now owned or hereafter acquired and wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, all products and proceeds thereof (excepting, however, avoidance actions under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code other than claims for recovery of any unauthorized disposition of Postpetition Collateral). <br><br> Regardless of the order in which proceeds of DIP Collateral are received, the DIP Obligations shall be deemed to be paid first by any DIP Collateral that is not Term Loan Collateral, Revolving Loan Collateral, or replacement liens or proceeds thereof ("Postpetition-Only Collateral"), and for the avoidance of doubt if the DIP Obligations are paid in full and the Debtor's estate subsequently receives proceeds of Postpetition-Only Collateral, the Debtor shall be deemed to pay such proceeds to Lender for application to the DIP Obligations and Lender shall apply to the Prepetition Obligations a corresponding amount of proceeds of other DIP Collateral that is not Postpetition-Only Collateral. |
| (r) | Certain Waivers: | Debtor waives presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which Debtor may in any way be liable, and hereby ratifies and confirms whatever the Lender may do in this regard. |
| (s) | Perfection Other than Under State Law: | The Postpetition Liens and Adequate Protection Lien (as defined in the Interim Order) shall be deemed perfected |

| | | without the need for Lender to make any filings or take any other action; provided, however, if Lender desires to take any actions to further evidence its perfected liens and security interests, it may do so and Debtor shall cooperate by executing and delivering any instruments or documents or taking any other actions requested by Lender in connection therewith. |
|---|---|---|
| (t) | Professional Fee Carve Out: | The liens of the Lender on the DIP Collateral and the Superpriority Claims shall be subject to a Carve Out (the "Carve Out") in the aggregate amount not to exceed the lesser of (i) the aggregate amount provided in the Budget (defined below) for the applicable Carve Out Professional for the period commencing on the date of the order of relief and ending on the Termination Date and (ii) the aggregate amount of allowed fees and expenses that accrue during the period commencing on the date of the order of relief and ending on the Termination Date. The Carve Out shall be reduced dollar-for-dollar by any payments of fees and expenses to the applicable Carve Out professionals. The Carve Out shall also include quarterly fees required to be paid pursuant to 28 U.S.C. §1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court.<br><br>Notwithstanding anything to the contrary herein, no portion of the Carve Out may be utilized for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting or preparing for any claims or causes of actions against the Lender, or in connection with challenging or raising any defenses to the prepetition obligations under the Term Loan or the Revolving Credit Agreement, the Obligations under the DIP Facility, or the liens of the Lenders. |
| (v) | Reporting: | The Debtor shall provide to Lender a budget-to-actual report in a form and with a frequency requested by Lender, and shall provide such other reporting as Lender shall reasonably require. |
| (w) | Events of Default: | The DIP Facility provides for usual and customary events of defaults for facilities of this type, including, but not limited to:<br>    (a) Any Event of Default under the Revolving Credit Agreement arising on or after the entry of this |

Interim Order;

(b) any failure by the Debtor to timely pay any Postpetition Obligations to the Lender upon the Maturity Date (defined below) or when otherwise due;

(c) any representation or warranty made by Debtor in connection with the Postpetition Financing Agreement that is or was untrue in any material respect as of the date on which it was made;

(d) the use of proceeds of the Postpetition Financing Agreement or any Cash Collateral other than strictly in accordance with the Approved Budget, except to the extent Lender has expressly consented to such use of funds prior to such use;

(e) failure of the Debtor in any material respect to satisfy its reporting requirements in connection with the Approved Budget, as provided for or contemplated by in the Revolving Credit Agreement or herein;

(f) denial by this Court of a motion for authority to enter into an Approved Sale, or an Approved Sale has not, for any reason, been consummated on or before May 6, 2018;

(g) appointment of a chapter 11 trustee for the Debtor, conversion of this chapter 11 case to a case under chapter 7 of the Bankruptcy Code, or appointment of an examiner for the Debtor;

(h) entry of an order granting relief from the automatic stay to any party other than Lender permitting such party to take any action against the Debtor or any property of the estate;

(i) entry by the Court of any order (other than one sought or consented to by Lender) modifying, terminating or shortening the period during which the Debtor has the exclusive right to propose or to solicit acceptances of a chapter 11 plan;

