**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 7** |
| **NEW ENGLAND CONFECTIONERY** | ) **(conversion pending)** |
| **COMPANY, INC.,** | ) |
| | ) **Case No. 18-11217-MSH** |
| **Debtor.** | ) |
| | ) |

<u>**DECLARATION OF MICHAEL MCGEE IN SUPPORT OF FIRST DAY MOTIONS**</u>

I, Michael McGee, declare as follows:

1.      I have served as the President of New England Confectionery Company, Inc., a Delaware corporation ("<u>NECCO</u>" or the "<u>Company</u>" or the "<u>Debtor</u>"), continuously since September 2014.  I am familiar with the day-to-day operations and business and financial affairs of the Debtor in this capacity.

2.      I am, therefore, familiar with all aspects of the Debtor's affairs, including business operations, strategic planning, financial reporting, legal affairs and other relevant issues, including, but not limited to, the Debtor's efforts to address its current financial difficulties, including through its efforts to bring about a sale of the Company's assets and its recent preparation for the transition into operation as chapter 11 debtor-in-possession.

3.      On April 3, 2018 (the "<u>Involuntary Date</u>"), the Debtor became subject to the filing of an involuntary petition for relief with the United State Bankruptcy Court for the District of Massachusetts (the "<u>Court</u>") under chapter 7 of the Bankruptcy Code, thus commencing this bankruptcy case (the "<u>Case</u>").

4.      On the date hereof (the proposed "<u>Conversion Date</u>"), the Debtor is herewith filing a Motion to Convert the Case into a proceeding under chapter 11 of the Bankruptcy Code. To enable the Debtor to operate effectively, minimize disruption to its operations, and maximize the value of its assets, the Debtor has filed various applications and motions seeking immediate or expedited relief.  Specifically, the following motions are being filed on behalf of the Debtor concurrently herewith:

      a.   Debtor's Motion for Conversion to Chapter 11 (the "<u>Conversion Motion</u>").

b. Debtor's Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Postpetition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Priority, (III) Authorizing Use of Cash Collateral and Providing for Adequate Protection (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing (the "DIP Motion");

c. Debtor's Motion For Order Approving Private Sale of Certain of Debtor's Assets Free and Clear Of All Liens, Claims, Encumbrances, and Interests And Granting Related Relief (the "Sale Motion").

d. Debtor's Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages, Salaries and Bonuses, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (VI) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments (the "Employee Compensation and Benefits Motion").

e. Debtor's Motion for Order Authorizing (A) Continued Maintenance of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, (C) Continued Use of Existing Cash Management Systems, and (D) Waiver of Certain Guidelines Relating To Bank Accounts (the "Cash Management Motion"); and

f. Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving The Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion");

    g.   Debtor's Motion for Emergency Determination of the foregoing First Day Motions

(collectively, the "<u>First Day Motions</u>").

5.     This Declaration is submitted in support of the First Day Motions, which are described in greater detail below, and may serve as support of additional motions that may be filed on or after the Conversion Date.

6.     If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge.  As the President of the Debtor responsible for its operations, I am familiar with the Debtor's day-to-day operations, business affairs, financial condition and books and records.  My testimony herein and the concurring testimony that I would provide if called up to testify before the Court is based on my service as an officer of the Debtor, my review of the Debtor's books and records, and other relevant documents, my discussions with the Company's officers, directors, and management team and my review of the information compiled and communicated to me by them, at my request, the advice and analysis that I have been provided with by the professional advisors engaged by the Company, and my first-hand knowledge of the intricacies and inner-workings of the Company's business..

7.     After a brief Preliminary Statement, Part I of the Declaration describes the business operations and background of the Debtor and of the Case.  Part II sets forth the facts relevant to each of the First Day Motions.

**<u>Preliminary Statement</u>**

8.     The Debtor, while formally incorporated in 1901, traces its history and roots to a local Massachusetts candy company that began operating in 1847, and is considered one of -- if not the -- oldest continuous company producing candy in the United States.  It is best known for its Necco Wafers, and production of the Clark Bar, Haviland Thin Mints, and Sweetheart Conversation Hearts.

9.     As of the date hereof, the Debtor employs approximately 232 full-time employees, mostly in its headquarters in Revere, Massachusetts, of which nearly 85% belong to a labor union.

10.     All of the Debtor's stock is presently owned by NECCO Holdings, Inc.  The stock of NECCO Holdings, Inc. is all owned directly or indirectly by ACAS, LLC (formerly known as American Capital, Ltd., successor by merger with American Capital Financial Services, Inc.) (the "Lender").

**Capital Structure and Debt Obligations**

11.     As of the Involuntary Date, the Debtor had incurred a substantial amount of debt, with total liabilities exceeding $152 million, of which just over $107 million constitutes the Secured Debt (as defined below).

12.     On December 21, 2007, the Lender,  and  its affiliate, as agent for the Lender, and the Debtor entered into the following credit agreements:

   a.  Credit Agreement, entered into on December 21, 2007, between the Debtor, as borrower, and American Capital Financial Services, Inc., as Lender's agent, as subsequently revised and amended, concerning certain loans made by Lender to the Debtor (the "Term Loans").

   b.  Pledge and Security Agreement entered into on December 21, 2007, whereby the Debtor, as borrower, granted to Lender, in its capacity as agent, for the benefit of Lender, a lien on and security interest in all of its assets, including all accounts receivable, deposit accounts, inventory and proceeds thereof (the "Term Loan Collateral").  The Lender subsequently perfected its security interest in the Term Loan Collateral by filing a UCC-1 Financing Statement against the Debtor.

   c.  Deposit Account Control Agreement entered into on October 10, 2014, between Lender, NECCO and Eastern Bank, pursuant to which Lender perfected its interest in NECCO's deposit account at Eastern Bank.

