**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 7** |
| **NEW ENGLAND CONFECTIONERY** | ) **(conversion pending)** |
| **COMPANY, INC.,** | ) |
| | ) **Case No. 18-11217-MSH** |
| Debtor. | ) |
| | ) |

## DEBTOR'S MOTION FOR ORDER
## APPROVING PRIVATE SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND
## CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND
## <u>GRANTING RELATED RELIEF</u>

### (Expedited Determination and Shortened Notice Requested)

In accordance with 11 U.S.C. § 363, Federal Rules of Bankruptcy Procedure 2002 and

6004, and Massachusetts Local Bankruptcy Rule 6004-1, New England Confectionery

Company, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor") hereby

requests the entry of an order, on an expedited basis, (i) authorizing the Debtor to sell by

private sale (the "Private Sale") all of the estate's right, title and interest in certain of the

Debtor's assets (the "Purchased Assets") free and clear of all liens, claims, and interests, to

CI-N Acquisition LLC (the "Buyer") for the amount of $13,296,900.18, subject to applicable

price adjustments, plus certain earn-out rights based on the future success of the business and

results of future disposition of the Purchased Assets (the "Purchase Price"), (ii) approving the

sale procedures and form of notice by which the Debtor will sell in accordance with this

Motion, as set forth in the *Notice of Intended Private Sale*, attached as <u>Exhibit A</u> (the

"Notice"); (iii) scheduling a final hearing (the "Sale Hearing") to approve the Sale to the

Buyer or, if applicable, to a winning bidder; and (iv) granting related relief.

By this Motion, the Debtor seeks to preserve the stewardship of a company and a product brand that has its roots in American culture and history dating back to the 19th century. In further support of this motion, the Debtor states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (M). Venue of this proceeding and this motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The basis for the relief requested in this Motion is found in Section 363 of the Bankruptcy Code, Rules 2002, 6004, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Massachusetts (the "MLBR").

### FACTUAL BACKGROUND

1.      On April 3, 2018 (the "Involuntary Date") an involuntary petition pursuant to Chapter 7 of the Bankruptcy Code was filed against the Debtor (the "Involuntary Petition").  On April 17, 2018 (the "Conversion Date"), the Debtor consented to the entry of an order for relief and filed a motion seeking to convert the case to a case under Chapter 11 (the "Conversion").[1]

2.      The Debtor continues to operate its business during the present involuntary "gap period" consistent with its normal practices, and upon the granting of the Conversion intends to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date of this Motion, no trustee, examiner, or statutory committee has

---

[1] References herein to "prepetition" and "postpetition" shall mean, as applicable, the period of time prior to the Conversion Date or subsequent to the Conversion Date.

been appointed in the Case.

3.      A detailed description of the Debtor and its businesses, and the facts and circumstances supporting this Motion, are set forth in greater detail in the Declaration of Michael McGee in support of the Debtor's various first day applications and motions, sworn to on April 17, 2018 (the "McGee Declaration"), incorporated herein by reference. Capitalized terms not defined herein shall have the meanings provided in the McGee Declaration.

4.      In addition, a detailed discussion of the sale process conducted by the Debtor's investment banker between June 2017 and March 2018 is included in the Affidavit of James M. Dworkin in Support of Debtor's Motion for Order Approving Private Sale of Certain of Debtor's Assets Free and Clear of All Encumbrances, Claims, Encumbrances, and Interests And Granting Related Relief, a copy of which is appended hereto as Exhibit B (the "Dworkin Affidavit").

5.      Simultaneously with the filing of this Motion, the Debtor has submitted a motion requesting that the Court enter an order converting this proceeding to a case under Chapter 11 of the Bankruptcy Code.  The Debtor determined to convert this case to a Chapter 11 proceeding to enable it to maintain its business as a going-concern during the course of this proceeding, thus enabling it to continue its efforts to effectuate the sale of its assets in manner that maximizes potential recoveries for its creditor constituents and attempts to preserve the value and identity of its historic brand.  The Debtor's continued management of its operations and the existing sale process is warranted because of the likelihood that it will be able to conclude a sale of substantially all of the Debtor's assets as a going concern, thereby preserving certain operational value, and that the Debtor's estate will further benefit from a proposed "second-stage" sale of the Assets thereafter.  The Debtor is familiar with its customers, its accounts, and its vendors and has close relationships with many of its customers. Accordingly,

the Debtor's continued management of its estate will maximize the value of the estate and the Purchased Assets for the benefit of all of the Debtor's creditors. Moreover, the proposed sale transaction contemplates that the Debtor will continue to operate for a period of time after the closing of the Sale in coordination with the Buyer (as discussed below) to produce further inventory for sale and, as a result, the Debtor would be the recipient of a post-sale earn-out, which is anticipated to produce a further significant return to the Debtor's estate in addition to the sale proceeds deliverable upon the closing (the "Closing Sale Proceeds" as further defined below). In addition, the Debtor would retain a residual right to receive additional payment from the Buyer if and when the Buyer were to re-sell any of the Purchased Assets to a purchaser who would therefor acquire the ability to continue the production of the Debtor's brand products, as the Debtor can no longer do so. The value of this residual "second-stage" right will shared among the Buyer and the Debtor and is based upon the total amount recovered by the Buyer in its subsequent sales of the Purchased Assets. The method for calculating the allocation of these future sale amounts is set forth below.[2]

6.    The Debtor has also contemporaneously sought orders from the Court approving the Debtor's receipt of debtor-in-possession financing and the use of cash collateral pursuant to Sections 364(a) and 363(a) of the Bankruptcy Code to fund its continued operations. In accordance with the proposed sale and pursuant to the sale documents, the Debtor would be reimbursed by the Buyer for a significant portion of its post-sale operating expenses, including, but not limited, to the majority of the Debtor's employee wages and costs.

---

[2] This motion contains a general description of the proposed sale transaction. In the event of any inconsistency between the description contained herein and the terms set forth in the applicable transaction documents, including the Asset Purchase Agreement ("APA"), attached hereto as Exhibit D, and the Transition Services Agreement ("TSA"), attached hereto as Exhibit E, those documents shall govern and control. The Schedules to both the APA and TSA shall be made available upon request.

**Background of Prior Sale Efforts**

7.      The relief requested in this Motion is sought recognizing that the Debtor

undertook significant efforts to market and consummate the proposed sale with the Buyer for

more than seven months prior to the Involuntary Date.  Through an extensive pre-petition sale

process, the Debtor has identified and negotiated with the Buyer who has made the highest

and best offer to purchase the Purchased Assets.

