UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| In re: | Chapter 7 |
| NEW ENGLAND CONFECTIONERY COMPANY, INC. | Case No. 18-11217 (MSH) |
| Debtor | |

**AMERICRAFT CARTON, INC.'S OMNIBUS OPPOSITION TO FIRST DAY MOTIONS AND EXPEDITED CONSIDERATION OF OTHER MOTIONS**

Americraft Carton, Inc., ("Americraft") herby opposes the "First Day Motions" and the request for expedited and/or emergency consideration of those and the other motions filed by Debtor on April 17 (collectively "the Motions"),[1] saying in support as follows:

**I.    INTRODUCTION**

Though this matter has been pending for approximately two weeks, Debtor, on one day's notice, is requesting that this Court turn the entire proceeding upside down.  The Debtor wants to convert this involuntary Chapter 7 case into a Chapter 11 case, allow it to act as a debtor-in-possession, accept superpriority DIP financing from the largest secured lender (that also happens to own the stock of the Debtor and control its board of directors), and speed up the planned sale of all remaining assets of the Debtor for approximately $15 million dollars to Gordon Brothers, a specialist in what it euphemistically describes on its website as "industrial disposition" – i.e. liquidation.

Americraft objects to the Motions and any expedited/emergency consideration.  The Debtor is entirely controlled by the secured lender, ACAS LLC, which has long planned the

---

[1] For the record, Americraft opposes Docket Entries Nos. 18, 20-22, 23, 33-34 and expedited/emergency treatment of same.

{S1147579.1}

liquidation of Debtor and already extracted much of Debtor's value, to the detriment of the rest of the creditors. ACAS has manufactured this whole emergency as a way of forcing through an asset sale without the involvement of a Creditor's Committee or Trustee. Because of ACAS', and thus Debtor's, bad faith, conversion to Chapter 11 is inappropriate, but at the very least, if the Court grants the conversion, it should, as described below, allow enough time for (1) the creditors to address the many request for relief in the Motions, and (2) an independent third party to be appointed, to review the proposed sale, and manage the Debtor in the interim.

## II.  BACKGROUND

### A.  Since Early 2017, ACAS Has Intended the Liquidation of Debtor.

As Debtor admits, ACAS, through a subsidiary, owns all of the stock of Debtor. *See* DIP Financing Motion, Docket Entry No. 20, ¶9. In addition, a majority of the members of Debtor's Board are employed by ACAS or ACAS' parent, Ares Capital Corp. ("Ares"). ACAS has controlled Debtor since at least December 2007, when it loaned tens of millions of dollars to Debtor. ACAS actively managed Debtor for approximately a decade, installing its own CEO shortly after investing in the company.

That active management changed in early 2017, when Ares purchased ACAS in a $3.4 billion merger. ACAS began to plan for Debtor's liquidation and the recoupment of as much of ACAS' debt as possible. Shortly after the merger, in February 2017, ACAS recorded a financing statement covering the loans it had made to Debtor nearly a decade earlier. A short time later, in April 2017, Debtor, controlled by ACAS, consummated a sale of its real estate in Revere, for a purchase price of $54.6 million. Even though Debtor was an active manufacturing company with hundreds of workers and large amounts of equipment necessary to make candy, ACAS and Debtor made no provision for a location to continue the business after the sale. Instead, Debtor

only secured a short-term lease to stay on the Revere property until August 2018, which is the exact month the last of Debtor's loans to ACAS became due.

Instead of using the proceeds from the real estate sale to fund Debtor's ongoing operations, ACAS had Debtor repay ACAS' loans. Americraft has brought numerous claims in Massachusetts Superior Court against ACAS based on this transaction, including fraudulent transfer, tortious interference, veil piercing, as well as a derivative claim on Debtor's behalf against ACAS and Debtor's board and management. A copy of the Complaint is attached hereto as Exhibit A.

