# **EXHIBIT A**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is entered into as of May ___, 2018, by and between Harold B. Murphy, in his capacity as Chapter 11 Trustee (solely in such capacity the "**Trustee**," with NECCO (as defined below) and the Trustee being collectively the "**Seller**") of NECCO, the debtor in In re New England Confectionery Company, Inc., Chapter 11 Case No. 18-11217-MSH (the "**Bankruptcy Case**"), currently pending in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"), and Frankford Candy LLC, a Delaware limited liability company (the "**Purchaser**").

## Introduction

WHEREAS, the Purchaser wishes to purchase from the Seller, and the Seller desires to sell to the Purchaser, certain assets of Seller as set forth herein. The purchase and sale of the assets and the other transactions contemplated hereby are sometimes collectively referred to herein as the "**Transactions**."

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1
## THE TRANSACTIONS; CLOSING

1.1.  **Purchase and Sale of Purchased Assets**. Subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties contained herein, at the Closing, the Purchaser shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Purchaser, free and clear of all liens, claims (including, but not limited to, any "claim" as defined in Section 101(5) or "lien" as defined in Section 101(37) of the Bankruptcy Code), security interests, mortgages, encumbrances and restrictions of every kind (collectively, "**Liens**"), all of Seller's right, title and interest in the following assets (collectively, the "**Purchased Assets**") on an "**AS IS**" "**WHERE IS**" basis with no representations and warranties of any kind except as are specifically provided for herein:

(a)  all raw materials, work-in-process and finished goods, and other items of inventory owned by Seller with respect to the Product Line (collectively, "**Inventory**"), including, without limitation, all Inventory listed or described on **Schedule 1.1** attached hereto and incorporated herein by this reference;

(b)  all tangible assets, including all machinery, equipment, tools and other tangible property and equipment, owned or used by Seller with respect to the Product Line (collectively, "**Equipment**"), including, without limitation, all Equipment listed or described on **Schedule 1.1** attached hereto and incorporated herein by this reference; provided, that the foregoing shall not include any assets used but not owned by the Seller that arise from contracts included in the Excluded Assets;

(c)  all intellectual property and related rights owned or used by Seller with respect to the Product Line, including, without limitation, all patents, trademarks, tradenames, service marks and copyrights (whether registered or unregistered), domain names, and other similar designations of source or origin (and all applications and registrations for the foregoing), trade secrets, know how, all historic catalogs, engineering, artwork, copywriting,

LEGAL\36254922\2

document and data files, images, pictures, photos, creative copy and drafts, brochures, catalogues, brand logos, corporate photographs, recipes, designs, artwork design and copy for current and future catalogs and marketing materials, including the "Sweethearts" name and all variations thereof (collectively, "**Intellectual Property**"), including, without limitation, all Intellectual Property listed or described on **Schedule 1.1** attached hereto and incorporated herein by this reference; provided, that the foregoing shall not include any assets used but not owned by the Seller that arise from contracts included in the Excluded Assets;

(d) to the extent applicable, all certificates of title and other documentation necessary to convey title to the Equipment included in the Purchased Assets (the "**Certificates of Title**");

(e) all manufacturer and other warranties relating to the Purchased Assets, to the extent assignable;

(f) the licenses, permits, authorizations, franchises and certifications of governmental and non-governmental authorities held by the Seller that are related to the Purchased Assets (the "**Permits**"), including, without limitation, all Permits listed or described on **Schedule 1.1** attached hereto and incorporated herein by this reference; and

(g) all manuals, instructions and other similar documents related to the Purchased Assets, to the extent in the possession and control of the Seller.