(j) commencement of any litigation by the Debtor or

|     |     |     |
| --- | --- | --- |
|     |     | by any person acting or purporting to act by, through, or on behalf of the Debtor or its estate, against Lender or any person or entity affiliated with Lender;<br><br>(k) if Debtor is enjoined, restrained or in any way prevented by any legislative, administrative or regulatory action, or by any court order (other than an order of the Court consented to by Lender) from continuing to conduct all or any material part of its business;<br><br>(l) if Debtor shall grant or suffer any lien on any Postpetition Collateral without Lender's express written consent; or<br><br>(m) failure to abide by any obligation of Debtor set forth in the Interim Order. |
| (x) | Remedies Upon Default: | Upon an Event of Default the Lender shall have no obligation to provide any further financing or other advances or financial accommodations to the Debtor and shall have the right to request from the Bankruptcy Court an emergency hearing, on three business days' notice, to seek relief from automatic stay (including without limitation for the purposes of exercising any or all rights and remedies available with respect to the Prepetition Collateral or the DIP Collateral, whether under the DIP Facility, the Revolving Credit Agreement, or any other prepetition or postpetition agreements with the Debtor, the Interim Order, or applicable law) and any other relief as is just and proper. |

## DISCLOSURES

32. The required disclosures under the applicable provisions of MLBR 4001-2(d) are limited in this transaction to seeking approval of a proposed default or termination of the DIP Facility upon a claim being made against the Lender or entry of an

order granting relief from stay against the Debtor (disclosure required under MLBR 4001-2(c)(13)(i), (ii)).[3]

33. Additionally, the terms proposed by the Lender require that certain events as enumerated herein would terminate the DIP Facility and the Lender's obligations to continue funding the Debtor's operations.  The Lender requires these provisions as a condition of its obligations under the DIP Facility, in part because the fulfillment of these conditions will demonstrate that the Debtor remains capable of moving towards the shared mutual goal of selling its business as a going concern.

34. These terms of the DIP Facility are justified because the Debtor is in immediate and critical need of the financing available through the DIP Facility, particularly to bridge operations through the proposed 363 sale process.  As discussed above and further below, the Debtor is unable to obtain financing on an unsecured, administrative expense basis.  The only acceptable proposals that would provide the critical liquidity to the Debtor has been provided after extensive negotiations with the Lender on the terms set forth in the DIP Credit Agreement and the proposed DIP Orders. Without this financing, the Debtor would not be able to pay its employees or vendors, which is essential to operating its business as a going concern and, ultimately, exiting the Case.

---

[3] The Lender in this Case has a first priority pre-petition security interest and will also hold a super-priority post-petition security interest. However, the DIP Facility is not, and should not be construed as, a roll-up. Accordingly, no disclosure is required under MLBR 4001-2(c)(6).

## BASIS FOR RELIEF REQUESTED

**A.     The Debtor Should Be Permitted to Obtain Post-Petition Financing Pursuant to Bankruptcy Code Section 364(c).**

35.     As a debtor-in-possession, the Debtor is authorized to operate its businesses under Bankruptcy Code section 1108.  As part of that operation, the Debtor may incur unsecured debt in the ordinary course of business.  See 11 U.S.C. § 364(a). The Bankruptcy Code offers debtors-in-possession additional flexibility to the extent they need additional credit, but cannot attract such credit on unsecured terms.

36.     Section 364 of the Bankruptcy Code governs the ability of debtors-in-possession to incur debt or obtain credit postpetition.  More specifically, section 364(c)(1)-(3) of the Bankruptcy Code addresses the incurrence of postpetition credit on a non-priming basis, providing as follows:

(c)     If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the Court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

37.     In evaluating proposed post-petition financing under Bankruptcy Code section 364(c), courts perform a qualitative analysis and generally consider similar factors, including whether:

- 23 -

(a)    unencumbered credit or alternative financing without superpriority status is available to the debtor;

(b)    the credit transactions are necessary to preserve assets of the estate;

(c)    the terms of the credit agreement are fair, reasonable, and adequate;

(d)    the proposed financing agreement was negotiated in good faith and at arms'-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

(e)    the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying the first three factors); In re Aqua Assocs., 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under Bankruptcy Code section 364(c)); In re Crouse Grp., Inc., 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987) (same); Bland v. Farmworker Creditors, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying all factors in making a determination under Bankruptcy Code section 364(d)).