13.     On August 8, 2008, the Debtor, as borrower, and Core Business Credit, LLC ("Core") as lender, entered into that certain Loan and Security Agreement, as subsequently revised and amended (the "Revolving Credit Agreement") for revolving loans made by Core to the Debtor (the "Revolving Line of Credit").  As security for the Revolving Line of Credit, the Debtor granted Core a lien on all of its personal property, as subsequently perfected by the filing of a UCC-1 Financing Statement against the Debtor.  On August 8, 2008, Core assigned its rights

under the Revolving Credit Agreement to Core Business Funding, LLC, which on November 1, 2010, further assigned its rights under the Revolving Credit Agreement to the Lender.

14.     On October 10, 2014, the Lender, the Debtor, and Eastern Bank executed a Deposit Account Control Agreement, pursuant to which Lender perfected its interest in the Debtor's deposit account at Eastern Bank.  Lender maintains a perfected first-priority security interest in the Debtor's deposit accounts, both by reason of the Deposit Account Control Agreement and by reason of the status of funds in such accounts as proceeds of accounts receivable and inventory in which Lender has a first-priority security interest.

15.     As of the Involuntary Date, the Debtor owed the Lender in excess of $85.7 million on account of the Term Loans and $21.3 million on account of the Revolving Line of Credit (the "Secured Debt").  Other than printers leased from Canon and forklifts leased from HYG Financial Services, the Lender is the only other perfected, secured creditor of record as of the Involuntary Date.

### Events Leading to the Debtor's Involuntary Petition and Voluntary Conversion

16.     In the period leading up to the Involuntary Date, the Debtor was in an over-advance position with the Lender and was in payment default.  Additionally, the Debtor was unable to keep current with its trade vendors.  Several trade vendors  brought suit against the Debtor, including seeking attachments of the Debtor's bank accounts and accounts receivable, which, when granted, further constrained the Debtor's liquidity and ability to operate. These attachments were dissolved at just about the same time as the filing of the involuntary petition.

17.     As a result of various events of default, including but not limited to payment defaults, the Lender, prior to the Involuntary Date, provided the Debtor with a notice of default and accelerated all amounts due and owing under the Term Loans and the Revolving Credit Agreement, and notified the Debtor that it no longer had any obligation to advance funds under the Revolving Line of Credit.

### Sale Process Prior to the Involuntary Date

18.     Beginning in September 2017, the Debtor commenced a sales process, retaining Threadstone Advisors LP ("Threadstone") as its investment banker, who, on the Debtor's behalf solicited multiple proposals for the acquisition of substantially all of its assets.  Threadstone

identified 45 potential strategic and financial purchasers of the assets and provided them with substantial information regarding the Debtor's assets, operations, and projections for future growth.  As a result of that process, nine (9) potential acquirers submitted proposals to acquire the assets of the Debtor.  From among them, the Debtor and Threadstone identified CI-N Acquisition LLC, a subsidiary of Gordon Brothers (the "Buyer"), as having presented the highest and best offer to purchase the Debtor's assets as a going-concern.

19.    The Debtor and Threadstone pushed forward to effectuate the sale; however, in light of the attachments obtained by trade creditors, which constrained the Debtor's cash flow, and the Debtor's on-going financial defaults, the Debtor was not able to complete the sale prior to the Involuntary Date.

20.    In light of the Debtor's default under its prepetition loan obligations and all the financial issues facing the Debtor, the Lender filed a complaint against the Debtor in Massachusetts Superior Court and sought the imposition of a receivership over the Debtor's assets, to which the Debtor consented.  It was contemplated that the receiver would seek to consummate the sale of the Debtor's assets that had been contemplated by the Company and assented to by the Lender.  However, before that could occur, the involuntary petition was filed against the Debtor by its trade creditors.

21.    In light of the involuntary petition, which halted the Debtor's efforts to sell the business to the proposed purchaser, the Debtor has decided to convert this case to a Chapter 11 proceeding in order to maintain the existing operations of the business, in a manner that will enable it to consummate the sale pursuant to Section 363 of the Bankruptcy Code.

**<u>Need for Debtor in Possession Financing And Permission To Use Cash Collateral</u>**

22.    The filing of the involuntary petition has exacerbated the Debtor's financing needs, increased the costs associated with existing operations, and  delayed its proposed sale of the assets as the means of maintaining a going-concern enterprise that will continue to employ its employees and produce its products.   The Debtor has an immediate need for such financing in addition to permission to use cash collateral in order to be able to pay critical expenses of operation and complete a going concern sale of its assets.

23.    In the First Day Motions, the Debtor simultaneously seeks the authority of the Court to maintain its current operations for a period of time sufficient to revive the proposed sale

of the Company consistent with an expedited timetable for a properly executed Section 363 sale process, which in the exercise of the Debtor's reasonable business judgment, represents the best and most efficient means to maximize the value of the Debtor's brand and its business.

24.    Contemporaneously with the filing of this Declaration, the Debtor has filed the Sale Motion, seeking approval for the sale of its assets on an expedited private-sale basis.  In order to maximize the realization of net value by the Debtor's estate, the sale would provide for the buyer to take over the cost and decision-making authority associated with production of further inventory, as of a specified transition date.  Thus, it is essential for the sale to be consummated promptly, to minimize costs to the Debtor's estate by shifting those continuing operating costs to the proposed buyer, and thereby maximizing the net value of any existing assets and the proceeds of the sale.   Until the sale is approved and the buyer assumes production and related costs, the Debtor will have substantial continuing expenses for payroll, materials and other operating expenses.  The proposed postpetition financing is essential to enable the Debtor to fund these expenses, as well as other administrative expenses.

25.    To meet its objectives, the Debtor has entered, subject to this Court's approval, into the DIP Facility (as defined in the DIP Motion), pursuant to which the Debtor will receive a senior secured debtor-in-possession line of credit that should provide them with sufficient liquidity to navigate through the proposed sale process.

## I. BACKGROUND

### A.    Overview of the Debtor.

26.    NECCO was founded in 1901 and has continued manufacturing operations of one of the country's oldest and most iconic brands of candies.  The Company has developed and trademarked the following products, which have since become household names: NECCO wafers, Sweethearts conversation hearts, Mary Jane, Clark bar, Skybar, Mighty Malt, Haviland Thin Mints.