8.      Beginning in September 2017, the Debtor commenced a sales process, retained

Threadstone Advisors, LP ("Threadstone") as its investment banker, and solicited multiple

proposals for the acquisition of substantially all of its assets.  Threadstone identified 45

potential strategic and financial purchasers of the Debtor's assets and provided them with

substantial information regarding the Debtor's assets, operations, and projections for future

growth.  From among the initial 45 recipients of Threadstone's initial outreach, 21 of those

parties expressed interest in the Debtor's assets and executed non-disclosure agreements.

Following a due diligence period, 9 potential acquirers submitted proposals to acquire the

Debtor's assets.  From among them, the Debtor and Threadstone identified the Buyer, as having

presented the highest and best offer to purchase the Debtor's assets as a going-concern.[3]

9.      As the proposed sale transaction was reaching its final stages of negotiation in or

around March 2018, as a result of various events of default, including but not limited to payment

defaults, the Debtor's secured lender, ACAS, LLC (formerly known as American Capital, Ltd.,

successor by merger with American Capital Financial Services, Inc.) ("ACAS") provided the

---

[3] A thorough discussion of the sale process undertaken by Threadstone is included in the Dworkin Affidavit.

Debtor with a notice of default and accelerated all amounts due and owing under the Term Loans

and the Revolving Line of Credit, and notified the Debtor that it no longer had any obligation to

advance funds under the Revolving Line of Credit.

10.    During that prior period, the Debtor was in an over-advance position with ACAS

and was in payment default.  Additionally, the Debtor was unable to keep current with its trade

vendors.  As a result, several trade vendors brought suit against the Debtor, including seeking

attachments upon the Debtor's bank accounts and accounts receivable, which, when granted,

further constrained the Debtor's liquidity and ability to operate.  These attachments have since

been dissolved as a result of the filing of the involuntary petition.

11.    Throughout this period, the Debtor and Threadstone pushed forward to

effectuate the sale to the Buyer; however in light of lawsuits filed by trade creditors (resulting

in attachments of bank accounts and accounts receivable) and the Debtor's on-going financial

defaults with respect to the ACAS debt, the Debtor was not able to sufficiently advance the sale

transaction prior to the Involuntary Date.

12.    In order to complete the sale of the Debtor's assets to the Buyer, ACAS filed a

complaint against the Debtor in Massachusetts Superior Court and sought the imposition of a

receivership over the Debtor's assets, to which the Debtor consented.  It was contemplated that

the receiver would seek to consummate the sale of the Debtor's assets.  However, before that

could occur, the involuntary petition against the Debtor was commenced by three of its trade

creditors.

13.    The filing of the involuntary petition has halted the Debtor's efforts to sell the

business to the proposed purchaser pursuant to a state receivership as originally contemplated.

Now, the Debtor has determined that the most efficient course of action to maximize the

remaining value to the estate is to convert this Case to a Chapter 11 proceeding, maintain the

existing operations of the business, and consummate the sale pursuant to Section 363 of the

Bankruptcy Code.

**Company Background**

14.    The Debtor, while formally incorporated in 1901, traces its history and roots to a

local Massachusetts candy company that began operating in 1847, and is considered one of -- if

not the -- oldest continuous company producing candy in the United States.  It is best known for

its Necco Wafers, and production of the Clark Bar, Haviland Thin Mints and Sweetheart

Conversation Hearts.

15.    As of the date hereof, the Debtor employs approximately 230 full-time

employees, mostly in its headquarters in Revere, Massachusetts, of which nearly 85% belong to

a labor union.

**Capital Structure and Debt Obligations**

16.    All of the Debtor's stock is presently owned by NECCO Holdings, Inc.  The

substantial majority of the stock of NECCO Holdings, Inc. is owned by ACAS.

17.    As of the Involuntary Date, the Debtor had accumulated a great amount of debt,

with total liabilities exceeding $152 million of which approximately a little over $107 million is

secured debt.

18.    The Debtor is subject to a series of secured loan obligations, including:

A.    Credit Agreement, entered into on December 21, 2007, between the Debtor,
as borrower, and ACAS, as Lender's agent, as subsequently revised and
amended, concerning certain loans made by Lender to the Debtor (the
"Term Loans").

B.    Pledge and Security Agreement entered into on December 21, 2007,
whereby the Debtor, as borrower, granted to Agent, for the benefit of
Lender, a lien on and security interest in all of its assets, including all

accounts receivable, deposit accounts, inventory and proceeds thereof (the "Term Loan Collateral"). ACAS subsequently perfected its security interest in the Term Loan Collateral by filing UCC-1 Financing Statement against the Debtor.

C.    Deposit Account Control Agreement entered into on October 10, 2014, between Lender, NECCO and Eastern Bank, pursuant to which Lender perfected its interest in NECCO's deposit account at Eastern Bank (the "Account Agreement").

D.    Loan and Security Agreement, as subsequently revised and amended (the "Revolving Credit Agreement") for revolving loans made by Core Business Credit LLC to the Debtor (the "Revolving Line of Credit"), assigned to Core Business Funding, LLC, which further assigned its rights to ACAS. As security for the Revolving Line of Credit, the Debtor granted Core a lien on all of its personal property, which security interest was perfected, *inter alia*, by the filing of UCC-1 Financing Statement against the Debtor.

19.    As of the Involuntary Date, the Debtor owed the Lender in excess of $85.7 million on account of the Term Loans and $21.3 million on account of the Revolving Line of Credit (the "Secured Debt"). Other than with respect to printers leased from Canon and forklifts leased from HYG Financial Services, the Lender holds the only secured claims of record as of the Involuntary Date.[4]

## Proposed Private Sale Terms

Purchase Price

20.    Subject to approval of the Bankruptcy Court, the Debtor has accepted an offer from the Buyer to purchase the Purchased Assets for the Purchase Price, which would be subject to closing allocations (*e.g.*, rent payments to be made to the Landlord out of the Purchase Price proceeds as noted below) and adjustments depending on the amount and value of certain of the Purchased Assets (*i.e.* failure to meet threshold levels of accounts receivable, inventory and work in process) to be sold on the closing date (such net amount, the "Closing Sale Proceeds"). In

---

[4] It is likely that the claims held by HYG and Canon will ultimately be deemed unsecured debts on the basis that they are either under-secured or unperfected, or both.

addition, during the period after the closing, the Buyer will pay over to the Debtor certain

proceeds received from the Buyer's sale of purchased inventories and sale of other Purchased

Assets, based upon a sharing formula (the "Post Closing Sale Proceeds," and collectively with

the Closing Sale Proceeds, the "Total Sale Proceeds").

21.     The APA provides that, from and after the Closing, the Debtor (while remaining

in Chapter 11) will provide operating services to the Buyer pursuant to the TSA, including the

provision of certain of its employees to assist the Buyer in creating new inventory for sale, as is

discussed in further detail below.