**B.    ACAS' Attempt to Secure an Emergency Receivership.**

As Debtor's financial difficulties continued throughout 2017, its debt to trade creditors, like Americraft, grew. Americraft, and others, instituted collection actions in early 2018. It was at that point that ACAS took drastic action to forestall the collection actions. After trying and failing to convince a Massachusetts Superior Court judge to reject attachments and other pre-judgment remedies sought by Americraft, ACAS for the first time issued a notice of default to Debtor and filed an Emergency Petition in a different Superior Court for appointment of a Receiver. As grounds, ACAS claimed the same "emergency" as allegedly exists here – the need to consummate a sale transaction.

The Court rejected the request without prejudice, noting that (1) ACAS had proceeded on an emergency basis without notifying all the creditors of Debtor, (2) had not demonstrated any emergency, (3) did not disclose that ACAS controlled Debtor, and (4) did not disclose that only days before another judge had issued attachments and reach-and-apply orders. *See* March 30, 2018 Order at 6-7, Exhibit B hereto. Having failed in Superior Court, ACAS, through Debtor, is attempting the same thing in this Court.

### III. THE COURT SHOULD DENY THE FIRST DAY MOTIONS.

In the First Day Motions, Debtor seeks, on an emergency basis, to covert the case to a Chapter 11 proceeding, continue to manage the company without outside intervention, and receive this Court's blessing for a sale of the remaining assets of Debtor. The Court should deny the request for two reasons: first, Debtor is not acting in good faith; and, second, the aim of the conversion is simply liquidation of the Company, making conversion futile.

#### A. The Requested Conversion Is Not in Good Faith.

As acknowledged by Debtor, conversion under Section 706(a) is only permitted when the debtor has acted in "good faith." *See Marrama v. Citizens Bank*, 549 U.S. 365, 127 S. Ct. 1105, 1110-11 (2007). The purpose of the conversion right is to give to "honest but unfortunate debtors . . . the chance to repay their debts should they acquire the means to do so." *Id.* at 1111. Therefore, pre-petition misconduct, misrepresentations during the bankruptcy proceeding, and other "atypical" conduct by the debtor invalidate the conversion right. *See id.* at 1111-12 & n.11. There are numerous relevant factors in the good faith analysis, including

> (1) debtor's accuracy in stating her debts and expenses, (2) debtor's honesty in the bankruptcy process, including whether she has attempted to mislead the court and whether she has made any misrepresentations, (3) whether the Bankruptcy Code is being unfairly manipulated, (4) the type of debt sought to be discharged, (5) whether the debt would be dischargeable in a Chapter 7, and (6) debtor's motivation and sincerity in seeking Chapter [11] relief.

*In re Cabral*, 285 B.R. 563, 573 (B.A.P. 1st Cir. 2002).

These factors argue against conversion here. First, Debtor is not seeking to get its business back on its feet and repay its debts to its creditors. Instead, it is seeking to shed assets, making operations impossible, to pay only a single creditor, its owner ACAS. *See In re Porter*, 276 B.R. 32, 36 n.3 (Bnkr. D. Mass. 2002) (citing cases for existence of subjective bad faith when "the real motivation behind the request was to abuse the reorganization process and cause

hardship or delay to creditors by seeking reorganization without an intent or ability to reorganize"). That has been the plan for over a year now. Debtor, depleted of its real estate, has no property at which to operate and no plan to operate past August 2018. After the proposed sale, it will have no means to do so. The motivation to benefit ACAS at the expense of all other creditors is obvious from the very text of the Asset Purchase Agreement. As section 1.6 of that Agreement makes clear, absent a contrary order from this Court, the sale proceeds will be paid directly to ACAS. *See also* Sale Motion ¶¶25-26 (proposing proceeds get paid to ACAS).

Second, Debtor and ACAS are attempting to abuse the bankruptcy process (like the receivership process before) in an attempt to deprive other creditors of any recourse, without adequate notice or opportunity to respond. At each juncture of this case, they have created the emergencies they later say require extraordinary relief. In the Superior Court, they claimed they needed a receiver to conclude negotiations with a purchaser for the benefit of all creditors, attempting to hide the fact that ACAS controlled Debtor and could obviously continue to negotiate with a purchaser if they wanted. *See* Superior Court Order at 7, Exhibit B hereto (concluding ACAS control over Debtor allowed it to take actions necessary to avoid wasting of assets forestalling any emergency). Moreover, Debtor's representation that a receiver was needed to consummate a transaction was obviously false because Debtor signed the Asset Purchase Agreement with Gordon Brothers about two weeks after the Superior Court denied the receivership.