1.2. **Excluded Assets.** The Purchaser expressly understands and agrees that it is not purchasing or acquiring, and the Seller is not selling or assigning, any assets and/or properties of the Seller except those enumerated as Purchased Assets, including, without limitation, the following assets and properties of the Seller (the "**Excluded Assets**"): (a) all cash and cash equivalents, bank accounts and securities of the Seller, and all accounts receivable held by or owed to Seller, including all books and records relating to such accounts receivable, whether in tangible or electronic form, including invoices, purchase orders, proof of shipping and delivery, contracts of purchase, warranties and correspondence relating to such accounts receivable; (b) the corporate seals, organizational documents, minute books, stock books, tax returns or other records primarily having to do with the corporate organization of the Seller, all employee-related or employee benefit-related files or records and any other books and records related to employees which the Seller is prohibited from disclosing or transferring to Purchaser under applicable law and is required by applicable law to retain; (c) all insurance policies of Seller and all rights to applicable claims and proceeds thereunder; (d) all rights to any action, suit or claim of any nature available to or being pursued by the Seller, whether arising by way of counterclaim or otherwise, other than any rights to any action, suit or claim related to the Purchased Assets, (e) all benefit plans and trusts or other assets attributable thereto, (f) the rights which accrue or will accrue to the Seller under this Agreement, any other agreement, document or instrument entered into by the Seller in connection with this Agreement or in connection with the Transactions, (g) all rights arising under any agreement, contract, lease or other commitment of the Seller, whether written or oral, and (h) any sums of money that the Seller has been required to deposit or place with any of its utility providers as additional security.

1.3. **Excluded Liabilities.** Neither the Purchaser nor any of its Affiliates shall assume or in any way be responsible for any obligations or liabilities of the Seller or any of its Affiliates (whether or not disclosed) of any kind. Without limiting the generality of the foregoing, neither the Purchaser nor any of its Affiliates will assume: (a) any Taxes of Seller

LEGAL\36254922\2

or any of its Affiliates, any sales Tax associated with the transfer of the Purchased Assets from Seller to Purchaser pursuant to this Agreement, or any personal property Tax imposed upon the Purchased Assets through the Closing Date; (b) any liability relating to any benefit plans, employees or contractors of the Seller or any of its Affiliates; (c) any obligation of the Seller under this Agreement or any other agreement, document or instrument entered into by the Seller in connection with this Agreement; (d) any obligation of the Seller incurred in connection with the Transactions, including all amounts in respect of legal, investment banking, financial advisor, broker and other similar fees, costs, expenses and obligations; (e) any Indebtedness; (f) any liability arising out of any action, arbitration, claim, proceeding or litigation of any nature (whether or not disclosed) against the Seller or relating to the operation of its business; (g) any liability arising out of the Seller's violation of any Legal Requirement; (h) any liability arising under any agreement, contract, lease or other commitment of Seller, whether written or oral, and any liability arising out of the failure of the Seller to comply with any such agreement, contract, lease or other commitment; (i) any liability to any stockholder of the Seller or to any Affiliate of the Seller; (j) any liability or obligation of the Seller arising out of or relating to the Bankruptcy Case; or (k) any other liabilities or obligations of the Seller relating to the use of the Purchased Assets prior to the Closing or any other actions or inaction by the Seller prior to the Closing, including but not limited to, leading to the loss of life or loss of property. The liabilities and obligations of the Seller, which shall remain the obligation and responsibility of the Seller following the Closing, are collectively referred to as the "**Excluded Liabilities**."

1.4. **Certain Definitions.** For purposes of this Agreement, the following terms shall have the meanings indicated below:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" means, with respect to a specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"**Facility**" means the property locally known and numbered as 153 American Legion Highway, Revere, Massachusetts.

"**Fundamental Representations**" means the representations set forth in Section 2.1, Section 2.2, Section 2.3, the last sentence of Section 2.4, Section 3.1, Section 3.2, Section 3.3 and Section 3.4.

"**Indebtedness**" means all principal, interest, fees, expenses and other amounts in respect of borrowed money, notes, bonds, debentures and other debt securities, guarantees, interest rate, currency or other hedging arrangements, capital leases, letters of credit and/or installment purchases incurred by the Seller or any of its Affiliates, or required to be paid in order to discharge fully all such amounts.

"**Legal Requirements**" means, with respect to any Person, all foreign, federal, state and local statutes, laws, ordinances, judgments, decrees, orders, rules, regulations, policies and

guidelines, in each case of any governmental entity, applicable to such Person.

"**Motion for Sale Order**" means the Debtor's Motion For Order Approving Private Sale of Certain of Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests and Granting Related Relief attached hereto as Exhibit 1.4(a).

"**NECCO**" means New England Confectionery Company, Inc., a Delaware corporation.

"**New Inventory**" means inventory produced after the Closing Date and on or prior to the end of the Transition Period (as defined in the TSA).

"**Person**" means any natural person or corporation, limited liability company, partnership, trust, other business entity, governmental authority or non-governmental authority.