38.    For the reasons discussed below, the Debtor satisfies the standards required to obtain post-petition financing on a secured superpriority Lien basis under Bankruptcy Code section 364(c).

**B.    The Debtor Is Unable to Obtain Financing on More Favorable Terms.**

39.    Whether a debtor is unable to obtain unsecured credit is determined by application of a good faith effort standard, and debtors must make a good faith effort to demonstrate that credit was not available without granting a security

- 24 -

interest.  See In re YL W. 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y.

2010) ("Courts have generally deferred to a debtor's business judgment in granting

section 364 financing); In re Gen. Growth Properties, Inc., 412 B.R. 122, 125 (Bankr.

S.D.N.Y. 2009).   The required showing under Bankruptcy Code section 364 that

unsecured credit was not available is not rigorous.  See, e.g., In re Snowshoe Co., Inc.,

789 F.2d 1085, 1088 (4th Cir. 1986) (stating that Bankruptcy Code section 364(d)

imposes no duty to seek credit from every possible lender, particularly when "time is of

the essence in an effort to preserve a vulnerable seasonal enterprise.").

> 40.    Here, as detailed in the McGee Declaration, despite its best efforts,

the Debtor has been unable to obtain unsecured credit sufficient to finance its operations.

Moreover, the Debtor cannot obtain alternative financing of the magnitude proposed

under the DIP Order on an unsecured basis, even if the resulting claim were to be allowed

as an administrative claim.   Finally, the Lender has agreed to fund the Debtor's

continuing operations only if they are given the added protection and benefits provided

by the Interim Order.   Without the DIP Facility, the Debtor would be assured of a

piecemeal liquidation under chapter 7 of the Bankruptcy Code, rather than a proposed

going concern sale that will maximize value.

> 41.    Therefore, the Debtor respectfully submits that its efforts to obtain

post-petition financing satisfy the standards required under Bankruptcy Code section

364(c).  See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 448–49 (Bankr. D. Colo. 1985)

(authorizing interim financing stipulation where Debtor's best business judgment

indicated financing was necessary and reasonable benefit to the estate); In re Ames Dep't

Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit,

courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"; In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117 (N.D. Ga. 1989) (where few lenders can or will extent the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

**C.     The Proposed Financing Is Necessary to Preserve the Assets of the Debtor's Estate.**

42. Pending a going concern sale, the Debtor intends to operate its business in the ordinary course and require immediate access to post-petition financing. Cash is necessary for working capital, operating costs and expenses incurred during this Case, including funding payroll for the Debtor's employees.  The Debtor does not have sufficient sources of working capital, financing or cash collateral to carry on the operation of its business without additional financing.  The Debtor's ability to maintain its business pending sale is dependent on its ability to continue to operate, and the Debtor cannot operate unless they can fund payments for post-petition rent, payroll, goods, services, and other operating expenses.  The proposed DIP Facility thus is essential to the Debtor's continued operational viability and will provide the Debtor with the opportunity to maximize value through a going concern sale.

43. The alternative in this Case is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the maximum value of the assets involved to the benefit of *all* classes of creditors and constituencies involved in this Case."  In re Dynaco Corp., 162 B.R. 389, 396 (Bankr.

D.N.H. 1993).   Because this result would be at fundamental odds to the rehabilitative

purposes of chapter 11, approval of the Motion is warranted. Id. at 394 (noting that "'it is

apparent that Congress intended business under reorganization to proceed in as normal a

fashion as possible.'") (quoting In re Prime, Inc., 15 B.R. 216, 219 (Bankr. W.D. Mo.

1981)).

      44. As a debtor in possession, the Debtor has a fiduciary duty to protect

and maximize the estate's assets.   See In re Mushroom Transp. Co., Inc., 382 F.3d 325,

339 (3d Cir. 2004).  As noted above, the Debtor requires post-petition financing under the

terms of the DIP Financing Agreements to continue its operations pending the proposed

going concern sale.

**D.     The Terms of the Proposed Financing Are Fair, Reasonable, and Appropriate.**

      45.     In considering whether the terms of post-petition financing are fair

and reasonable, courts consider the terms in light of the relative circumstances and

disparate bargaining power of the debtor and the potential lender.   In re Farmland Indus.,

Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Matter of Ellingsen MacLean

Oil Co., Inc., 65 B.R. 358, 365 n.7 (W.D. Mich. 1986), aff'd sub nom. In re Ellingsen

MacLean Oil Co., Inc., 834 F.2d 599 (6th Cir. 1987) (a debtor may have to enter into

hard bargains to acquire funds).