27.    The Company currently manufactures and distributes from 135 American Legion Highway Revere, MA, and sells its products on an international level.

28.    The Company's does business across all trade classes, and its principal customers include "mass" chains such as Walmart and Target, drug store chains including Walgreens and

CVS, value channels including Dollar General, Family Dollar, and Dollar Tree, as well as grocery, convenience, and large distributors.

29.     Along with its seasonal and everyday branded business, NECCO also produces various private label products for companies.

**B.     The Debtor's Business Operations.**

**1.  Employees and Sales.**

30.     As of the Involuntary Date, the Debtor employed approximately 232 full time individuals and 4 individuals on a part time basis in the United States, primarily in the state of Massachusetts, with external sales representatives in Connecticut, Washington DC, and Texas. The principal manufacturing facility and executive office is located in Revere, Massachusetts. This facility is leased from Atlantic-Revere Realty LLC (the "Landlord").

**2.  Financial Performance**

31.     For the year ended 2017, the Company realized $50.6 million in gross sales revenues and approximately  cash flow, inclusive of gains recognized from asset sales above book value.  This compares against metrics from 2016 when the Company realized $58.3 million in gross sales revenues and negative $1.3 million in cash flow before financing activities.

32.     The Company has an international portfolio of trademarks and domain names – some dating back to 1847.  The Company's marks include NECCO wafers, Sweethearts, Clark, Skybar, Haviland, Mighty Malts, Canada mints, Mary Jane.

**3.  Vendors.**

33.     The Debtor has developed a portfolio of dozens of product lines and over 400 individual items products brands that are recognized and sold primarily in the US with select international distribution.  The principal suppliers sell source materials for the Debtor's candy products: sugar and sweeteners, cocoa, fillings, flavors, functional ingredients, and packaging. Other principal vendor categories include: shipping, brokerage commissions, 3rd party maintenance and parts suppliers.  Relations with the Company's vendors have been generally

good with many longstanding vendor relationships, however, they have become strained under the Company's financial difficulties.

34.     The Company purchases raw materials and packaging, historically on 10 - 90 days' credit, and runs a production cycle of 30-45 days on average but as long as 120-180 days for seasonal production. The typical sales and collection cycle lasts 30-90 days on average but can be as long as 120-150 days seasonally.

## C.     Organizational Structure.

35.     The Debtor is a Delaware corporation that is a wholly-owned subsidiary of NECCO Holdings, Inc. is a Delaware corporation, which is principally owned by ACAS, LLC (formerly known as American Capital, Ltd., successor by merger with American Capital Financial Services, Inc.) a private equity firm who acquired the Company in 2007.

## D.     Capital Structure.

### 1.     Secured Debt.

36.     As of the Involuntary Date, the Debtor owed the Lender in excess of $85.7 million on account of the Term Loans and $21.3 million on account of the Revolving Line of Credit, secured by virtually all assets of the Company.  Other than printers leased from Canon (printers) and forklifts leased from HYG Financial Services, the Lender is the only other secured creditor of record as of the Involuntary Date.

### 2.     Unsecured Debt.

37.     The Debtor has accumulated a significant amount of accrued and unpaid trade and other unsecured debt in the ordinary course of its business, which as of the Involuntary Date amounted to approximately $10 million.  The Debtor is subject to various collection suits from its vendors seeking payment of past due amounts.

## E.     The Debtor's Goals In This Case.

38.     The Debtor intends to sell all or substantially all of its assets through an expedited private sale process.  Given the Debtor's increasingly eroding liquidity and mounting trade debt,

the Debtor believes that this is the best means to maintain the NECCO brand and business model, while maximizing the value of its assets for the benefit of the estate and creditors.

39.     Given that the Debtor's cash collateral will not be sufficient to maintain operations through the contemplated sales process, the Debtor intends to enter into the DIP Facility, subject to Court approval.  Pursuant to the DIP Facility, the DIP Lender will provide a credit line to the Debtor to be drawn down in accordance with the DIP Facility and a post-petition budget (the "Budget") agreed to by the DIP Lender and the Debtor, subject to the terms of the DIP Facility.

40.     The Debtor also intends to enter into an Asset Purchase Agreement ("APA") with an unrelated third party buyer for the purchase of substantially all of the Debtor's assets, subject to the terms and conditions of the APA and proposed sale pleadings. The proposed buyer was found under the guidance of the Company's pre-petition Investment Banker, and is the party with whom the Company has negotiated extensively and who has proposed a purchase price that the Company regards as the highest and best offer that it received for any interested party during the extensive prepetition sales process.

41.     I believe that the financing plan offered by the DIP Lender and the anticipated private sale provide the Debtor with the best means to preserve and maximize the value of its assets for the benefit of its estate in light of the extreme financial difficulties and hardships affecting the Debtor's business operations.  Without the proposed DIP Facility the Debtor will have insufficient liquidity to operate, and without the consummation of the prospective sale to the selected third party occurring in the near term, the Debtor will face substantial difficulties in developing a viable exit strategy.  Further, even with the proposed DIP Facility, the Debtor will not have sufficient liquidity to have a drawn out sale process, nor would a drawn out sale process be in the interest of the bankruptcy estate because it will in all likelihood sharply decrease the net value realized for stakeholders.  I further believe that the Debtor is unable, in the present circumstances, to meet its liquidity needs by obtaining financing on an unsecured, administrative expense basis.  Without the DIP Facility the Debtor would be unable to maintain its business, as its customers, vendors, and suppliers would likely stop doing business with the Debtor in the near term.