22.     If the value of the Purchased Assets in the categories of accounts receivable,

inventory and WIP falls short of the minimum threshold requirements set forth in the APA, then

the Purchase Price will be reduced by a fraction of the difference between the applicable

minimum threshold requirement and the actual value of the Purchased Assets in each respective

category as of the date of the closing[5].  The Buyer has stated and the Debtor has accepted that the

proposed minimum threshold requirements attempt to mimic the conditions of the Purchased

Assets as of March 2018, when the sale was initially intended to close.  Therefore, these

adjustments represent an agreement among the Debtor and the Buyer to honor the Buyer's initial

offer to purchase the Purchased Assets as adjusted for Debtor's receipt of the proceeds of certain

accounts receivable and the decline in the value of the Debtor's assets since the Buyer delivered

its initial offer to purchase the Purchased Assets.

23.     The Buyer has placed a significant value on the Debtor's existing inventory and

its ability to continue to produce inventory sufficient to meet customers' demands during the

---

[5] For example, for each dollar that the actual balance at closing of accounts receivable may be less than the accounts
receivable threshold, the Purchase Price would be reduced by $0.70. (See APA definition of Purchase Price).

transition period that will follow the Closing.  The APA defines "New Inventory," as inventory produced after the closing of the Sale.  As an enhancement to the Purchase Price, the Debtor shall receive 30% of adjusted net proceeds from the subsequent sale of New Inventory by the Buyer, and the Buyer shall receive 70% of such proceeds, thereby providing another potentially significant return to the Debtor after the closing of the Sale.

24.     Finally, as a key element of the negotiated transaction and with the additional benefit of allaying the concern of any party in interest that the Purchased Assets have a greater market value than the assured payment represented by the Closing Sale Proceeds, the APA provides that should the Buyer resell any of the Purchased Assets to third parties prior to the Termination Date – the "second stage" sale referenced above -- then the Debtor would receive an allocation of such proceeds in the following proportions as set forth in the APA.  Once the Buyer receives an aggregate of $15,250,000 of Net Proceeds (as defined in the APA from its subsequent sale of the Purchased Assets, the Debtor will receive a further payment of sale proceeds according to the following waterfall:

a.     First, all aggregate Net Proceeds from the sale of the Purchased Assets greater than $15,250,000 but less than or equal to $18,750,000 shall be paid (i) 70% to the Debtor and (ii) 30% to the Buyer;

b.     Second, all aggregate Net Proceeds from the sale of the Purchased Assets greater than $18,750,000 but less than or equal to $22,250,000 shall be paid (i) 65% to the Debtor and (ii) 35% to the Purchaser; and

c.     Third, all aggregate Net Proceeds from the sale of the Purchased Assets greater than $22,250,000 shall be paid (i) 60% to the Debtor and (ii) 40% to the Buyer.

Application of Sale Proceeds

25.     Pursuant to the further orders of the Court, the Debtor has proposed in its DIP

Financing Motion that the Closing Sale Proceeds will be applied first against any outstanding

amounts owed to ACAS under the DIP Financing Agreement (as such term is defined in the DIP

Financing Motion), and thereafter shall be distributed to ACAS on account of its prepetition

secured debt, subject to the challenge rights set forth in the DIP financing order.

26.     Accordingly, Section 1.6 of the APA provides that at the closing, the Buyer will

distribute the Purchase Price as follows: (i) $1,781,401.08 (the "Landlord Payment") out of the

purchase proceeds will be paid directly to the Debtor's landlord, Atlantic-Revere Realty LLC

(the "Landlord") as payment of all rent and any additional rent owed to the Landlord for

occupancy between April 1, 2018 and October 31st, 2018 (the "Termination Date"), (ii) the

Debtor will paid for all of its costs and expenses associated with the closing of the proposed

transaction; and (iii) the balance of the Purchase Price, the Closing Sale Proceeds, after

deduction of the Landlord Payment and the Debtor's transaction costs, will be paid to ACAS for

the benefit of the Debtor's account.

Related Terms

27.     The APA provides that, as a condition to the Buyer's obligation to purchase the

Purchased Assets, the Debtor and the Buyer will enter into the TSA. The TSA provides a

framework by which the Debtor shall provide certain services to the Buyer, including, but not

limited to, providing those of Debtors' employees who are deemed necessary to assist the Buyer

in the production of the New Inventory, that will be sold by the Buyer to retain existing customer

relationships and enhance the re-sale value for the Debtor's brands and other Purchased Assets.

28.     Additionally, the TSA provides that the Buyer shall fund many of the Debtor's

costs and expenses associated with the production of New Inventory following the Closing,

including, but not limited to, employee wages and expenses, thereby limiting the amount of

money that the Debtor will need to borrow from ACAS or any other DIP lender.  The payments

and reimbursements received by the Debtor from the Buyer are in addition to amounts paid as

part of the Total Sale Proceeds.

29.    Separately, the Buyer will enter into a License Agreement with the Landlord that

will permit the Buyer to have access to the Debtor's facility in Revere, Massachusetts (the

"Premises") and assist in its operations during the post-closing period.  The License Agreement

is necessary because the Debtor's remaining term of occupancy under the existing Lease ends on

August 31, 2018, whereupon the Debtor, and its assets, must vacate the leased premises.  Given

the delays in the process so far, the parties have determined that it is in the best interests of all

parties to close the transaction as soon as possible in order to maximize the time and minimize

the costs associated with producing New Inventory.  The Buyer and the Debtor have successfully

negotiation with the Landlord that, as part of the License Agreement, the Buyer shall be

permitted to remain and Debtor shall be permitted to operate under the TSA until October 31,

2018.  As a condition to entering into the Licensing Agreement through the Termination Date,

the Landlord has required the delivery of the Landlord Payment in conjunction with the proposed

sale of the Purchased Assets.

Timing of Closing

30.    The APA requires that the Sale must close on or before May 1, 2018.  While this

appears as a significantly condensed timeline if seen only in light of the pendency of this Case, in

reality this robust sale process has ensued for over six month and the parties had intended the

Sale to close weeks ago first independently and then as part of the proposed receivership.  A

specific chronology and account of the Debtor's efforts to market and sell the Purchased Assets

is outlined in the Dworkin Affidavit.  In light of its vigorous marketing efforts prior to the

Involuntary Date, the Debtor does not believe that any further extra time marketing the

Purchased Assets would result in a higher and/or better offer.  Indeed, the result of any such

delay would be the loss of what is clearly the highest and best offer available for the Debtor's

assets.