ACAS and Debtor have continued misrepresenting their motivations in this Court. They claim an emergency need for the requested relief because (1) Debtor will be running out of cash by the end of the week, and (2) the negotiated purchase by Gordon Brothers requires a closing by the beginning of May. Both of those are problems of their own making. If Debtor is indeed running out of cash, it is only because ACAS has refused to provide working capital under the

line of credit Debtor has been using for some time. In other words, ACAS cut off Debtor's funding and now claims an emergency lack of funding.

Just as self-made is the imminent closing deadline for the Asset Purchase Agreement with Gordon Brothers. ACAS and Debtor represented to the Massachusetts Superior Court only a few weeks ago that they had not consummated a purchase with a buyer and needed a receiver to finish up negotiations. Yet, on their own, after denial of the receivership, they completed the transaction in a matter of days. In fact, the Agreement was signed on the same day Debtor filed the First Day Motions. *See* Docket Entry No. 33, Exhibit D. Thus, at the same time Debtor was writing its papers claiming this Court should on an emergency basis shorten the sale notice period because of an imminent closing date, Debtor and ACAS were setting the closing date.

Just as Debtor and ACAS manufactured an illusory emergency in Superior Court, they are trying to engineer quick action in this case. The evident purpose is to conclude a sale before an independent party like a Creditors' Committee or Trustee can evaluate the fairness of the transaction. An "honest but unfortunate" debtor interested in reorganizing to pay its creditors, does not engage in this types of gamesmanship and these misrepresentations,[2] nor does it harbor

---

[2] Debtor has made other misleading statements in this Court. In the limited time it has had to review Debtor's numerous motions, Americraft has identified three such statements. First, Debtor represented to the Superior Court at the end of March 2018, that it was "in the process of *negotiating* a sale to a prospective buyer," *see* Exhibit B at 2 (emphasis added), yet tells this Court that the sale to Gordon Brothers was scheduled to "close" at the end of March. *See* Sale Motion ¶22.

Second, in its DIP Financing Motion, Docket Entry No. 20, Debtor intimated that ACAS provided notice of default and accelerated the amount due in March 2018 just like other arms' length creditors were doing at the time. *See id.* ¶¶15-16. In fact, ACAS only issued default notices once other creditors began to have success in their collection actions and ACAS needed to provide a factual basis for pursuing its emergency receivership strategy.

Third, in Paragraph 11 of the Sale Motion, Debtor represented that it was not able to conclude the Gordon Brothers transaction because of, among other things, the defaults to ACAS. That is obviously untrue, inasmuch Debtor did sign the agreement with Gordon Brothers on April 17,

an overriding desire to benefit the single creditor that controls its every action. In these circumstances, conversion should be denied.

> B. **Liquidation Is Debtor's and ACAS', Evident Purpose Making Conversion Futile.**

Similarly, conversion should not be granted when it is futile. *See In re Lilley*, 29 B.R. 442, 443 (1st Cir. BAP 1983). That is exactly the case here. While Debtor has not filed any reorganization plan, it is not difficult to discern what the true purpose of the supposed reorganization is. The existing lease to operate in Revere ceases in just a few months. There is no viable way that Debtor will be able to continue to operate and manufacture candy, which is precisely why it issued sixty-day WARN Notices to its employees on March 6, 2018. And that is why Debtor has agreed to sell itself to Gordon Brothers, which specializes in liquidation. Converting to Chapter 11 simply to liquidate the company achieves nothing, and thus should be denied. *See In re Tardiff*, 145 B.R. 357, 360 (Bankr. D. Me. 1992) ("Conversion need not be permitted where it serves no point.").

**IV.    IN THE ALTERNATIVE, THE COURT SHOULD DENY EXPEDITED TREATMENT OF THE SALE MOTION AND THE OTHER MOTIONS.**

Even if the Court is inclined to allow the conversion and interim financing, it can and should impose conditions on that conversion to allow sufficient time for appointment of a Creditor's Committee or trustee to evaluate the sale, manage Debtor on an ongoing basis, and allow creditors to examine the rest of Debtor's emergency requests.