"**Product Line**" means the "Sweethearts" product line brand manufactured by Seller.

"**Purchase Price**" means $500,000.00.

"**Purchase Price Deposit**" means $25,000.00.

"**Sale Approval Date**" means the date on which the Bankruptcy Court enters the order of the Bankruptcy Court approving the Motion for Sale Order.

"**Sale Approval Order**" means the order of the Bankruptcy Court approving the Motion for Sale Order, which order is not subject to stay pursuant to Bankruptcy Rules 3020(c) or 6004 and is in the form attached hereto as Exhibit 1.4(b).

"**Tax**" or "**Taxes**" means all taxes, charges, fees, levies, penalties, additions or other assessments imposed by any foreign, federal, state or local taxing authority, including, but not limited to, income, excise, property, sales, use, transfer, franchise, payroll, withholding, value added, social security or other taxes, charges or assessments, including any interest, penalties or additions attributable thereto.

"**Tax Returns**" means all reports, estimates, declarations of estimated Tax, information statements and returns relating to, or required to be filed in connection with, any Taxes and any schedules attached to or amendments of (including refund claims with respect to) any of the foregoing.

"**TSA**" means a Transition Services Agreement between the Seller and the Purchaser in the form attached hereto as Exhibit 1.4(c).

1.5. Closing. The Transactions contemplated hereby shall take place at a closing (the "**Closing**") to be held remotely by the electronic exchange of documents and signatures (or at such location as the parties may designate in writing) on the date, after the entry by Bankruptcy Court of the Sale Approval Order, that the conditions to Closing specified in Article 5 hereof have been satisfied or waived or such other date as agreed to in writing by the Seller and the Purchaser (the "**Closing Date**").

1.6. Payment of Purchase Price.

(a) Upon the execution, and on the date of this Agreement, Purchaser will

LEGAL\36254922\2

deliver to Trustee the Purchase Price Deposit by check or wire transfer of immediately available funds pursuant to the wire instructions provided by Trustee. At the Closing, the Purchase Price Deposit shall be credited against the Purchase Price paid by Purchaser to Seller. The Purchase Price Deposit shall be non-refundable except as otherwise provided in this Agreement, in which case the Purchase Price Deposit shall be returned to Purchaser pursuant to the terms of this Agreement.

(b)     At the Closing, the Purchaser will pay to Trustee or Seller, as applicable, an amount equal to (i) the Purchase Price minus (ii) the Purchase Price Deposit, to be paid by check or wire transfer of immediately available funds pursuant to the wire instructions provided by Trustee or Seller, as applicable.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLER

The Seller represents and warrants to the Purchaser that the following is true and correct:

2.1.    **Organization, Power and Standing.** NECCO is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own, lease and operate its properties and to carry on its business. NECCO is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do so would not have or be reasonably expected to have a material adverse effect on the Purchased Assets. The Trustee has been duly appointed as trustee for NECCO and has all requisite power and authority to proceed with the Transactions.

2.2.    **Due Authorization; No Conflict.** The Seller has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and (subject to entry of the Sale Approval Order) to carry out the terms of this Agreement and the other agreements, instruments and documents of the Seller contemplated hereby. Except as specified on **Schedule 2.2** (the "**Required Consents**") and subject to entry of the Sale Approval Order, no consent, order, authorization, approval, declaration or filing with any Person, is required on the part of the Seller for or in connection with its execution, delivery or performance of this Agreement or any of the other agreements, documents and instruments contemplated hereby. Subject to obtaining the Required Consents specified on **Schedule 2.2** and subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Seller will not result in any violation of, be in conflict with, constitute a default under, or cause the acceleration of any obligation or loss of any rights under, any Legal Requirement or agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document or Permit to which the Seller is a party or by which the Seller or Purchased Assets are bound.

2.3.    **Validity and Enforceability.** This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Seller is a party shall be when executed and delivered by the Seller, the valid and binding obligations of the Seller enforceable in accordance with its terms, subject only to entry of the Sale Approval Order.

2.4.    **Condition of Purchased Assets.** The condition and status of the Purchased

LEGAL\36254922\2

Assets has not materially changed from the condition and status of such assets as of the inspection conducted on Purchaser's behalf on February 1, 2018. At the Closing, the Purchaser will acquire from the Seller good and marketable title to the Purchased Assets, free and clear of all Liens.