      46. Section 364(d) requires that adequate protection be provided to holders

of liens that are to be subordinated by a superpriority post-petition lien.  Here, however,

the Lender presently holds a first priority security interest, securing debt in an  amount

greater than $107 million, and there is a high degree of confidence that any lienholder

whose interests are junior to those of the prepetition Lender would be deemed to be unsecured based on any reasonable valuation of the collateral. The only prepetition lienholder whose lien is impacted by the imposition of a postpetition superpriority Lien is the Lender in its capacity as the prepetition secured lender. Therefore the subordination of the prepetition liens will have no impact on third party creditors. As such, no adequate protection to any creditor other than Lender is warranted as there is no value in any junior lien that would be entitled to such protection. Therefore, the granting of the Lien to the Lender may be awarded without the need to award adequate protection rights to any junior secured creditors.

47. The terms of the DIP Facility and the proposed DIP Orders were negotiated in good faith and at arms'-length between the Debtor and the Lender, resulting in an agreement designed to permit the Debtor to obtain the needed liquidity to maximize the value of its assets through completion of a going concern sale.

**E.      Entry Into the Proposed Financing Reflects the Debtor's Sound Business Judgment.**

48.      A debtor's decision to enter into a post-petition lending facility under Bankruptcy Code section 364 is governed by the business judgment standard. See, e.g., In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition credit facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dept. Stores, Inc., 115 B.R. at 38 ("cases consistently reflect that the court's discretion under Bankruptcy Code section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and

powers or its purpose is not so much to benefit the estate as to benefit a party-in-interest").

49.     Generally, courts give broad deference to business decisions of debtors-in-possession.  See, e.g., Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).   Moreover, a Bankruptcy Court generally will respect debtors-in-possessions' business judgment regarding the need for and the proposed use of funds.

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

In re Ames Dept. Stores, Inc., 115 B.R. at 40.  The power of debtors-in-possession to incur post-petition secured debt follows necessarily from the general power of the debtor-in-possession to operate their businesses in the exercise of their business judgment.  See 11 U.S.C. § 1108.

50.     In the present Case, the Debtor's decision to obtain the postpetition financing represents an exercise of sound business judgment in the continued operation of the Debtor's business to allow it to finance its day-to-day operations including, without limitation, continuing to pay its employees and maximize the potential recovery to creditors. [4]

---

[4] Although the Lender, which indirectly owns the equity interests in the Debtor, has appointed two representatives to the Debtor's board of directors, those two individuals did not participate in the board's

**F.      Bankruptcy Code Section 363 Authorizes the Debtor to Use Cash Collateral.**

51.      Bankruptcy Code section 363(c)(2) provides that a debtor in possession may not use cash collateral unless (i) each entity that has an interest in such cash collateral provides consent, or (ii) the Court approves the use of cash collateral after notice and a hearing.  See 11 U.S.C. § 363(c).

52. Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

53. Bankruptcy Code section 361 provides that:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by –

(1) requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the

---

consideration or vote regarding the Postpetition Financing Agreement.  Instead, the Debtor's decisions regarding postpetition financing were made solely by those directors who are not affiliated with the Lender.

realization by such entity of the indubitable equivalent of
such entity's interest in such property.

11 U.S.C. § 361.  "The determination of adequate protection is a fact-specific inquiry" to

be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y.

1996) ("Its application is left to the vagaries of each case . . . but its focus is protection of

the secured creditor from diminution in the value of its collateral during the

reorganization process.") (internal quotation marks omitted, citation omitted).

54. Approval of the DIP Credit Agreement and, as required therein, the

application of Cash Collateral to the obligations under the Prepetition Loan Documents,

will provide the Debtor with immediate and ongoing access to the funds necessary to pay

its current and ongoing operating expenses, including postpetition wages and salaries and

utility and vendor costs. Unless these expenditures are made, the Debtor will be forced to

immediately cease operations, which would (i) result in irreparable harm to its business,

and (ii) deny the Debtor the opportunity to maximize value through a going-concern sale.