42.     Based on my experience and the negotiations that were undertaken with the Lender, I believe that the DIP Facility and the proposed private sale are on the best terms and

conditions available to the Debtor under the present circumstances.  In addition, I believe that the DIP Facility and proposed private sale provide the Debtor with better value than it could reasonably expect to obtain if the Debtor commenced this case without debtor-in-possession financing or a proposed private sale opportunity to sell all of the Debtor's assets or if this case remained a case under Chapter 7 of the Bankruptcy Code..  If the Debtor had commenced a free-fall bankruptcy, I believe there would be a substantial likelihood that the Debtor would ultimately be forced to liquidate its assets, thereby yielding a significantly reduced amount of value to the estate and its ever increasing list of creditors.

43.    After converting to chapter 11, the Debtor intends to operate its business in the ordinary course.  In the various First Day Motions being filed contemporaneously with this Declaration, the Debtor seeks relief on an expedited basis that will help preserve the value of its assets and permit it to conduct the Case efficiently and economically.

## II.  FACTS IN SUPPORT OF FIRST DAY MOTIONS[1]

44.    In order to enable the Debtor to minimize the adverse effects of the commencement of this Case, the Debtor has requested various types of relief in the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought in each First Day Motion, as well as the factual basis for each First Day Motion, is set forth below.

45.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption to its current business operations; and (b) is essential to maximizing the value of the Debtor's assets for the benefit of its estates and creditors.

## A.    DIP Motion

46.    On an interim basis, the Debtor is requesting access to weekly advances throughout the duration of Budget, as specified therein, in an aggregate amount up to

---

[1]    Capitalized terms used in this Section II and not otherwise defined herein shall have the meaning ascribed to them in the respective motion to which they relate.

approximately a total $5,000,000 commitment under the DIP Facility.  The DIP Facility will be used by the Debtor to fund fees under the Debtor's on-going operations from the date hereof through the date of the proposed sale, after which the proposed buyer will assume the costs associated with the day-to-day operations of the Debtor's business.  Specifically, the Debtor intends that the funds advanced under the DIP Facility will pay employees, vendors and suppliers, utility providers, and provide working capital in connection with the Debtor's other operations, all subject to the terms of the DIP Facility and the proposed budget appended thereto.

47.    The Debtor's liquidity issues amongst other business issues provide a clear basis to support the post-petition borrowings sought by the Debtor.  As is explained in greater detail in the DIP Motion, the DIP Facility will be used to provide necessary liquidity for working capital and other general corporate purposes of the Debtor.  The funds to be advanced by the DIP Lender under the DIP Facility are necessary for the Debtor to operate its business in the normal course, including funding its payroll operations and other business obligations.  Without the immediate access to the cash to be provided by the DIP Facility, the Debtor would be unable to fund its operations, which would be disastrous to the Debtor's efforts to maintain a viable business until a Sale is consummated.  I believe that access to the funds to be provided by the DIP Lenders are absolutely crucial to the Debtor's ability to maintain its businesses and not terminate operations immediately and thereby avoid immediate and irreparable harm to the Debtor's estates, employees, customers and creditors.

48.    With the assistance of the Debtor's management team and its financial advisors, I have created a proposed weekly cash flow budget that demonstrates projected cash flow and funding deficiencies, which Budget is attached to the DIP Motion as Exhibit A.  The Debtor will be required to comply with the Budget.  With respect to postpetition spending and payments, the projections found in the Budget represent the Debtor's best estimate of its near term future performance and liquidity needs, recognizing that the any financial projection is just an estimate of future performance and actual performance may differ.  The projections in the Budget are expressly premised on approval of the DIP Facility on an interim and final basis.  In my opinion, without the credit availability to be provided under the DIP Facility, the Debtor would be unable to fund operations, as the financing provides a measure of comfort to the Debtor's vendors, customers and employees such that the Debtor should be able to honor its obligations during the pendency of the Case.

49.     The Debtor has sought and has been unable to obtain financing from other sources on terms preferable to the proposed in the DIP Facility, including, without limitation, on an unsecured or administrative expense basis.  The Debtor's ability to obtain postpetition funding through the proposed DIP Facility is largely premised upon the Debtor's existing relationship with the proposed Lender and its knowledge of the Company, its assets, and operations.  I believe that it would be very difficult, if not impossible, to obtain financing on more preferable terms from a different lender on the timeline necessary to ensure uninterrupted operations and to enable the Debtor to simultaneously advance the proposed sale.

50.     The terms of the DIP Facility have been reviewed and negotiated in the context of the Company's current operations and its proposed future operations during the interim period during which the Debtor's Sale Motion may be considered by the Court and interested parties.  If allowed, the sale of the Debtor's assets and the transfer of the majority of the costs associated with the Debtor's regular operations would significantly reduce the costs being incurred by the Debtor on a routine basis and therefore its reliance upon the DIP Facility.

51.     The Debtor's Board of Directors determined in the exercise of its sound business judgment that the Debtor requires financing under the terms of the DIP Facility and the agreements related thereto.  Although the Lender, which indirectly owns the equity interests in the Debtor, has appointed two representatives to the Debtor's five-person board of directors, those two individuals did not participate in the board's consideration or vote regarding the Postpetition Financing Agreement.  Instead, the Debtor's decisions regarding postpetition financing were made solely by those directors who are not affiliated with the Lender.

52.     The terms of the DIP Facility rely heavily upon the previously negotiated lending relationship that has existed between the Debtor and the Lender (and its predecessor) for nearly ten years.  The Debtor and the Lender have made limited modification to the existing terms of their lending relationship to accommodate the instant circumstances and the Debtor's immediate need for financing pursuant to Section 362(a) of the Bankruptcy Code.  There have been no changes in the pricing of the financing.

53.     These modifications to the terms of the Debtor and the Lender's existing financing terms have been negotiated in good faith and at arm's length between the Debtor and the Lender, and with the understanding that the operations of the Company must be permitted to continue in order allow for a successful sale of the Debtor's assets.  The Debtor believes that

such a sale and the continuing financing of the Company's operational needs in the context of the bankruptcy will maximize the value of its assets and provide the best value for the Debtor's estate and its constituents.  The proposed terms of the DIP Facility are fair, reasonable and appropriate under the circumstances.

54.    The Debtor's five-member Board of Directors determined in the exercise of its sound business judgment that the Debtor requires financing under the terms of the DIP Facility and the agreements related thereto.