31.      Moreover, in order for the Debtor and the Buyer to maximize the production of

New Inventory, the parties will need to operate out of the Debtor's Premises and enter into the

License Agreement with the Landlord on a timely basis.  Any further delay in the approval and

closing of the Sale, is likely to disrupt the timelines imposed on the parties, and could result in

further reduction in the Closing Sale Proceeds and additional funds to be received by the Debtor

from its revenue split from the sale of the Purchased Assets, or a loss of the transaction entirely.

32.      In this light, the Debtor and Buyer believe that it is essential that this transaction

be approved and closed by this date in order to preserve as much value and generate additional

net proceeds to provide an even more meaningful return to the Debtor's estate, thereby

maximizing the value of its assets through this sales process.  The Total Proceeds available to the

Debtor will be enhanced by at least three distinct aspects of the transaction if the Sale is closed as

soon as possible.  First, the operating costs of the Debtor will be significantly reduced as soon as

the TSA is implemented and the Buyer assumes the obligation to fund the Debtor's operating

expenses referenced in the TSA.  Second, the longer the time period is between the closing and

Termination Date, the longer the opportunity will be for the Debtor to create New Inventory, the

proceeds of which will enhance the amount of the Total Proceeds.  Third, the greater the timeline

is for the Buyer to effect subsequent sales of the Purchased Assets, the greater probability it will

have to maximize the value of those Purchased Assets because there will be greater stability around the value of the Purchased Assets, there will be greater inventory (based upon the existing and New Inventory), and the Buyer will be better equipped to maintain and maximize the Debtor's existing customer base in a manner that will enhance the re-sale value of the Purchased Assets, for its and the Debtor's mutual benefit.

Best and Highest Offer; Sale Process

33.    While it is not possible to predict the Total Proceeds with certainty at this time, the existing Purchase Price presented by the Buyer is guaranteed to provide the Debtor with at least the significant value of the Closing Sale Proceeds, and when combined with the Post-Closing Proceeds, the Debtor projects that the Total Proceeds resulting from the proposed sale are likely to exceed any other the offers to purchase the Purchased Assets that the Debtor has or is likely to receive. The likely alternative to consummating the transaction with Buyer on an expedited basis would be a prompt liquidation, which would generate substantially less value for the Debtor's assets, and would also cause harm to other stakeholders, including employees, customers, suppliers, and the Landlord.

34.    The Buyer was identified by the Debtor through an arm's-length sale process as the party most able and willing to submit an offer that will maximize the value of the Debtor's assets.  As set out in the Dworkin Affidavit, the Debtor, with its investment banker and professional advisors, have carefully studied the market for the Purchased Assets, and determined that of the several offers received by the Debtor, the Buyer's represents the highest and best offer.  The Buyer is a disinterested person as defined by 11 U.S.C. § 101(14).

35.    In addition, the Buyer has required, as a condition to effecting the Sale

transaction, that its offer will not be subject to a competitive bidding process or auction.[6]  Clearly

this is a sale term that the Debtor recognizes will necessitate the Court making an exception to

certain of the terms imposed under Local Rule 6004-1(c), and part of the relief requested in this

Motion is the grant of such exception.  While this limitation has been imposed by the Buyer, the

Debtor can cite certain extenuating circumstances that would warrant this Court's approval of

this limitation.  First, the constraints imposed by need to extend the right of occupancy of the

Debtor's manufacturing facility would compel acceptance of this limitation.  The Landlord has

informed the Debtor that it will allow <u>only</u> this Buyer to remain within the leased premises

beyond the expiration of the Debtor's Lease term.  The Debtor is informed that this extended

term allowance would not be offered to any other prospective buyer, as the Landlord has

expressed confidence in Gordon Brothers as the entity who is most qualified in conducting asset

acquisitions, operations and sales of this nature.  That extended term will permit continued

production and sale of the Debtor's product, and thereby provide a significant increase in the

payment to the Debtor under the proposed sale terms.  In addition if a going concern sale were

not to be consummated, thereby resulting in an inevitable liquidation, the Lease precludes the

Debtor's ability to conduct such a liquidation of its Assets within the leased premises.  In

essence, this failed sale scenario would force the Debtor to bear the extensive costs and logistics

of removing its cumbersome plant and equipment in order to conduct a subsequent liquidation of

the Assets.  Finally, in light of the extensive sale process that was held during the year prior to

the bankruptcy filing, the Debtor firmly believes (particularly in light of the prior efforts of its

investment banker)[7] that it has fully explored the market of potential buyers and has been

---

[6] See APA termination provisions Section 7.1(d).
[7] See Affidavit of James Dworkin.

brought to the best possible proposal at this time.  Hence the Debtor would propose that the

requested deviation from sale procedure of competitive bidding, while perhaps extraordinary, is

warranted under the pending circumstances and applicable limitations where a further bid

process would likely be fruitless, and would likely push the most capable and valuable bidder out

of the sale process.

<u>Sale Free and Clear of Encumbrances</u>

36.     The sale of the Purchased Assets is to be made free and clear of all liens

(including mechanics′, materialmens′ and other consensual and non-consensual liens and

statutory liens), security interests, encumbrances and claims (including, but not limited to, any

″claim″ as defined in section 101(5) of the Bankruptcy Code), reclamation claims, mortgages,

deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan

agreements, instruments, contracts, leases, licenses, options, rights of first refusal, rights of

offset, recoupment, rights of recovery, judgments, orders and decrees of any Court or foreign or

domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration,

assignment, debts, charges, suits, rights of recovery, interests, products liability, alter-ego,

environmental, successor liability, tax and other liabilities, causes of action and claims, to the

fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or

unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated,

matured or unmatured, material or non-material, disputed or undisputed, or known or unknown,

whether arising prior to, on, or subsequent to the Involuntary Date, whether imposed by

agreement, understanding, law, equity or otherwise (each, an ″Encumbrance″), and other

monetary interests in the same.  Accordingly, the Debtor requests that this Court order that any

remaining Encumbrances on or affecting the Purchased Assets attach to or affect the proceeds of

the sale to the same extent, and in the same order of priority, as each such interest now attaches

to or affects the Purchased Assets, subject, in each case, to the provisions of the DIP Financing

order and to this Court's power to determine subsequently the validity, extent and priority of any

liens, encumbrances or other interest.

37.    All parties and/or entities asserting Encumbrances and contract rights against the

Debtors and/or any of the Purchased Assets shall be permanently enjoined and precluded from,

with respect to such Encumbrances: (i) asserting, commencing or continuing in any manner any

action against Buyer or any director, officer, agent, representative or employee of the Buyer (all

such entities are collectively referred to as the "Protected Parties"), or against any Protected

Party's assets or properties, including without limitation against the Purchased Assets; (ii) the

enforcement, attachment, collection or recovery, by any manner or means, of any judgment,

award, decree or order against the Protected Parties or any properties or assets of the Protected

Parties; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Protected

Parties or any properties or assets of the Protected Parties, including without limitation the

Purchased Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind

against any obligation due the Protected Parties; and (v) taking any action, in any manner, in any

place whatsoever, that does not conform to or comply with the provisions of this Order or the

Asset Purchase Agreement.  The holder of any Encumbrance that properly exercises remedies

against the Debtor, or any purchaser from such holder through foreclosure, shall not be precluded

from enforcing the Asset Purchase Agreement against Buyer in accordance with its terms.