---

2018, with the defaults still outstanding. Moreover, ACAS was intimately involved in the negotiations with Gordon Brothers. It issued the default notices during the negotiations precisely because it knew it would not affect the negotiations.

{S1147579.1}                                                7

This Court has the inherent power to impose conditions on the conversion from a Chapter 7 to Chapter 11. *See In re Porter*, 276 B.R. at 37 (citing cases). Here, Debtor is completely controlled by its single biggest creditor, which has in the past made the Debtor dispose of some of its most valuable assets for the creditor's gain. The Debtor's Board and management have demonstrated that they do not act in the best interests of the Debtor. If conversion is granted and DIP financing granted, the Court should delay consideration of the remaining issues, including the sale motion, so that an independent third party, such as a Creditor's Committee or Trustee can be appointed.

The need for additional time is evident upon a brief review of Debtor's requested relief, much of which is geared toward helping ACAS not Debtor. Americraft has only had a single day to review all of Debtor's motions. But in that short time, it has noted objections to several of the terms of the proposed DIP Facility. First, the Facility requires that "all obligations" owed to ACAS be secured by Postpetition Collateral. *See* DIP Financing Motion ¶31(q). The Postpetition Collateral should be limited to security the DIP Facility, not pre-petition obligations to ACAS.

Second, there are several events of default under the DIP Facility that unduly impair the Debtor's and creditors' rights. For example, institution of litigation by the Debtor or on behalf of the Debtor "against Lender or any person or entity affiliated with Lender" constitutes a default. *See* DIP Financing Motion ¶31(w)(j). That is intended to prevent any derivative claim against the Debtor's board (most of whom are employed by ACAS or ACAS' parent) for breach of their fiduciary duties in the management of Debtor and sale of its Revere real estate. Thus, any reorganization will be held hostage to ACAS' attempt to immunize its employees and itself from any action by a Trustee or other party. Indeed, appointment of a trustee also constitutes a

default, *see id.* ¶31(w)(g), which will prevent any even-handed review of the reorganization process.

Finally, there is no emergency that justifies prohibiting adequate investigation and consideration by the creditors and/or a trustee. As requested by Debtor, ACAS will be providing funding that is budgeted to last thirteen weeks. *See* Approved Budget, Exhibit A to Interim Order, Docket No. 20-1. That should be more than enough time for the creditors and others to review the Sale Request as well as the other emergency requests.

WHEREFORE, AmeriCraft respectfully requests the Court:

A. Deny the "First Day Motions" as well as Docket No. 34;

B. In the alternative, deny expedited consideration of the Sale Motion and emergency consideration of the other Motions; and

C. Grant any other just and appropriate relief.

Respectfully submitted,

AMERICRAFT CARTON, INC.

By its attorneys,

/s/ James S. LaMontagne
James S. LaMontagne (BBO# 631022)
Christopher M. Candon (BBO# 650855)
Charles M. Waters (BBO# 631425)
SHEEHAN PHINNEY BASS & GREEN, PA
1000 Elm Street, 17th Floor
Manchester, NH 03101
Tel.: 603-668-0300
Fax: 603-627-8121
E-mail: ccandon@sheehan.com

Dated:  April 18, 2018

{S1147579.1}                                                                9

## CERTIFICATE OF SERVICE

      I, Christopher M. Candon, hereby certify that a copy of the Notice of Appearance and Request for Service of Papers was served upon all parties via first class mail, postage prepaid, or electronically via the CM/ECF system on April 18, 2018.

Patrick P. Dinardo, Esq.
Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

John Fitzgerald
Office of the United States Trustee
5 Post Office Square, Suite 1000
Boston, MA 02109-3945

Joseph L. Schwartz
Riker, Danzig, Sherer, Hyland & Perretti
One Speedwell Avenue
Morristown, NJ 07962

John J. Dussi, Esq.
Cohn & Dussi
500 West Cummings Park, Suite 2350
Woburn, MA 01801

New England Confectionery Company, Inc.
135 American Legion Highway
Revere, MA 02151

      /s/ James S. LaMontagne
      James S. LaMontagne