2.5. **Permits.** The Seller is in compliance in all material respects with all of the Permits required with respect to the Purchased Assets, all of which are in full force and effect and will be in full force and effect and held by the Purchaser immediately after giving effect to the Transactions. The Seller does not know of any threatened suspension, revocation or invalidation of any such Permits, or any basis therefor.

2.6. **Litigation.** Except as set forth on **Schedule 2.6** and except for the Bankruptcy Case, no action, arbitration, suit, proceeding or investigation is pending or, to the knowledge of the Seller, threatened against the Seller, or any equity holder, former equity holder, officer, director, manager or employee of the Seller, in each case, regarding the Purchased Assets. Except as set forth on **Schedule 2.6**, the matters disclosed on such Schedule will be covered by the Seller's insurance policies.

2.7. **Environmental Matters.** There is and will be no liability attaching to the Purchaser or the Purchased Assets as a result of any hazardous substance that may have been discharged on or released from any premises owned or operated by the Seller (including any predecessors or subsidiaries) or in connection with the Purchased Assets, or disposed of on-site or off-site. For purposes of this Section, "hazardous substance" shall mean oil or any other substance which is included within the definition of a "hazardous substance," "pollutant," "toxic substance," "toxic waste," "hazardous waste," "contaminant" or other words of similar import in any foreign, federal, state or local environmental Legal Requirement.

2.8. **No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE 2, neither the Seller, any equity holder of the Seller, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Seller and the Seller hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Purchaser by any director, officer, employee, agent, consultant, or representative of the Seller or any of its Affiliates). **The Purchaser acknowledges that, except as otherwise specifically provided for in this Agreement, the Purchased Assets are being sold to the Purchaser on an "AS IS" "WHERE IS" basis with no representations or warranties of any kind.**

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller that the following is true and correct.

3.1. **Organization, Power and Standing.** The Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to effect the Transactions. The Purchaser is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do

LEGAL\36254922\2

so would not have or be reasonably expected to have a material adverse effect on this Transaction.

3.2. **Due Authorization.** The Purchaser has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and to carry out the terms of this Agreement and the other agreements, instruments and documents of the Purchaser contemplated hereby.

3.3. **No Conflict.** No consent, approval or authorization of or declaration or filing with any governmental or non-governmental authority or any party to any contract with the Purchaser is required on the part of the Purchaser for or in connection with its execution, delivery or performance of this Agreement and the other agreements, documents and instruments contemplated hereby. The execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Purchaser will not result in any violation of, be in conflict with, or constitute a default under any Legal Requirement, agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document or permit to which the Purchaser is a party or by which the Purchaser is bound.

3.4. **Validity and Enforceability.** This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Purchaser is a party shall be when executed and delivered by the Purchaser, the valid and binding obligations of the Purchaser enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

3.5. **No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE 3, neither the Purchaser, any equity holder of the Purchaser, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Purchaser and the Purchaser hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Seller or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Seller by any director, officer, employee, agent, consultant, or representative of the Purchaser or any of its Affiliates).

## ARTICLE 4
## COVENANTS

4.1. **Personal Property Taxes.** The Seller shall be responsible for all personal property Taxes imposed upon the Purchased Assets through the Closing Date and to the extent such Taxes do not relate to a Straddle Period (as defined below), Seller shall pay such personal property Taxes directly to the appropriate taxing authority when due. In the case of any personal property Taxes that are imposed on a periodic basis and are payable for any portion of any taxable period that includes but does not end on the Closing Date (each such taxable period, a "**Straddle Period**"), the portion of such personal property Tax that relates to the portion of the Straddle Period (a) ending on the Closing Date shall be deemed to be the amount of such personal property Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period and (b) beginning on

LEGAL\36254922\2

the day immediately following the Closing Date and ending with the last day of the applicable taxable period shall be deemed to be the amount of such personal property Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period beginning with the day immediately following the Closing Date and ending with the last day of the applicable taxable period and the denominator of which is the number of days in the entire taxable period. Any credits relating to a Straddle Period shall be allocated on a basis consistent with the allocations made pursuant to the preceding sentence. The Seller shall be responsible for all personal property Taxes that relate to the portion of any Straddle Period ending on the Closing Date and, to the extent unpaid at Closing, shall pay to (or as directed by) the Purchaser amounts equal to such personal property Taxes and such payments shall be made in each applicable case by no later than five business days prior to the due date for paying such amount of personal property Taxes to the relevant taxing authority. The Purchaser shall be responsible for all personal property Taxes paid by the Seller prior to the Closing that relate to the portion of any Straddle Period beginning on the day immediately following the Closing Date and ending with the last day of the applicable taxable period and shall pay to the Seller amounts equal to such personal property Taxes within five business days of receipt of a copy of the bill for such personal property Taxes from the appropriate taxing authority and evidence of payment of such personal property Taxes by Seller.