55. In addition, the availability under the DIP Credit Agreement will

provide confidence to the Debtor's vendors, including those identified as critical vendors,

thereby aiding in the administration of the Case and promoting a successful

reorganization.

56. The interests of the Prepetition Senior Secured Lenders are adequately

protected for purposes of Bankruptcy Code section 363(e) because the Prepetition Senior

Secured Lenders are the DIP Lenders and have agreed to the terms of the DIP Credit

Agreement and DIP Orders, the Debtor intends to preserve value by maintaining

operations pending a sale of substantially all its assets, and pursuant to the DIP Orders,

the Prepetition Senior Secured Lenders will have, among other things, the benefit of replacement liens and superpriority administrative expense claims to the extent set forth therein to protect the Prepetition Senior Secured Lender from any diminution in value of its interest in the Debtor's assets.

57. The Debtor believes that such protections are adequate under the circumstances. Further, given the significant value that the Debtor stands to lose if the DIP Facility is not approved and immediately implemented, such protections are wholly appropriate and justified.

## INTERIM ORDER AND FINAL HEARING

58.   Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable to avoid immediate irreparable harm to a Debtor's estate, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion, but in no event greater than thirty (30) days following the Court's entry of an Interim Order.

59. The urgent need to preserve the Debtor's business, and avoid immediate and irreparable harm to the Debtor's estate, makes it imperative that the Debtor be authorized to obtain post-petition financing, pending the Final Hearing, in order to continue its operations and administer the Case.  Without the ability to obtain access to such funding, the Debtor would be unable to meet its post-petition obligations, including payroll obligations to employees, and otherwise would be unable to fund its working capital needs, thus causing irreparable harm to the value of the Debtor's estate and effectively foreclosing the possibility of the possibility of maintaining its operations through the time of a going concern sale.

60. Accordingly, the Debtor respectfully requests that, pending the hearing on the Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## IMMEDIATE RELIEF IS NECESSARY

61. Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Funds are urgently needed to meet all of the Debtor's liquidity needs and to administer these cases in an orderly and efficient manner. In the absence of immediate postpetition financing, the Debtor's ability to preserve the value of its business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtor's estate. For these reasons, the Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor.

## WAIVER OF ANY APPLICABLE STAY

62. The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the Court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtor seeks in the Motion is necessary for the Debtor to operate its business without interruption and to preserve the value for its estate. Accordingly, the Debtor respectfully requests that the Court waive the fourteen-day stay

imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

63. Notice of this Motion shall be given to: (i) the Office of the United States Trustee for the District of Massachusetts; (ii) holders of the thirty (30) largest unsecured claims against the Debtor; (iii) the Debtor's senior secured pre-petition lender; (iv) all other secured or potentially secured creditors; (iv) all taxing authorities whom the Debtor believes may have, or may, assert claims against the Debtor or any of the Debtor's assets; (v) counsel to each of the petitioning creditors that are party to Involuntary Petition; and (vi) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, notice of this Motion and any order entered respecting this Motion will be served as required Bankruptcy Rule 2002 and MLBR 4001-2. The Debtor submits that under the circumstances, no other or further notice need be given.

## NO PRIOR REQUEST

64. No previous motion for the relief sought herein has been made to this or any other court.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court enter the Interim Order substantially in the form annexed hereto: (a) authorizing the Debtor to obtain the postpetition financing from the Lender; (b) setting the Final Hearing; (c) following the Final Hearing, approving the postpetition financing on a final basis; (d) authorizing the

Debtor to execute any and all documents and take such other actions as necessary to effectuate the transactions contemplated by the postpetition financing; and (e) granting such other and further relief as this Court deems just and proper under the circumstances.

Respectfully Submitted,

NEW ENGLAND
CONFECTIONERY COMPANY,
INC.,

By its proposed counsel,


/s/   Scott Moskol
**Scott H. Moskol (BBO #628323)**
**William V. Sopp (BBO #544625)**
**Tal M. Unrad (BBO #673498)**
**BURNS & LEVINSON LLP**
125 Summer Street
Boston, MA 02110
Phone: (617) 345-3000
Fax: (617) 345-3299
smoskol@burnslev.com
wsopp@burnslev.com
tunrad@burnslev.com

DATED: April 17, 2018

## <u>Exhibit A</u>

**Proposed Interim Order**

## <u>Exhibit B</u>

**Revolving Credit Agreement**
**(together with the amendments thereto)**