55.    I believe that the relief requested in the DIP Motion is both necessary and in the best interests of the Debtor's estates and its creditors.

**B.    Sale Motion**

57.    The Debtor is seeking this Court's approval of the Sale Motion, pursuant to which, the Debtor intends to sell substantially all of its assets (the "Purchased Assets") to the Buyer (the "Sale").  The APA between the Debtor and the Buyer contemplates that the Buyer and the Debtor would enter into a transitional services agreement (the "TSA"), pursuant to which the Debtor would provide certain services and employees to the Buyer for the production of new inventory after the closing of the Sale.  The APA also contemplates that the Buyer and the Landlord will enter into a license agreement (the "License Agreement") pursuant to which the Buyer would receive a license to be able to access the Debtor's facility through the remaining term of the lease.

58.    The APA provides that, as consideration for the sale of the Purchased Assets, the Buyer would pay to the Debtor the sum of $13,296,900.18 (the "Purchase Price").  The Purchase Price is subject to downward adjustments depending upon the amount and value of the Purchased Assets being sold to the Buyer.  Thus if there is less inventory, by way of example, than was projected as part of the calculation of the Purchase Price, the Purchase Price could be adjusted downward.  Additionally, from the Purchase Price, the Debtor will pay directly to the Landlord the sum of $1,781,401.08 for unpaid and future rental obligations.

59.    Utilizing its expertise in transaction so this type, the Buyer intends to collect, market and sell the purchased assets so as to yield total proceeds in excess of the purchase price. Upon the Buyer reaching an amount of proceeds in excess of --$15.25 million – the APA provides for a profit sharing process substantially in the Sellers favor.  Thus the APA, with

respect to total consideration to be paid for the Purchased Assets, provides for further upside to the Debtor in excess of the Purchase Price.

60.     The TSA also provides a mechanism for the Debtor to receive consideration additional to the Purchase Price.  The TSA anticipates that the Company will provide employees and other services to the Buyer in order to complete the production of post-closing new inventory to be sold by the Buyer.  The Debtor will receive a share of the revenue defined as 'net proceeds' resulting from the sale of such new inventory.  Further, the TSA provides that the Buyer will fund or reimburse certain costs and expenses associated with maintain the Debtor's business operations through this period.

61.     The Sale Motion seeks to sell the Purchased Assets to the Buyer via a private sale, in light of the lengthy sale process conducted pre-petition.

62.     The Sale Motion also requests the Court to shorten the notice required to be given to interested parties of the Sale.  I believe that such a result is warranted because the APA requires a closing to occur on or before May 1, 2018, or the Buyer may terminate the Agreement and  I believe that, based upon the sale and marketing process, there will be no other purchasers of the Purchase Assets that would pay an amount in excess of or even equal to that being paid by the Buyer and thus the best means to maximize the value of the Debtor's assets for the benefit of its creditors and other constituents will come from the proposed Sale to the Buyer.  Additionally, delay past May 1st could have a detrimental impact upon the total consideration being paid in light of A) the potential of post-closing Purchase Price downward adjustments and B) the limiting of time that the Debtor and the Buyer may produce new inventory from which the Debtor is afforded a share of such revenues (as the lease expires would have expired on August 31st had not the Landlord and the Buyer reached a two month extension of the lease's termination date).

62.     After having gone through such a vigorous sales and marketing process, I believe that the Sale to the Buyer represents the highest and best price that could be received for the Purchased Assets and additional time to market a Sale will not result in a higher sales price, but only in further delay and contribute to the erosion of the value of the Purchased Assets, as well

as potentially causing the Buyer to walk away from the Sale.  Accordingly, I believe that the
proposed Sale to the Buyer represents the best return to the Debtor, its estate and its creditors.

### C.      Employee Compensation and Benefit Motion.

56.      The Debtor's workforce is comprised of full-time salaried employees (the
"Salaried Employees"), full-time hourly employees (collectively with the Salaried Employees,
the "Full Time Employees"), and regular part-time hourly employees ("Part Time Employees").
As of the Involuntary Date, the Debtor employs approximately 232 Full Time Employees, and
4 Part Time Employees. The Debtor also has an additional 154 employees on lay off that are
brought in to work when necessary.  The majority of the Debtor's Employees are located at the
Debtor's corporate headquarters in Revere, Massachusetts.  In addition, the Debtor has
employees that work remotely.

57.      There are 188 employees represented by three different unions (the "Union
Employees") and 48 employees who are not represented by a union (the "Non-union
Employees"). Of the Union employees, 160 employees (the "BCT Employees") are members of
the Local No. 348 of the Bakery, Confectionery, Tobacco Workers and Grain Millers
International Union, AFL-CIO (the "BCT Union"), 23 employees (the "IAM Employees") are
members of the Lodge No. 264 of District 15, International Association of Machinists (the "IAM
Union"), and 5 employees (the "IUOE Employees") are members of the Local 877 of the
International Union of Operating Engineers (the "IUOE Union").

58.      All hourly Employees are paid weekly in arrears for the prior week period
(Monday through a week from the following Sunday).  Salaried Employees are paid on the
15th and 30th/31st of every calendar month, or the last business day prior to the 15th and
30th/31st of the month when such dates fall on a non-business day.

59.      The Debtor's payroll process for hourly Employees is as follows: every
Wednesday the Debtor deposits the aggregate amount of payments owed to all hourly
employees into the Debtor's third party payroll administrators, Harpers Payroll Services, Inc.
("Harpers") bank account for processing.  On Thursday, Harpers uses those funds from the
Debtor to pay the hourly employees' wages for the prior week and any amounts that are
deducted from those wages and paid to third parties by Harpers.  Finally, on late Thursday or

Friday, Harpers makes direct deposits to hourly employees' bank accounts or delivers live checks to the Debtor for distribution to employees.