38.    The consummation of the Asset Purchase Agreement pursuant to an Order of this

Court shall not, except to the extent specifically provided in the APA (including the TSA) or

such an order, subject Buyer to any liability whatsoever with respect to the Debtor's prepetition

or postpetition operations in any form or manner whatsoever, including, without limitation, by

reason of any theory of successor or transferee liability, de facto merger, or substantial

continuity, whether known or unknown and whether asserted or unasserted as of the closing.

<u>**ARGUMENT**</u>

**I.      <u>The Private Sale is in the Best Interests of the Debtor, Its Estate, and Its</u>**
         **<u>Creditors</u>**

39.      Section 363(b)(1) of the Bankruptcy Code provides that "[t]he Debtor, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1). A bankruptcy court's power to authorize a sale of estate

property under Section 363(b) is subject to the court's discretion. See, e.g., In re WPRV-TV,

Inc., 983 F.2d 336, 340 (1st Cir. 1993). Pursuant to Bankruptcy Rule 6004(f)(1), sales of

property outside the ordinary course may be held by private sale or public auction.

40.      The Debtor's Assets consist mainly of its Receivables, Inventory, tangible

machinery, tools, computers, vehicles, fixtures, intellectual property, Bank Accounts, and

Permits (each, as defined in the APA).

41.      In order to maximize the value of the Purchased Assets, the Debtor engaged the

services of an investment banker familiar with the confections industry, Threadstone.  The

Debtor and Threadstone have thoroughly marketed the Purchased Assets to a variety of potential

purchasers identified by Threadstone.

42.      The Debtor and Threadstone have conducted a systematic sale process and

evaluated the various indications of interests and offers they received to purchase all or some of

the Purchased Assets, as is outlined in the Dworkin Affidavit. The Debtor has reasonably

determined that the offer submitted by the Buyer to purchase the Purchased Asset constitutes the

highest and best offer for the Purchased Assets.

43.     The Debtor proposes the following terms for the Private Sale:

a.     The Debtor intends to sell all of the estate's right, title, and interest in the Purchased Assets to the Buyer for the Purchase Price.

b.     A listing of the Purchased Assets will be made available to any interested party upon request from the Debtor.

c.     The Purchased Assets will be sold in "as is" and "where is" condition. The Debtor has made no representations or warranties whatsoever, either express or implied, with respect to the Purchased Assets.

d.     Pursuant to section 363(f) of the Bankruptcy Code, the Purchased Assets shall be sold free and clear of any liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests attaching to the proceeds of the Private Sale to the same extent, validity and priority as they existed on the Conversion Date.

e.     The Debtor has requested that the Bankruptcy Court determine that the Buyer be deemed to be a "good faith" purchaser providing the Debtor with consideration for the Purchased Assets which constitutes payment of "value" pursuant to Section 363(m) of the Bankruptcy Code.

44.     In the context of the APA negotiations, the Buyer has imposed the following conditions and has incorporated these conditions into the APA submitted to the Court for approval:

a.     The Buyer shall have the right to terminate the APA, if the Court has not granted its approval and the sale has not closing on or prior to May 1, 2018;

b.     The notice period prescribed by Bankruptcy Rule 2002 should be shortened to accommodate the closing of the sale on or before May 1, 2018; and

c.     The Debtor should not be permitted to engage with third-parties to discuss their potential acquisition of the Purchased Assets during the approval period and no competitive bids should be permitted.

45.     Given the extensive marketing and sale process undertaken by the Debtor prior to the filing of this Motion, the absence of any currently available higher or better offer to purchase the Purchased Assets, the substantial likelihood that the value of the Debtor's assets will continue to decline with the passage of time, and the risk of losing what is clearly the highest and best offer available for the Purchased Assets, Debtor is willing to enter into the APA upon the terms required by the Buyer.

46.     As noted above, the Debtor recognizes the apparent differences between the Buyer's requirement under Section 7.1(d) of the APA that no competitive offers be solicited versus the requirements imposed upon debtors-in-possession by 6004-1, which prescribes the process of soliciting higher and better offers in the context of sales subject to approval under Section 363 of the Bankruptcy Code.  To the extent that the Court finds that the foregoing condition is contrary to the requirement imposed under MLBR 6004-1, the Debtor seeks relief from the application of the competitive bid provisions of that rule so as to enable to the consummation of the proposed sale on the terms stated in the APA.

47.     The Debtor believes that Purchase Price is greater than that which would be realized from a public sale of the Purchased Assets, taking into account the nature of the Purchased Assets, advertising charges, and labor costs associated with a retail auction and the transportation of the Purchased Assets. The Debtor has not received any higher expression of interest for acquisition of the Purchased Assets during the pendency of this case – or prior to the Involuntary Date -- after extensive marketing and a vigorous sale process conducted by the Debtor's investor banker, and believes Purchase Price to be the highest and best offer obtainable for the Purchased Assets. To realize that value requires proceeding by private sale on an expedited basis.  The terms of the transaction itself contain a safety valve against the danger that

the counterbid process is designed to address, namely, that the Debtor and its investment bankers

might be wrong and that the Purchased Assets have greater value than the amount assured to the

Debtor under the APA.  That safety valve consists of the Debtor's entitlement under the APA to

the Post-Closing Sale Proceeds consisting of greater than 50% of any value above $15,250,000

realized by the Buyer from its intended resale of the Purchased Assets.  Thus, the proposed

transaction fits within the narrow circumstances when private sale is appropriate and in the best

interests of the bankruptcy estate.

48.      The Debtor has considered the option of trying to effectuate the sale transaction

through a Plan of Reorganization or a liquidating plan under Section 1123 of the Bankruptcy

Code, but has determined that any attempt to do so would impair the value of the Debtor's assets.

Given the pending timeline for the proposed sale (and any others that could be presented), the

time required to propose and solicit acceptance of a plan would be prohibitive.  Stated simply,

during the plan confirmation process, the value of the Purchased Assets would deteriorate and

the Buyer, who has offered the highest and best purchase price for such assets, would have the

right to -- and the Debtor believes likely would -- terminate the transaction, because of the loss of

value.  Further the Debtor's senior lender , ACAS has been consented to the proposed sale, free

and clear of its liens, and has agreed to  provide DIP financing  which is predicated on the

Debtor's intent to Debtor to consummate the sale within the time frame contemplated by the

APA and this Motion.