4.2. **Equipment**. The tangible assets that are part of the Purchased Assets and that are not going to be used to produce New Inventory, shall be emptied, cleaned and made ready for sale by the Seller by the Closing Date or within 10 days thereof.

4.3. **Inspection Rights Pre-Closing**. The Purchaser and its representatives shall have the right to reasonable access to the Facility at any time during normal business hours prior to Closing for the purposes of inspecting the Purchased Assets and preparing for and taking actions in connection with the marketing and sale of the Purchased Assets (with such reasonable access not including the ability to conduct any invasive environmental actions without the written approval of Seller).

## ARTICLE 5
## CLOSING DELIVERABLES; PURCHASE PRICE

5.1 **Conditions to Obligations of Purchaser**. Unless waived in writing by the Purchaser, at or prior to the Closing, the obligation of the Purchaser hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

(a) **Representations and Warranties True**. The representations and warranties of the Seller contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

(b) **Covenants Performed**. The Seller shall have performed and complied with the covenants, agreements and conditions required to be performed or complied with by it hereunder on or prior to the date of the Closing.

(c) **Purchased Assets**. The condition and status of the Purchased Assets shall be unchanged in any material respect from the condition and status of such assets as of the inspection conducted on Purchaser's behalf on February 1, 2018.

(d) **Required Consents Received**. The Seller shall have obtained and

LEGAL\36254922\2

delivered to the Purchaser copies of all Required Consents listed on or required to be listed on **Schedule 2.2**, and no such Required Consents shall have been withdrawn, suspended or conditioned.

(e) **Instrument of Transfer**. The Seller shall have executed and delivered to the Purchaser a Bill of Sale, in a form reasonably acceptable to the Purchaser, reflecting the Seller's transfer of the Purchased Assets to the Purchaser free and clear of all Liens.

(f) **Certificates of Title**. The Seller shall have delivered to the Purchaser all Certificates of Title and other documentation necessary to convey title to the Equipment included in the Purchased Assets, duly endorsed and in a form suitable for transfer to Purchaser.

(g) **No Injunction**. The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

(h) **TSA**. The Purchaser shall have received the TSA executed by the Seller and Seller shall employ the General Employees and Production Employees as defined in and required by the TSA.

(i) **Sale Approval Order**. The Sale Approval Order approving this Agreement, the TSA and any other agreements related hereto and the Transactions shall have been entered by the Bankruptcy Court, which Sale Approval Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Purchaser.

(j) **Inventory and Accounts Receivable**. The Seller shall have delivered to Purchaser at least one day prior to the Closing Date an Inventory listing by item report (in a form substantially the same as prior versions delivered by Seller to Purchaser) and a closing certificate (in form and substance satisfactory to Purchaser).

(k) **Documents**. The Purchaser shall have received such other certificates, documents and materials as it shall reasonably request.

5.2   **Purchaser Closing Deliverables**. Unless waived in writing by the Seller, at or prior to the Closing, the obligation of the Seller hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

(a) **Payment of Purchase Price**. At the Closing, the Purchaser will pay (or cause to be paid) the Purchase Price in accordance with Section 1.6(b) by check or wire transfer of immediately available funds pursuant to the wire instructions provided by Seller.

(b) **No Injunction**. The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

(c) **Representations and Warranties True**. The representations and warranties of the Purchaser contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

(d) **Covenants Performed**. The Purchasers shall have performed and complied with the covenants, agreements and conditions required to be performed or complied

LEGAL\36254922\2

with by it hereunder on or prior to the date of the Closing.

(e)     **Sale Approval Order.** The Sale Approval Order approving this Agreement, the TSA and any other agreements related hereto and the Transactions shall have been entered by the Court, which Sale Approval Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Seller.