60.     Unlike hourly payroll, payrolls for salaried Employees are run 24 times a year on semi-monthly basis – the 15th and 30th/31st of every month, or the last business day prior to the 15th and 30th/31st of the month when such dates fall on a non-business day ("Salary Payroll Dates").  Two days before each Salary Payroll Date, the Debtor deposits the aggregate amount of payments owed to all salaried employees to Harper's bank account for processing. The following day, Harpers uses those funds from the Debtor to pay the salary employees' wages owed and any amounts that are deducted from those wages and paid to third parties by Harpers.  Finally, that day or the day after, Harpers makes direct deposits to salaried employees' bank accounts or delivers live checks to the Debtor for distribution.

61.     In 2018, the average weekly amount paid to all Employees has been approximately $286,085, which amount includes wages for all salaried and hourly Employees. The Debtor's most recent Salaried Employee Payday was April 13, 2018, and its most recent Hourly Employee Payday was April 13, 2018, 2018.  The total, aggregate amount of the most recent payroll cycle for hourly employees, paid weekly, was $146,088.72 and salaried employees, paid semi-monthly was $153,305.  The Debtor's next scheduled Salaried Employee Payday is April 30, 2018 and the next scheduled Hourly Employee Payday is also Friday, April 20, 2018.

62.     The Debtor believes that, as of Monday, April 16, 2018, there were no wages earned but remain unpaid with respect to Salaried Employees on account of existing accrued wages and salaries. In addition, the Debtor believes that, as of Monday, April 16, 2018, approximately $175,305 was earned but remains unpaid with respect to Hourly Employees and $10,220 was earned but remains unpaid with respect to Salary Employees on account of existing accrued wages and salaries. Pursuant to this Motion, the Debtor seeks to pay the outstanding amounts owed to Employees as of Friday, April 13, 2018 for accrued and unfunded wages and salaries, in an amount not to exceed $185,525, subject to the DIP Financing Documents. The amount owed to any other individual Employee on account of Employee Claims does not exceed $12,850, and thus under the cap imposed by Bankruptcy Code § 507(a)(4), and is not in respect of any time period more than seven days before Friday, April 13, 2018.

63.     In order to ensure optimal performance by the Employees, the Debtor offers bonus and incentive programs (collectively, the "Employee Bonus Programs") to certain Employees.  Bonuses are based on individual Employee performance and reaching certain metrics.  In addition, Employees are awarded bonuses if, because of their efforts, particular brands of merchandise sold through the Debtor's website hit certain sales metrics.  The Debtor does not maintain a formal Employee Bonus Program and bonuses paid out to Employees are determined on a case by case basis.  As of the Involuntary Date, the Debtor does not owe any money in prepetition bonuses to Employees.

64.     *Paid Time Off.*  The Debtor's Employees accrue vacation time ("Vacation") and sick leave ("Sick Leave") as follows:  Full Time Employees are eligible for paid Vacation and Sick Leave. They are eligible to accrue Vacation as follows:

Non-Union Salary Employees

| Length of Employment | Annual Vacation |
|---|---|
| 0 to 1 year | Pro-rated 10 days |
| 1 to 3 years | 10 days |
| 3 to 10 years | 15 days |
| 10+ years | 20 days |

BCT Employees

| Length of Employment | Annual Vacation |
|---|---|
| 1 to 2 years | 1 week |
| 2 to 8 years | 2 weeks |
| 8 to 20 years | 3 weeks |
| 20 to 25 years | 4 weeks |
| 25+ years | 5 weeks |

**IAM Employees**

| Length of Employment | Annual Vacation |
|---|---|
| **1 to 2 years** | 1 week |
| **2 to 8 years** | 2 weeks |
| **8 to 20 years** | 3 weeks |
| **20 to 21 years** | 4 weeks |
| **21 to 22 years** | 4 weeks & 1 day |
| **22 to 23 years** | 4 weeks & 2 days |
| **23 to 24 years** | 4 weeks & 3 days |
| **24 to 25 years** | 4 weeks & 4 days |
| **25+ years** | 5 weeks |

**IUOE Employees**

| Length of Employment | Annual Vacation Day Accrual |
|---|---|
| **6+ months** | 5/6 of a day per calendar month. |

Paid time off ("PTO") is paid at the Employee's base pay rate at the time of Vacation and does not include overtime or any special forms of compensation such as incentives or commissions. Any employee terminating employment will be entitled only to Vacation that has been accrued but not taken. PTO is capped at the total accrual max based on the length of employment. PTO also includes any Sick Leave, which includes: an Employee's personal illness, well-care, medical and dental appointments, and other personal appointments.  Sick Leave may also be used for illness and well-care for an Employee's immediate family.  IAM Employees, BCT Employees and Non-union Employees accrue 1 hour of Sick Leave for every 30 hours worked, however, unused time is not payable on termination of employment.

65.     As of Monday, April 16, 2018, the Employees have approximately $377,000 in the aggregate of accrued and unused Vacation. The Debtor seeks the authorization, but not the obligation, to continue its Vacation policy and to honor, in the ordinary course of business, all unused Vacation accrued prior to Monday, April 16, 2018, but not to make cash payments on account of accrued but unused Vacation, except at separation of employment and where required by state law, and subject to the terms and conditions of the DIP Financing Documents.

66.     The Debtor offers its Full Time Employees various standard employee benefits (the "Benefit Programs") including, without limitation, (a) medical coverage, (b) dental insurance, (c) vision insurance, and (d) life and disability insurance. The amounts set forth below reflect the approximate accrued cost of such Benefit Programs, which the Debtor seeks to continue in the ordinary course of its business, subject to the terms and conditions of the DIP Financing Documents.