49.      Based upon the foregoing, the Debtor submits that the Private Sale is in the best

interests of the estate and its creditors, and that the exercise of the Court's discretion to approve

the Private Sale is warranted.

**II.      The Proposed Sale is Within the Debtor's Sound Business Judgment**

50.      Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1). Moreover, section 105(a) of the Bankruptcy Code provides

that bankruptcy courts "may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

51.     A sale of a debtor's assets should be authorized pursuant to section 363 of the

Bankruptcy Code if a sound business purpose exists for doing so. In re SW Boston Hotel

Venture, LLC, No. 10-14535-JNF, 2010 WL 3396863, at *3 (Bankr. D. Mass. Aug. 27, 2010); In

re Aerovox, 269 B.R. 74, 80 (Bankr. D. Mass. 2001); see also In re Martin, 91 F.3d 389, 395 (3d

Cir. 1996); In re Lionel Corp., 722 F.2d 1063, 1071-72 (2d Cir. 1983).

52.     In evaluating a debtor's exercise of business judgment, courts afford that debtor

some deference because the debtor is familiar with its business and industry. See SW Boston

Hotel Venture, 2010 WL 3396863, at *3. A debtor in possession's business decision should be

approved by the court unless it is shown to be so manifestly unreasonable that it could not be

based upon sound business judgment, but only on bad faith, or whim or caprice. In re Cadkey

Corp., 317 B.R. 19, 22-23 (D. Mass. 2004); Aerovox, Inc., 269 B.R. at 80 (citing In re Logical

Software, 66 B.R. 683, 686 (Bankr. D. Mass. 1986)). A debtor's business decisions are entitled to

"great judicial deference." In re WPRV-TV, Inc., 143 B.R. 315, 319 (D.P.R. 1991), vacated on

other grounds, 165 B.R. 1 (D.P.R. 1992); see also In re Thinking Machs. Corp., 182 B.R. 365,

368 (D. Mass. 1995) (emphasizing "the high degree of deference usually afforded purely

economic decisions of trustees"), rev'd on other grounds, 67 F.3d 1021 (1st Cir. 1995). In

considering approval of a debtor in possession's business decision, the court does not act as an

arbiter of disputes between creditors and the estate but as an "overseer of the wisdom with which

the bankruptcy estate's property is being managed by the trustee or debtor-in-possession."

Aerovox, Inc., 269 B.R. at 80 (quoting In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir.

1993)). A debtor in possession generally satisfies the business judgment standard if it acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company. See In re Genesys Research Inst., Inc., No. 15-12794-JNF, 2016 WL

3583229, at *19 (Bankr. D. Mass. June 24, 2016) (quoting In re MF Global, Inc., 535 B.R. 596,

605 (Bankr. S.D.N.Y. 2015).

53.     Courts have applied various factors in determining whether a sound business

justification exists, including: (a) whether a sound business reason exists for the proposed

transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction

has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice

is provided. See Fulton State Bank v. Schipper (In re Schipper), 933 F.2d. 513, 515 (7th Cir.

1991); see also Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test);

accord In re Montgomery Ward Holding Corp., 242 B.R. 147, 153-54 (D. Del. 1999). While the

Bankruptcy Code does not define "good faith," the First Circuit has used the traditional equitable

definition of good faith in the context of a good faith purchaser, requiring that such purchaser

provide value in good faith and without knowledge of adverse claims. Jeremiah v. Richardson,

148 F.3d 17, 23 (1st Cir. 1998).

54.     The proposed Sale of the Debtor's assets through the proposed sale procedures is

justified because the Debtor has already conducted a thorough, vigorous sales process and the

offer received by the Buyer is clearly superior to any other offer received by the Debtor for the

Purchased Assets. The Debtor and Threadstone have already formulated a marketing strategy

and are prepared to implement that strategy expeditiously to enhance the Purchase Price and the

ultimate value received by the Debtor and its estate. The process and sale timeline proposed for

the consummation of the Sale herein shall yield the maximum value for the Debtor and provide

sufficient notice of the proposed Sale.   The Debtor's request to shorten the typical notice period

is also warranted in that if the proposed Sale is not completed by May 1, 2018, there is a very

real risk that (a) the Buyer will terminate or modify the terms of the APA (including the

calculation of the Purchase Price), and/or (b) the Purchase Price will be inherently reduced based

on the reduction in time between the closing of the sale and the termination of the Debtor's lease

for the use of its manufacturing facility.

55.      Given the Debtor's extensive marketing of its assets, the Debtor does not believe

there are any other potential bidders that would pay an amount equal to or in excess of the

Purchase Price.  Therefore, the Debtor submits that they will have satisfied the requirements of

section 363(b) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 prior to the entry of

an order in substantially the form attached hereto as Exhibit C on or before May 1, 2018 that

authorizes the sale of the Purchased Assets consistent with the terms of the APA and those

described in this Motion.

**III.    Sale Free and Clear of Liens, Claims, Interests and Encumbrances**

56.      Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor seeks to sell the

Purchased Assets free and clear of all liens, claims, and interests, with all such liens, claims, and

interests to attach to the proceeds of the sale of the Purchased Assets with the same validity,

priority and enforceability as existed on the Conversion Date.

57.      Pursuant to Section 363(f) of the Bankruptcy Code, a Debtor may sell property

free and clear of liens, claims and encumbrances if one of the following conditions is satisfied:

(1)      Applicable non-bankruptcy law permits the sale of such property free and
          clear of such interest;

(2)     the lienholder or claimholder consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in a bona fide dispute; or

(5)     the lienholder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

58.    ACAS has asserted security interests in the entirety of the Purchased Assets arising from secured loans made to the Debtor.  Three additional creditors may assert pre-petition secured claims against certain of the Purchased Assets; these claims are likely to be under-secured and/or unperfected, and therefore will be treated as unsecured claims.  ACAS has consented to sale of the Purchased Assets free and clear of its liens, with the Sale Proceeds being applied against its outstanding obligations consistent with the terms of the DIP Financing Motion.

59.    Based upon the foregoing, the Debtor requests, pursuant to Section 363(f) of the Bankruptcy Code, that the Purchased Assets be sold free and clear of any and all liens, claims, and interests, with such liens, claims, and interests attaching to the net proceeds of the Private Sale with the same validity, priority and enforceability as existed on the Conversion Date. Nothing herein shall be deemed to be an acknowledgment by the Debtor as to the validity priority or enforceability of any asserted liens, claims, or interests.