## ARTICLE 6
## SURVIVAL; INDEMNIFICATION

6.1.   **Survival.** The representations, warranties, covenants and agreements contained herein shall survive until the applicable statute of limitations has expired. No action for a breach of the representations, warranties and covenants contained herein shall be brought more than 12 months following the Closing Date, except for claims (i) relating to Fundamental Representations and claims relating to the covenants set forth in Section 4.1 hereof which shall survive indefinitely, and (ii) of which the Seller has been notified with reasonable specificity by the Purchaser, or claims of which the Purchaser has been notified with reasonable specificity by the Seller, within the applicable period, shall survive until such claims have been resolved.

6.2.   **Indemnification by the Seller.** From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Seller shall indemnify and hold the Purchaser and its Affiliates harmless from and against all claims, liabilities, obligations, costs, damages, losses and expenses (including attorneys' fees and costs of investigation but excluding consequential or punitive damages) of any nature (collectively, "**Losses**") arising out of or relating to (i) any breach or violation of the representations or warranties of the Seller set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Seller set forth in this Agreement, (iii) the Excluded Liabilities, (iv) any other obligations or liabilities of Seller as may be detailed in the TSA or a breach by Seller of the TSA, (v) the Bankruptcy Case, (vi) any Liens that attach to or are asserted against the Purchased Assets after the Closing due to any action or inaction by the Seller prior to the Closing, or (vii) any violation of any bulk sales laws as a result of the consummation of the Transactions, to the extent applicable.

6.3.   **Indemnification by the Purchaser.** From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Purchaser shall indemnify and hold the Seller harmless from and against all Losses arising out of or relating to (i) any breach or violation of the representations or warranties of the Purchaser set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Purchaser set forth in this Agreement, or (iii) any other obligations or liabilities of Purchaser as may be detailed in the TSA or a breach by Purchaser of the TSA.

6.4.   **Right of Set-Off.** If the Seller has not satisfied in cash any indemnification obligation owed by it hereunder after notice of any such obligation, the Purchaser or any of its Affiliates may, at their discretion, satisfy the unpaid portion of such obligation by, to the extent permitted by law, setting-off against any amounts that may be due and owing from the Purchaser or any of its Affiliates to the Seller or any of its Affiliates. Unless otherwise set-off as provided for in this Section 6.4, all indemnity payments shall be made within seven (7) days of request by the party demanding indemnification.

6.5. **Adjustment to Purchase Price.** All indemnification payments paid pursuant to this Article shall be adjustments to the Purchase Price.

## ARTICLE 7
## TERMINATION

7.1. **Termination.** This Agreement and the Transactions contemplated hereby may be terminated:

(a) by mutual written consent of the Purchaser and the Seller;

(b) by the Seller, if the Purchaser shall have breached or failed to perform in any of its other obligations, covenants or agreements under this Agreement or if any of the representations and warranties of the Purchaser set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Seller's reasonable satisfaction within three (3) days after the Purchaser is provided notice of such breach, failure or misrepresentation;

(c) by the Purchaser, if the Seller shall have breached any of its obligations, covenants, or agreements under this Agreement or if any of the representations and warranties of the Seller set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Purchaser's reasonable satisfaction within three (3) days after Seller is provided notice of such breach, failure or misrepresentation;

(d) by the Purchaser, if (i) the Sale Approval Order is not entered by the Bankruptcy Court on or before May 23, 2018, or (ii) the Sale Approval Order has been entered by the Bankruptcy Court on or before May 23, 2018 but the Closing Date shall not have occurred on or before May 25, 2018 or, in each case, such other date, if any, as the Purchaser and the Trustee may agree in writing; and

(e) automatically, if Seller accepts a bid relating to a definitive written agreement involving a sale, pursuant to the Order Approving Bid Procedures, of any of the Purchased Assets to a purchaser or purchasers other than Purchaser (an "**Alternative Transaction**");

except that this Agreement may not be terminated under this section by or on behalf of any party that is in breach of any representation or warranty or in violation of any covenant or agreement contained herein.

7.2. **Effect of Termination.**

(a) If this Agreement is terminated under Section 7.1(a), (c), (d) or (e) herein, Trustee or Seller, as applicable, shall promptly return and pay the Purchase Price Deposit to Purchaser.