67.     *Medical Insurance Program.* Full Time Employees are eligible to participate in the Debtor's medical insurance program administered through Blue Cross Blue Shield (the "Health Plan").  Under applicable state laws, the Debtor is required to provide the Employees with a Health Plan. The Health Program includes benefits typical of such plans provided by similar companies.  The Health Plan is approximately 67% paid by the Debtor and 33% paid by the Debtor's Full Time Employees through paycheck withholding, although these percentages vary based on the type of employee and union that the Employee is a member of. The average monthly cost to the Debtor, after taking into account Employee contributions, of maintaining the Health Plan has been approximately $84,968 per month. The Debtor believes that as of Monday, April 16, 2018 no amount is owed for existing costs incurred under the Health Plan.  The Debtor seeks the authorization, but not the obligation, to continue to pay postpetition costs of the Health Plan, during the pendency of this Case, in accordance with and subject to the terms and conditions of the DIP Financing Documents.

(a)     IAM Employees have the option of participating in their union medical insurance program (the "IAM Plan") or in the Health Plan.  If the IAM Employee chooses to participate in the IAM Plan, then the Debtor and the IAM Employee split the premium payment in a proportion based on the type of plan.

(b)     IUOE Employees are mandated by their union agreement to participate in

their union medical insurance plan (the "IUOE Plan"). The Debtor pays the full premium of the IUOE Plan and then is partially reimbursed by the IUOE Employee thru payroll deductions for 20% of the premium.

68.     *Dental Insurance Program.* Non-union Employees and IAM Employees are eligible to participate in the Debtor's dental program administered through Delta Dental (the "Dental Plan"). The Dental Plan includes benefits typical of such plans provided by similar companies. The Dental Plan is paid entirely by the Debtor and then the Debtor is reimbursed by the Employees through paycheck withholding, either partially or in full depending on the type of Employee. BCT Employees are eligible to participate in their union's dental plan (the "BCT Dental Plan"). For the BCT Dental Plan, the Debtor pays an amount to the union based on the amount of hours the BCT Employee worked. The average monthly amount remitted to Delta Dental from Employee wages withheld is approximately $4,072 per month. The average monthly amount paid to the BCT Union to cover the BCT Dental Plan and BCT Vision Plan is $9,000. However, the Debtor estimates that as of Monday, April 16, 2018, no amount is owed to Delta Dental or to the BCT Union.  The Debtor seeks the authorization, but not the obligation, to continue to pay postpetition costs of the Dental Plan during the pendency of this Case, subject to the terms and conditions of the DIP Financing Documents.

a.   IOUE Employees receive dental benefits through the IOUE Plan and premiums are paid in the same manner as the medical benefits explained above.

69.     *Vision Insurance Program.* Non-union Employees and IAM Employees are eligible to participate in the Debtor's vision program administered through VSP (the "Vision Plan"). The Vision Plan includes benefits typical of such plans provided by similar companies. The Vision Plan is paid entirely by the Debtor's Full Time Employees through paycheck withholding; however, it is the Debtor's responsibility to transmit those amounts directly to VSP. BCT Employees are eligible to participate in their union's vision plan (the "BCT Vision Plan"). For the BCT Vision Plan, the Debtor pays an amount to the union based on the amount of hours the BCT Employee worked. As mentioned above, the average monthly amount paid to the BCT Union to cover the BCT Dental Plan and BCT Vision Plan is $9,000. The average monthly amount remitted to VSP from Employee wages withheld is approximately $375 per month. However, the Debtor estimates that as of Monday, April 16, 2018, no amount is owed in respect of remittances due to VSP under the Vision Plan nor to BCT Union under the BCT Vision Plan.

The Debtor seeks the authorization, but not the obligation, to continue to pay postpetition costs of the Vision Plan and the BCT Vision Plan during the pendency of this Case, subject to the terms and conditions of the DIP Financing Documents.

70.      *Life, Disability and Related Insurance Coverage.*  Full Time Employees are eligible to participate in the Debtor's Life, Short Term Disability and Long Term Disability program administered through Aetna (the "Related Insurance Programs").  The Related Insurance Programs include benefits typical of such plans provided by similar companies. The Related Insurance Plans are paid either by the Debtor or the Employee, depending on the type of Employee and the type of the Related Insurance Program. The employee paid portion of the premium is withheld from the Employee's wages. In the aggregate, the average monthly cost of maintaining the Related Insurance Plans has been approximately $6,000. However, the Debtor estimates that as of Monday, April 16, 2018, no amount is owed in respect of the Related Insurance Plans. The Debtor seeks the authorization, but not the obligation, to continue to pay costs of the Related Insurance Plans during the pendency of this Case, subject to the DIP Financing Documents.

71.      Under the laws of various states, the Debtor is required to maintain workers' compensation insurance to provide its Employees with coverage for injury claims arising from or related to their employment with the Debtor. The Debtor maintains a workers' compensation benefits program through MEMIC Indemnity Company (the "WC Program"). The WC Program provides benefits to all of the Debtor's Employees for claims arising from or related to the Employee's employment with the Debtor.

72.      Debtor maintains a 401(k) plan (the "Retirement Plan"), administered by Transamerica, through which qualified and participating Employees may defer a portion of their salary to help meet their financial goals and accumulate savings for their future. BCT Employees and IUOE Employees are entitled to matching contributions from the Debtor. The Debtor is obligated to match 100% of the BCT Employee deferral up to a maximum of 4.5%. The Debtor is obligated to match 50% of the IUOE Employee deferral up to a maximum of 6% (for a maximum of 3%). The Debtor pays on average $13,161 in matching contributions with respect to the Retirement Plan per month. As of April 16, 2018, there is approximately $3,200 owing in matching contributions with respect to the Retirement Plan. The Debtor is not obligated to match contributions from any other Employees besides BCT Employees and IUOE Employees.

73.     The Debtor also is obligated to contribute to a pension plan for the benefit of IAM Employees (the "IAM Pension Plan").  The Debtor pays on average $16,000 per month in contributions to the IAM Pension Plan. As of April 16, 2018, there is approximately $4,000 owing in contributions with respect to the IAM Pension Plan.

74.     The Debtor also has a pension plan that it has stopped contributing to and has been frozen since 2010 (the "Frozen Pension Plan"), however, it is obligated to pay for administration of the Frozen Pension Plan.