## IV.    Good Faith Protections under Section 363(m)

60.    Because the Private Sale will effectuate transfer of the Purchased Assets following an arm's-length transparent sale process, purchasers of the Purchased Assets are entitled to the protections of Section 363(m) of the Bankruptcy Code which provides:

The reversal or modification on appeal of an authorization under  subsection

(b)...of this section of a sale...of property does not affect the validity of a sale...
under such authorization to an entity that purchased...such property in good
faith, whether or not such entity knew of the pendency of the appeal, unless such
authorization and such sale...were stayed pending appeal.

11. U.S.C. § 363(m).

61.    Courts have defined a "good faith purchaser" as "one who buys property in good

faith and for value, without knowledge of adverse claims." In re Mark Bell Furniture Warehouse,

Inc., 992 F.2d 7, 8 (1st Cir. 1993).  "Good faith" is a lack of "fraud, collusion...or an attempt to

take grossly unfair advantage of other bidders." Id. citing In re Andy Frain Servs., Inc., 798 F.2d

1113, 1125 (7th Cir. 1986). Due to the absence of a bright line test for good faith, the

determination is based on the facts of each case, concentrating on the "integrity of [an actor's]

conduct during the sale proceedings." In re Tri-Cran, Inc., 98 B.R. 609, 618 (Bankr. D. Mass.

1989) quoting Rock Indus. Machinery Corp., 572 F.2d at 1198 (7th Cir. 1978).

62.    The Purchased Assets have been appropriately marketed. The Purchase Price,

which was offered following arm's-length negotiations with the Buyer. All parties with an

interest in the Purchased Assets will receive notice of the Private Sale and will be provided an

opportunity to be heard prior to its consummation. The Debtor submits that such notice is

adequate and satisfies the requisite notice provisions required under section 363(b) of the

Bankruptcy Code. Under the circumstances, the Buyer or other purchaser of the Purchased

Assets should be afforded the benefits and protections that Section 363(m) of the Bankruptcy

Code provides.

## V.    <u>Notice</u>

63.    Bankruptcy Rule 9006 permits the Court to shorten the twenty-one (21) day

notice of a hearing on the proposed sale of property of the estate that is otherwise required by

Federal Rule of Bankruptcy Procedure 2002.

64.     The Debtor has taken all reasonable efforts to market the Purchased Assets to

potential buyers during the prior six month period.  As affirmed in the Dworkin Affidavit, it is

highly unlikely that any new potential purchaser would emerge if the Debtor were to re-open or

engage in a further sale process.

65.     Because of the nature of the Purchased Assets and the terms of the transaction as

posed under the APA, the Buyer must take possession of the Purchased Assets as soon as is

practicable in order to maximize the value of the transaction for itself and for the Debtor. As

outlined herein and in the Dworkin Affidavit, there is a true likelihood that any delay of the

proposed closing will cause a significant decline in the value of the Purchased Assets that can be

realized by the Debtor for the benefit of its estate.  Moreover, the Buyer may terminate the APA

if the Sale is not consummated by May 1, 2018.

66.     There is an immediate need for DIP funding, which is predicated upon an

expedited sale of the Purchased Assets, rather than a longer term continuity of operations by the

Debtor.  There is also a need to utilize the existing inventory in the production process to meet

pending customer orders and maintain customer relationships in a manner that will maintain

these valuable customer relationship and promote ongoing purchases of the Debtor's products.

Further, the value in the Debtor's brand and product identity would be irreparably damaged if

production were suspended and product ceased to be supplied to customers, even if for only a

brief period.

67.     Accordingly, the Debtor requests that the notice period with respect to the Private

Sale be shortened so that a hearing on the Private Sale can be held on or before April 27, 2018,

or at the Court's next available hearing date, such that the Debtor and the Buyer may be

permitted to close the transaction no later than May 1, 2018.

68.     Notice of this Motion shall be served upon: (i) the Office of the United States

Trustee for the District of Massachusetts; (ii) holders of the thirty (30) largest unsecured claims

against the Debtor; (iii) the Debtor's senior secured pre-petition lender; (iv) all other secured or

potentially secured creditors; (iv) all taxing authorities whom the Debtor believes may have, or

may, assert claims against the Debtor or  any of the Debtor's assets; (v) counsel to each of the

petitioning creditors that are party to involuntary petition; and (vi) all parties who have filed a

notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  As

this Motion is seeking "first day" relief, notice of this Motion and any order entered respecting

this Motion will be served as required Bankruptcy Rule 2002 and MLBR 6004-1.  The Debtor

submits that under the circumstances, no other or further notice need be given.

69.     Once the Court has approved the form of Sale Notice attached hereto as Exhibit A

and provided the Debtor with a hearing date and an objection deadline, a copy of the Notice of

Sale shall be served on all creditors and all other parties entitled to receive such notice under

FRBP 6004 and MLBR 6004-1.  The Trustee requests that this Court find such service to be

appropriate and sufficient notice in the particular circumstances.

### *Waiver of Stay Imposed by Bankruptcy Rule 6004 and 6006*

70.     In order to maximize the value of the Debtor's assets, it is essential that the sales

occur on an expedited basis. Accordingly, the Debtor respectfully requests that the Court waive

any stays impose by Bankruptcy Rules 6004(h) and 6006(d) upon entry of the Sale Order.

### <u>Conditions to Closing</u>

71.     The Debtor proposed that there shall be no conditions to the consummation of the

Sale other than (i) the Court's entry of a final order approving the APA, the TSA, the License

Agreement and the Sale and entering an order consistent with the proposed sale order attached

hereto, (ii) the Debtor's and the Buyer's performance of its obligations under the APA, (iii) the

satisfaction of closing conditions identified in the APA, and (iv) the absence of any material

adverse effect to the Debtor or its estate arising during the interim period.  The Purchaser's

obligations under the APA are not subject to any financing contingency.

72.     The Debtor, the Buyer, and ACAS have reviewed the terms of the transaction and

have assented to the proposed deviation from the Local Rules that would require the sale be

approved without engaging in a competitive sale process if permitted by the Court.

73.     In addition, Purchaser may terminate the Agreement if the Sale Approval Order is

not entered or if the Closing has not occurred by May 1, 2018.

**Expedited Determination**

74.     Since the Involuntary Date, as a result of the filing of the Involuntary Petition, the

sudden and unexpected interruption of business by the Debtor, and its lack of communication

with customers, the value of the Debtor's business and its goodwill has sharply declined.

75.     The Purchaser's purchase of substantially all of the assets of the Debtor

anticipates that some of the remaining customers and goodwill of the business may be salvaged

by expeditiously reviving these imperiled customer relationships following the closing of the

Sale.

76.     The Debtor and Buyer have agreed that an expeditious sale of the Purchased

Assets is essential to capturing the remaining value of the Debtor's business and therefore

request that this court authorize the relief sought under this Motion on an expedited basis.