(b) If this Agreement is terminated under Section 7.1(b) herein or if the Sale Approval Order has been entered by the Bankruptcy Court on or before May 23, 2018 and all of the conditions precedent to the Purchaser's obligation set forth in Section 5.1 have been met and Purchaser fails to pay the Purchase Price, Trustee or Seller, as applicable, shall retain the Purchase Price Deposit, and Trustee or Seller, as applicable, shall have no further remedies or

LEGAL\36254922\2

recourse available against Purchaser except the right to retain the Purchase Price Deposit.

7.2. **Other Bids.** Purchaser acknowledges that Seller may receive bids (such prospective bids which are Competing Bids, as defined in the Order Approving Bid Procedures, the "**Competing Bids**") from prospective purchasers (such prospective purchasers who are Competing Bidders, as defined in the Order Approving Bid Procedures, the "**Competing Bidders**") for the sale of all of the Purchased Assets or certain Product Lines and/or Co-Generation Assets (each as defined in the Order Approving Bid Procedures) as provided in the Order Approving Bid Procedures. Seller shall cause an auction to be conducted before the Bankruptcy Court and thereat, Seller shall have the right to select, and seek final approval of the Bankruptcy Court for, the highest and better Competing Bid or Competing Bids from the Competing Bidders.

## ARTICLE 8
## MISCELLANEOUS

8.1. **Notices.** All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by e-mail or fax, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered:

    (a)    if to the Seller:

New England Confectionary Company, Inc.
c/o Harold B. Murphy
Chapter 11 Trustee

_____
_____
Fax: (\_\_\_) _____
E-mail: _____

with a copy (which shall not constitute notice) to:

Burns & Levinson, LLP
125 Summer Street
Boston, MA 02110
Attention: Frank A. Segall, Esq.
Fax: (617) 345-3299
E-mail: fsegall@burnslev.com

    (b)    if to the Purchaser, to:

Frankford Candy LLC
9300 Ashton Road
Philadelphia, PA 19114
Attention: Stuart Selarnick, Chief Executive Officer
Fax: (\_\_\_) _____
Email: sselarnick@frankfordcandy.com

with a copy (which shall not constitute notice) to:

> Cozen O'Connor
> One Liberty Place
> 1650 Market Street, Suite 2800
> Philadelphia, PA 19103
> Attention: Ira C. Gubernick and Michael P. Zanan
> Fax: (215) 701-2477 and (215) 701-2239
> Email: igubernick@cozen.com and mzanan@cozen.com

or at such other address as may have been furnished by such person in writing to the other parties. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, e-mailed or faxed or otherwise actually delivered, or on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service.

8.2. **Governing Law; Forum.** This Agreement shall be governed by and construed in accordance with the internal laws of The Commonwealth of Massachusetts applicable to agreements executed and to be performed solely within such State. Any judicial proceeding arising out of or relating to this Agreement shall be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, each of the parties to this Agreement accepts the exclusive jurisdiction of such court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.

8.3. **Amendments, Waivers.** This Agreement may be amended or modified only with the written consent of the Purchaser and the Seller. No waiver of any term or provision hereof shall be effective unless in writing signed by the party waiving such term or provision. No failure to exercise or delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights provided hereunder are cumulative and not exclusive of any rights, powers or remedies provided by law.

8.4. **Expenses.** Except as otherwise expressly set forth herein, all legal and other costs and expenses incurred in connection with this Agreement and the Transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

8.5. **Successors and Assigns.** This Agreement, and all provisions hereof, shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, provided that this Agreement may not be assigned by any party without the prior written consent of the other parties hereto except that (a) the rights hereunder of the Purchaser may be assigned to any assignee or nominee (and the Purchaser may designate different assignees and/or nominees for various rights), so long as the Purchaser remains obligated for the performance of its obligations hereunder and (b) this Agreement may be assigned by the Purchaser to any of its equity holders or Affiliates or to any Person acquiring a portion of the Purchased Assets, or the business or securities of the Purchaser, whether by merger, consolidation, sale of assets or securities or otherwise so long as such assignee assumes all obligations for the performance of the Purchaser's obligations hereunder.

8.6. **Entire Agreement.** This Agreement, the attached exhibits and schedules, and the other agreements, documents and instruments contemplated hereby contain the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof unless

LEGAL\36254922\2

expressly referred to herein.