75.     The Debtor pays approximately $25,066 for annual audit, administration, and related expenses concerning the Retirement Plan and Pension Plan. The last audits for the Retirement Plan and the Pension Plan were performed in 2016. The Debtor seeks the authorization, but not the obligation, to continue to pay existing accrued costs, in an amount not to exceed $39,666, and postpetition costs of the Retirement Plan incurred in the ordinary course of business during the pendency of this Case, subject to the terms and conditions of the DIP Financing Documents.

76.     Prior to Friday, April 13, 2018, the Debtor directly or indirectly reimbursed its Employees for certain expenses incurred on behalf of the Debtor in the scope of its employment (the "Employee Expenses").  The Employee Expenses are incurred in the ordinary course of the Debtor's business operations and include, without limitation, expenses for meals, travel, automobile mileage and other business-related expenses, as well as reimbursement for cellular telephone expenses. Historically, approximately $17,000 has been paid on account of Employee Expenses each month. Because a delay often occurs between the time such expenses are incurred and the time a reimbursement request is submitted by the Employee, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses. However, the Debtor estimates that, as of Friday, April 13, 2018, approximately $30,000 in Employee Expenses remain unpaid.

77.     The Debtor routinely deducts certain amounts from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs and other similar programs. On a monthly basis, the Debtor has deducted approximately $284,593 in the aggregate from Employees' pay.

Approximately $48,882 of Employee deductions have accrued but have not yet been paid to various third parties. In addition, the Debtor is responsible for remitting, for its own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("Payroll Taxes"). The Debtor has paid approximately $197,837 in the aggregate for employer-obligated Payroll Taxes each month, and the Debtor believes that approximately $28,812 is owing in that respect as of Monday, April 16, 2018. The Debtor seeks the authority, but not the obligation, to pay accrued but unfunded deductions, in an amount not to exceed $48,882, and Payroll Taxes, in an amount not to exceed $28,812, and to continue to deduct the Employee Withholdings in the ordinary course of business, subject to the terms and conditions of the DIP Financing Documents.

78.     As discussed above, the Debtor utilizes Harpers as its payroll administrator. The Debtor pays Harpers approximately $3,057 per month for its administrative services.  As of close of business on Monday, April 16, 2018, there is no amount that is owing to Harpers.

79.     As discussed above, the Debtor utilizes MEMIC Indemnity Company in connection with the WC Program. The Debtor pays MEMIC Indemnity Company approximately $14,893.10 per month in connection with the WC Program. As of Monday, April 16, 2018, the Debtor believes that approximately $14,898.10 is owing to MEMIC Indemnity Company.

80.     I believe that the relief sought in the Employee Compensation and Benefits Motion represents a sound exercise of the Debtor's business judgment and is necessary to avoid immediate and irreparable harm to the Debtor's estates.  I believe that without the relief requested in the Employee Compensation and Benefits Motion being granted, there is a great risk that the Employees required going forward for the Debtor's success will seek alternative employment opportunities.  Such a development would deplete the Debtor's workforce, thereby hindering the Debtor's ability to successfully conduct this Case.

**D.     Cash Management Motion.**

81.     Prior to the commencement of this Case, in the ordinary course of its business, the Debtor maintained four (4) accounts out of which they manage cash receipts and disbursements (the "Bank Accounts").  The Bank Account ending in 9219 is the Debtor's primary transactional account and will continue to be used for ordinary course payments to postpetition creditors and vendors, and is subject to a control agreement.  This account shall also be used in accordance

with the DIP Credit Agreement for the purpose of receiving all collateral proceeds postpetition, in accordance with the terms of the proposed DIP Credit Agreement. Proceeds deposited into this Bank Account will be used by the Debtor pursuant to, and in accordance with, the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement).

82.    The Debtor's cash management systems are highly automated and computerized. This allows the Debtor to manage centrally all of its cash flow needs and includes the necessary accounting controls to enable the Debtor, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtor will continue to maintain detailed records reflecting all transfers of funds.

83.    The cash management procedures that the Debtors use constitute ordinary, usual and essential business practices. The cash management system benefits the Debtor in significant ways, as it allows the Debtor to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

84.    The operation of the Debtor's business requires that the cash management systems continue during the pendency of this Case.  Requiring the Debtor to adopt new, segmented cash management systems at this early and critical stage of this Case would be expensive, would create unnecessary administrative problems and would likely be much more disruptive than productive.  Any such disruption could have an adverse impact upon the Debtor's ability to expedite the proposed sale of its assets, or if necessary, reorganize.  Consequently, maintenance of the existing cash management systems, as they may be modified under the DIP Financing Documents, during this Case is in the best interests of all creditors and other parties in interest.

85.    In light of the substantial size and complexity of the Debtor's operations, I believe that it is critical that the Debtor continues to utilize its existing Cash Management System without disruption and believe that the relief requested in the Cash Management Motion is both necessary and in the best interests of the Debtor's estates and its creditors.

**E.      Utilities Motion.**

86.      In connection with the operation of its business, the Debtor obtains electricity, telephone, internet, waste disposal, and other similar services (collectively, the "Utility Services") from several utility companies or brokers (collectively, the "Utility Companies").

87.      Uninterrupted Utility Services are essential to the Debtor's ongoing business operations and the overall success of this Case. The Debtor's operations and corporate office require electricity, telephone, internet, waste disposal, in addition to other Utility Services. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted. Accordingly, it is essential that the Utility Services continue uninterrupted during this Case.  To the extent that the payment of an additional security deposit will be required by any Utility Company, such amounts are provided for in the Budget.

88.      On average, the Debtor pays approximately $186.657.49 each month for third party Utility Services, as based on recent utility bills.

89.      For the reasons already set forth herein and the Utilities Motion, the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the Debtor, for the Debtor to operate its business without interruption and to preserve value for the Debtor's estates.

Executed this 17th day of April, 2018 at Boston, Massachusetts

New England Confectionery Company, Inc.

.                                    Debtor and Debtor in Possession

By:  /s/  Michael McGee                             
Michael McGee
Chief Financial Officer