77.     The Debtor further requests that the sale order entered in connection herewith

shall be effective immediately upon entry and Rule 6004(g) of the Federal Rules of Bankruptcy

Procedure be waived, and no automatic stay of execution, pursuant to Rule 6004(h), Rule

6006(d), or Rule 62(a) of the Federal Rules of Civil Procedure, applies with respect to such an

order entered in connection herewith.

WHEREFORE, the Debtor respectfully requests that the Court enter an order in the

form attached hereto as Exhibit C:

    a.    Approving the Notice and other notice procedures related to the Private Sale;

    b.    Authorizing the sale of the Purchased Assets pursuant to the terms set forth in this motion;

    c.    Authorizing the Debtor to convey all of its right, title, and interest in the Purchased Assets free and clear of any and all liens, claims, interest and encumbrances, with any liens, claims, and interests to attach to the proceeds of the sale with the same validity, priority, and enforceability as existed prior to the Involuntary Date;

    d.    Finding that the Buyer or other purchaser at the Private Sale are good faith purchasers and entitled to the protections of 11 U.S.C. § 363(m);

    e.    To the extent necessary, shortening the 21-day notice period otherwise required by Bankruptcy Rule 2002 with respect to a hearing on the sale of estate property to ten (10) days, pursuant to Bankruptcy Rule 9006;

    f.    Waiving the provisions of MLBR 6004-1 requiring the solicitation of higher and better offers to purchase the Purchased Assets;

    g.    Authorizing the Closing Proceeds to be distributed to the Landlord and ACAS, as provided in the APA;

    h.    Waiving the automatic stay provisions of Bankruptcy Rule 6004(h) such that the order may take effect immediately upon entry; and

    i.    Providing the Debtor with such other and further relief as just and proper.

Respectfully Submitted,
NEW ENGLAND CONFECTIONERY
COMPANY, INC.,
By its proposed counsel,

/s/   Scott Moskol
**Scott H. Moskol (BBO #628323)**
**William V. Sopp (BBO #544625)**
**Tal M. Unrad (BBO #673498)**
**BURNS & LEVINSON LLP**
125 Summer Street
Boston, MA 02110
Phone: (617) 345-3000
Fax: (617) 345-3299
smoskol@burnslev.com
wsopp@burnslev.com
tunrad@burnslev.com

DATED: April 17, 2018

## EXHIBIT A

**Proposed Notice**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 7** |
| **NEW ENGLAND CONFECTIONERY** | ) **(conversion pending)** |
| **COMPANY, INC.,** | ) |
| | ) **Case No. 18-11217-MSH** |
| Debtor. | ) |
| | ) |

## NOTICE OF INTENDED PRIVATE SALE

Notice is hereby given pursuant to Section 363 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 6004 and Massachusetts Local Bankruptcy Rule 6004-1, that New England Confectionery Company, Inc., as debtor and debtor-in-possession (the "Debtor"), intends to sell, transfer, and convey by private sale (the "Private Sale") all of the estate's right, title, and interest in its assets (collectively, the "Purchased Assets") to CI-N Acquisition LLC (the "Buyer") for the Purchase Price of $13,296,900.18, subject to certain allocation of proceeds and potential reductions based upon final asset values, plus certain earn-out rights ("Purchase Price") free and clear of all liens, claims, encumbrances, and interests, with such liens, claims, encumbrances, and interests to attach to the proceeds of the Private Sale.

**A listing of the Purchased Assets is available upon request from the undersigned**.

In connection with the proposed sale of the Purchased Assets the Debtor has filed the Debtor's Motion for (I) Order Establishing Bidding Procedures and Granting Related Relief and (II) Order Approving Sale of Substantially All Assets Free and Clear of All Encumbrances, Claims, Encumbrances, and Interests and Granting Related Relief [Docket No. 33] (the "Sale Motion"). The terms of the Private Sale are described below, and are more particularly set forth in the Sale Motion. A copy of the Sale Motion is available from counsel to the Debtor upon request.

**THE PURCHASED ASSETS SHALL BE SOLD FREE AND CLEAR
OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS**

1.     Pursuant to 11 U.S.C. § 363(f) and the Sale Motion, the Purchased Assets are to be sold to the Buyer free and clear of liens, claims, and interests whatsoever, known or unknown, including without limitation those noted in the Sale Motion.

2.     All liens, claims, or interests shall attach to the proceeds of the Private Sale to the same extent, priority, and validity that existed on April __, 2018, the date on which the Debtor's case was converted to a case under Chapter 11 of the Bankruptcy Code. The validity and enforceability of any contested lien shall be determined by the Bankruptcy Court after due notice and hearing.

3.      The Debtor has requested that the Bankruptcy Court determine, at the Sale Hearing (as defined below), that the successful bidder or bidders on the Purchased Assets be deemed to be "good faith" purchaser(s) providing to the Debtor consideration for the Assets which constitutes payment of "value" pursuant to Section 363(m) of the Bankruptcy Code.

4.      The Purchased Assets are to be sold in "as is" and "where is" condition. The Debtor makes no representations or warranties whatsoever, either express or implied, with respect to the Purchased Assets.

### DEADLINES FOR OBJECTIONS
### TO THE SALE MOTION; HEARING DATE FOR THE SALE MOTION

5.      A hearing on the Sale Motion is scheduled **for                          , 2018 at      :00  __M** before the Honorable Melvin S. Hoffman, United States Bankruptcy Court, District of Massachusetts, at the United States Courthouse, John W. McCormack Courthouse, 5 Post Office Square, Boston, Massachusetts, Courtroom 2.

6.      **Any objections to the Sale Motion must be filed on or before
          , 2018 at 4:30 p.m. via the Court's CM/ECF system or with the Clerk, United States Bankruptcy Court, District of Massachusetts, at the United States Courthouse, John W. McCormack Courthouse, 5 Post Office Square, Boston, Massachusetts 02109**. Any objection must state specifically why the Private Sale should not be authorized. Unless a timely objection is filed, the Private Sale may be approved without a hearing. A copy of any objection should be served on counsel to the Debtor, Scott H. Moskol, Esq., BURNS & LEVINSON LLP, 125 Summer Street, Boston, MA 02110 (smoskol@burnslev.com)**.**

**7.**      Pursuant to the terms of the **proposed Private Sale, the Court will not conduct a competitive bidding procedure or auction with respect to the Purchased Assets.  Notwithstanding the foregoing, a party shall be permitted to submit an offer** or counteroffer to purchase any or all of the Purchased Assets.

Respectfully submitted,

NEW ENGLAND CONFECTIONERY

COMPANY, INC.

By its proposed counsel,

Dated: _