8.7. **Counterparts.** This Agreement may be executed in one or more counterparts, and with counterpart facsimile signature pages, each of which shall be an original, but all of which when taken together shall constitute one and the same Agreement.

8.8. **Headings.** The headings of Articles and Sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.

8.9. **Further Assurances.** Following the Closing, the parties will execute and deliver such documents and take such other actions as may be reasonably requested from time to time by the Purchaser or the Seller in order to fully consummate the Transactions in accordance with this Agreement.

8.10. **Third Party Beneficiaries.** Nothing in the Agreement shall be construed to confer any right, benefit or remedy upon any Person that is not a party hereto or a permitted assignee or nominee of a party hereto, except as otherwise expressly set forth in this Agreement.

8.11. **No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other agreements and documents contemplated herein. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any other agreement or documents contemplated herein, this Agreement and such other agreements or documents shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement or any other agreements or documents contemplated herein.

8.12. **Publicity.** Purchaser and Seller shall have the right to disclose the Transactions contemplated hereby (other than the Purchase Price) in marketing materials, press releases and other announcements following the Closing; provided, that Purchaser shall have the right to review and approve any such public release by the Seller.

8.13. **Schedules and Exhibits.** All schedules and exhibits to this Agreement are an integral part of this Agreement and are incorporated herein by reference in this Agreement for all purposes of this Agreement. All schedules and exhibits delivered with this Agreement shall be arranged to correspond with the numbered and lettered sections and subsections contained in this Agreement, and the disclosures in such schedules shall qualify only the corresponding sections and subsections contained in this Agreement, unless otherwise expressly provided herein.

8.14. **Severability.** This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

8.15. **Certain Taxes.** All transfer, documentary, sales, use other such Taxes and fees

LEGAL\36254922\2

incurred in connection with this Agreement shall be paid by the Seller when due, and the Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use and other Taxes and fees.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as a sealed instrument as of the date first above written.

SELLER:

HAROLD B. MURPHY, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF NEW ENGLAND CONFECTIIONERY COMPANY, INC.

By:_____
  Name:
  Title:

PURCHASER:

FRANKFORD CANDY LLC

By:_____
  Name:
  Title: Executve V.P.

LEGAL\36254922\2

## SCHEDULE 1.1

Purchased Assets

### Inventory

Raw Materials: Includes boxes and carton displays. Excludes sugar and coloring raw materials.

WIP: Includes "Sweethearts" bulk work-in process inventory.

Finished Goods: Includes "Sweethearts" finished goods with expiration dates greater than 2/15/2019 only.

### Equipment

Tisma Filler Lines #1 and Line #2 (as set forth below):

| TISMA Filler Line 1 |
| --- |
| (1)Transfer Conveyors |
| Metal Detector |
| (1)Transfer Conveyors |
| Transfer Conveyor |
| Transfer Conveyor |
| Transfer Conveyor |
| 90 Deg Conveyor |
| Transfer Conveyor |
| Transfer Conveyor |
| Transfer Conveyor |
| Overhead Vibrating Conveyor |
| Nordson Glue |
| Robot |
| Shanklin Wrapper |
| (1) Heat Tunnel |
| Transfer Conveyor |
| Label Machine |
| Transfer Conveyor |
| Case Taper |

LEGAL\36254922\2

| TISMA Filler Line 2 |
| --- |
| Nordson Glue |
| (1)Transfer Conveyors |
| (1) Check Weighers |
| Metal Detector |
| (1)Transfer Conveyors |
| (1)Transfer Conveyors |
| (1)Transfer Conveyors |
| Stacker |
| (1)Tray Former |
| Nordson Glue for Tray Former |
| (1) Shrink Wrapper |
| Heat Tunnel |
| (1) Case Taper |
| Dust Collector |
| AC-2 Fans |
| Spray Pump |
| Return Pump |

Excludes sugar manufacturing equipment.

Intellectual Property

Brand Name: "Sweethearts"

All customer-related, sales-related and marketing-related books and records and other documentation and materials respect to the Product Line, whether in tangible or electronic form, including, without limitation, all customer data (including customer lists, mailing lists, email address lists, sales records, customer files and account histories) and sales and marketing plans.

## OTHER SCHEDULES

The Other Schedules will be finalized as of the Closing Date, and shall be available upon request.