## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is entered into as of May [__], 2018, by and between New England Confectionery Company, Inc., a Delaware corporation ("**NECCO**"), the debtor in In re New England Confectionery Company, Inc., Chapter 11 Case No. 18-11217-MSH (the "**Bankruptcy Case**"), currently pending in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"), Harold B. Murphy, in his capacity as Chapter 11 Trustee (solely in such capacity, the "**Trustee**" and, together with NECCO, the "**Seller**"), and Spangler Candy Company, an Ohio corporation (the "**Purchaser**").

### Introduction

WHEREAS, the Purchaser wishes to purchase from the Seller, and the Seller desires to sell to the Purchaser, certain assets of Seller as set forth herein. The purchase and sale of the assets and the other transactions contemplated hereby are sometimes collectively referred to herein as the "**Transactions**."

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE 1
### THE TRANSACTIONS; CLOSING

**1.1.**   **Purchase and Sale of Purchased Assets.** Subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties contained herein, at the Closing, the Purchaser shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Purchaser, free and clear of all liens, claims (including, but not limited to, any "claim" as defined in Section 101(5) or "lien" as defined in Section 101(37) of the Bankruptcy Code), security interests, mortgages, encumbrances and restrictions of every kind (collectively, "**Liens**"), all of Seller's right, title and interest in the following assets (collectively, the "**Purchased Assets**") on an **"AS IS" "WHERE IS"** basis with no representations and warranties of any kind except as specifically provided for herein:

**(a)**   all accounts receivable held by or owed to Seller, including all accounts receivable and charged-off accounts receivable as of the close of business on the date prior to the date hereof, as listed on the attached **Schedule 1.1(a)** (the "**Receivables**") and all books and records relating to such Receivables, whether in tangible or electronic form, including invoices, purchase orders, proof of shipping and delivery, contracts of purchase, warranties, correspondence and customer data (including customer lists, mailing lists, email address lists, sales records, customer files and account histories);

**(b)**   all raw materials, work-in-process and finished goods, and other items of inventory (collectively, "**Inventory**") owned by Seller, including, without limitation, all Inventory listed or described on **Schedule 1.1(b)** attached hereto and incorporated herein, and all Inventory in transit as of the Closing date;



(c)    all tangible assets, including all machinery, equipment (including but not limited to the cogeneration facility and all related equipment located at the Facility), tools, vehicles, computer equipment, software, furniture and fixtures, artwork, pictures, tradebooths, office supplies, tools, rolling stock, molds, dies, tooling, leasehold improvements and other property and equipment owned or used by Seller, including, without limitation, all of the foregoing items listed or described on **Schedule 1.1(c)(i)** attached hereto and incorporated herein by this reference but excluding all tangible assets previously sold, whether sold to Hershey or one or more of its Affiliates or otherwise and listed on **Schedule 1.1(c)(ii)**; provided, that, the foregoing shall not include any assets used but not owned by the Seller that arise from contracts included in the Excluded Assets;

(d)    all databases, customer lists, mailing lists, emails, documentation and agreements related to offers to purchase the Seller or any of the Seller's assets (including any contact information for such offerees), internet servers, and intellectual property and related rights owned or used by Seller, including patents, trademarks, tradenames, service marks, domain names, copyrights (including but not limited to the registered patents, trademarks, copyrights and domain names set forth on **Schedule 1.1(d)**), and other similar designations of source or origin (and all applications and registrations for the foregoing), trade secrets, know how, all historic catalogs, engineering, artwork, copywriting, document and data files, images, pictures, photos, creative copy and drafts, brochures, catalogues, brand logos, corporate photographs, recipes, designs, artwork design and copy for current and future catalogs and marketing materials, including the "New England Confectionery Company, Inc." and "NECCO" names and all variations thereof; provided, that, the foregoing shall not include any assets used but not owned by the Seller that arise from contracts included in the Excluded Assets;

(e)    to the extent applicable, all certificates of title and other documentation necessary to convey title to the equipment included in the Purchased Assets (the "**Certificate of Title**");

(f)    all manufacturer and other warranties relating to the Purchased Assets, to the extent assignable;

(g)    bank account number 1010109227 of Seller located at Eastern Bank (the "**Bank Account**");

(h)    the licenses, permits, authorizations, franchises and certifications of governmental and non-governmental authorities held by the Seller that are related to the Purchased Assets, as set forth on **Schedule 1.1(h)** (the "**Permits**");

(i)    all manuals, instructions, emails, and other similar documents related to the Purchased Assets, to the extent in the possession and control of the Seller; and

(j)    for the avoidance of doubt, all purchase orders received or entered into subsequent to the Closing Date, the proceeds thereof (subject to Section 3.2 of the Transition Services Agreement) and all rights and remedies thereunder, shall be the property of the Purchaser.

1.2.    **Excluded Assets**. The Purchaser expressly understands and agrees that it is not

{7407059:3 }

purchasing or acquiring, and the Seller is not selling or assigning the following assets and properties of the Seller (the "**Excluded Assets**"): (a) all cash and cash equivalents, bank accounts (other than the Bank Account, but excluding all cash in the Bank Account immediately prior to the Closing) and securities of the Seller; (b) all equity and other ownership interests in Seller and the corporate seals, organizational documents, minute books, stock books, tax returns or other records primarily having to do with the corporate organization of the Seller, all employee-related or employee benefit-related files or records and any other books and records related to employees which the Seller is prohibited from disclosing or transferring to Purchaser under applicable law and is required by applicable law to retain; (c) all insurance policies of Seller and all rights to applicable claims and proceeds thereunder, other than with respect to the Seller's obligations under § 4.1(b) of the TSA to name Purchaser as an additional insured, with waiver of subrogation; (d) all rights to any action, suit or claim of any nature available to or being pursued by the Seller, whether arising by way of counterclaim or otherwise, other than any rights to any action, suit or claim related to the Purchased Assets, (e) all benefit plans and trusts or other assets attributable thereto, (f) the rights which accrue or will accrue to the Seller under this Agreement, any other agreement, document or instrument entered into by the Seller in connection with this Agreement or in connection with the Transactions, (g) all rights arising under any agreement, contract, lease or other commitment of the Seller, whether written or oral, and (h) any sums of money that the Seller has been required to deposit or place with any of its utility providers as additional security (each a "**Utility Deposit**"). The Seller or its bankruptcy estate shall be entitled to the return of all Utility Deposits when so released by such utility providers but no earlier than November 30, 2018, or the date upon which the Seller has ceased all activities at the Facility. At the end of the day immediately preceding the Closing Date, Seller covenants and agrees to sweep all cash in the Bank Account to a separate bank account.

   **1.3.** **Excluded Liabilities.** Neither the Purchaser nor any of its Affiliates shall assume or in any way be responsible for any obligations or liabilities of the Seller or any of its Affiliates (whether or not disclosed) of any kind whatsoever, existing before or on the Closing Date or arising thereafter, including all of the liabilities of Seller or of any predecessor or Affiliate of Seller not specifically and expressly assumed by Purchaser pursuant to this Agreement. Without limiting the generality of the foregoing, neither the Purchaser nor any of its Affiliates will assume: (a) any Taxes of Seller or any of its Affiliates, any sales Tax associated with the transfer of the Purchased Assets from Seller to Purchaser pursuant to this Agreement, or any personal property Tax imposed upon the Purchased Assets through the Closing Date; (b) any liability relating to any benefit plans or any current or former employees, officers, directors or consultants of Seller or any Affiliates of Seller; (c) any obligation of the Seller under this Agreement or any other agreement, document or instrument entered into by the Seller in connection with this Agreement; (d) any obligation of the Seller incurred in connection with the Transactions, including all amounts in respect of legal, investment banking, financial advisor, broker and other similar fees, costs, expenses and obligations; (e) any Indebtedness; (f) any liability arising out of any action, arbitration, claim, proceeding or litigation of any nature (whether or not disclosed) against the Seller or relating to the operation of its business; (g) any liability arising out of the Seller's violation of any Legal Requirement; (h) any liability arising under any agreement, contract, lease or other commitment of Seller, whether written or oral, and any liability arising out of the failure of the Seller to comply with any such agreement, contract, lease or other commitment; (i) any liability to any stockholder of the Seller or to any Affiliate of the Seller; (j) any liability or obligation of the Seller arising out of or relating to the Bankruptcy Case; (k) any

liability arising out of, or in connection with the Excluded Assets; (l) any liabilities for any accounts payable of Seller; (m) any liability accrued on any financial statement of Seller other than any payments made pursuant to Section 1.6 hereof; (n) without limiting the generality of clause (b) above, all liabilities relating to, or in respect of, any wages, bonuses or other compensation or benefits, including without limitation, vacation days, sick days or other paid time-off, that is earned or accrued by, or with respect to employees or officers, directors or contractors of Seller or any Affiliate of Seller prior to the Closing; (o) all liabilities or obligations under the Worker Adjustment and Retraining Notification Act, as amended, if any, arising out of or resulting from (i) layoffs or termination of employees by Seller and/or (ii) the consummation of the Transaction; (p) any and all liabilities under any collective bargaining agreements of Seller; (q) any liability under the Employee Retirement Income Security Act of 1974, as amended; (r) any liability with relate to (i) the compliance or actual or alleged non-compliance with any Environmental Law, or (ii) any actual or alleged environmental condition or the presence, use, handling, storage, disposal, Release or threatened Release of, or exposure to, any Hazardous Material; (s) any liabilities for claims made by any current or former equityholder of Seller; (t) any liabilities of Seller and any Affiliates of Seller related to current or former employees, officers, directors or consultants of Seller or any Affiliates of Seller under any Employee Benefit Plan (including any Single-Employer Plans, Multiemployer Plans, or Disability Benefits Plans); (u) any liability arising out of any food safety matter; and (v) any other liabilities or obligations of the Seller relating to the use of the Purchased Assets prior to the Closing or any other actions or inaction by the Seller prior to the Closing, including but not limited to, leading to the loss of life or loss of property. The liabilities and obligations of the Seller, which shall remain the obligation and responsibility of the Seller following the Closing, are collectively referred to as the "**Excluded Liabilities**."

    **1.4.    Certain Definitions.** For purposes of this Agreement, the following terms shall have the meanings indicated below:

        "**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

        "**Affiliate**" means, with respect to a specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person.

        "**Auction**" means a public auction conducted as part of a final wind-down of the Sale of the Purchased Assets (other than the Receivables).

        "**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 10 et seq.

        "**Employee Benefit Plans**" means all "employee benefit plans," as defined in section 3(3) of ERISA, including any Single-employer Plans or Multiemployer Plans, and all other material employee benefit plans, programs, policies, practices, or other arrangements providing benefits (other than governmental plans and statutorily required

benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, stock purchase, stock option, change of control, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance, in each case, maintained or contributed to by Sellers and ERISA Affiliates with respect to Covered Employees

"**Environmental Law**" means any applicable foreign, federal, state or local Law currently in effect relating to pollution, the protection of the environment or natural resources.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means, with respect to any entity, trade or business, any other entity, trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the IRC or Section 4001(b)(1) of ERISA that includes or included the first entity, trade or business, or that is, or was at the relevant time, a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

"**Facility**" means the property locally known and numbered as 153 American Legion Highway, Revere, Massachusetts.

"**Fundamental Representations**" means the representations set forth in Section 2.1, Section 2.2, Section 2.3, the last sentence of Section 2.5, Section 3.1, Section 3.2, Section 3.3 and Section 3.4.

"**Hazardous Materials**" means (a) any petroleum, petroleum derived substances or petroleum products, flammable explosives, radioactive materials, radon, asbestos, or PCBs and (b) any chemicals, wastes, materials or substances which are regulated, classified or defined as "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "pollutant" or "contaminant" or any similar denomination under any Environmental Law.

"**Indebtedness**" means all principal, interest, fees, expenses and other amounts in respect of borrowed money, notes, bonds, debentures and other debt securities, guarantees, interest rate, currency or other hedging arrangements, capital leases, letters of credit and/or installment purchases incurred by the Seller or any of its Affiliates, or required to be paid in order to discharge fully all such amounts.

"**Legal Requirements**" means, with respect to any Person, all foreign, federal, state and local statutes, laws, ordinances, judgments, decrees, orders, rules, regulations, policies and guidelines, in each case of any governmental entity, applicable to such Person.

"**Motion for Sale Order**" means the Debtor's Motion For Order Approving Private Sale of Certain of Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests and Granting Related Relief attached hereto as

Exhibit 1.4(a).

"**New Inventory**" means inventory produced after the Closing Date and on or prior to the end of the Transition Period (as defined in the TSA).

"**Person**" means any natural person or corporation, limited liability company, partnership, trust, other business entity, governmental authority or non-governmental authority.

"**Purchase Price**" means **$14,500,000.00**. The Purchase Price shall be reduced (i) to the extent Seller fails to deliver to Purchaser accounts receivable with an aggregate face amount of at least $6,975,447, by an amount equal to $0.70 for each dollar which the face amount of accounts receivable the Purchaser receives from Seller is less than $6,975,447, (ii) to the extent Seller fails to deliver to Purchaser finished inventory held for sale in the ordinary course of business with a cost value of at least $2,660,196.06, by an amount equal to $0.509 for each dollar of cost value below $2,660,196.06 that the Purchaser receives, (iii) to the extent Seller fails to deliver to Purchaser packaging with a cost value of at least $2,822,904.69, by an amount equal to $0.365 for each dollar of cost value below $2,822,904.69 that the Purchaser receives, (iv) to the extent Seller fails to deliver to Purchaser work-in-process with a cost value of at least $1,415,690.30, by an amount equal to $0.402 for each dollar of cost value below $1,415,690.30 that the Purchaser receives, and (v) to the extent Seller fails to deliver to Purchaser ingredients with a cost value of at least $792,920.21, by an amount equal to $0.365 for each dollar of cost value below $792,920.21 that the Purchaser receives (adjustments made pursuant to clauses (i) through (v) above, collectively, the "Purchase Price Reduction").

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment.

"**Sale Approval Date**" means the date on which the Bankruptcy Court enters the order of the Bankruptcy Court approving the Motion for Sale Order.

"**Sale Approval Order**" means the order of the Bankruptcy Court approving the Motion for Sale Order in a form acceptable to Purchaser in its sole discretion, which order is not subject to stay pursuant to Bankruptcy Rules 3020(c) or 6004 and is in the form attached hereto as Exhibit 1.4(b).

"**Tax**" or "**Taxes**" means all taxes, charges, fees, levies, penalties, additions or other assessments imposed by any foreign, federal, state or local taxing authority, including, but not limited to, income, excise, property, sales, use, transfer, franchise, payroll, withholding, value added, social security or other taxes, charges or assessments, including any interest, penalties or additions attributable thereto.

"**Tax Returns**" means all reports, estimates, declarations of estimated Tax, information statements and returns relating to, or required to be filed in connection with, any Taxes and any schedules attached to or amendments of (including refund claims with

respect to) any of the foregoing.

"**TSA**" means a Transition Services Agreement between the Seller and the Purchaser in the form attached hereto as Exhibit 1.4(c).

**1.5.**    **Closing.** The Transactions contemplated hereby shall take place at a closing (the "**Closing**") to be held remotely by the electronic exchange of documents and signatures (or at such location as the parties may designate in writing) on the date, after the entry by Bankruptcy Court of the Sale Approval Order, that the conditions to Closing specified in Article 5 hereof have been satisfied or waived or such other date as agreed to in writing by the Seller and the Purchaser (the "**Closing Date**").

**1.6.**    **Payments at Closing**. At the Closing, the Purchaser will make or cause to be made the following payments of the Purchase Price (subject to any Purchase Price Reduction) by wire transfer as follows: (i) first, to Atlantic-Revere Realty LLC ("**Landlord**"), $2,303,101.54 (or such lesser or greater amount as Seller and Purchaser mutually agree is owed to the Landlord) as a prepayment of all rent and additional rent (including any real estate taxes) owed to Landlord between April 1, 2018 and November 30, 2018 pursuant to the Indenture of Lease dated April 24, 2017 between Seller and Landlord (the "**Lease**"), and (ii) second, the balance to the Seller. In addition, at Closing the Purchaser will make or cause to be made a payment to Seller equal to the amount of Work Fee, as defined in Section 7.2(a) below. The Seller hereby directs that payment of the balance pursuant to clause (ii) above and the Work Fee be made as directed by the Bankruptcy Court.

**1.7.**    Once the Purchaser has received an aggregate of $13,296,900.18 of Net Proceeds in cash from its sale or transfer, on arms-length terms, of the Purchased Assets (the "**Sale**"), any additional Net Proceeds from the Sale shall be paid to the Seller in the following order of priority, subject in each case to (x) the exclusion of Adjusted Net Proceeds (as defined in the TSA) received from the sale of New Inventory and (y) any reductions, offsets or adjustments as provided in this Agreement, including without limitation under Section 6.4 hereof:

**(a)**    First, all aggregate Net Proceeds of the Sale greater than $13,296,900.18 but less than or equal to $18,750,000 shall be paid (i) 70% to Seller and (ii) 30% to Purchaser;

**(b)**    Second, all aggregate Net Proceeds of the Sale greater than $18,750,000 but less than or equal to $22,250,000 shall be paid (i) 65% to Seller and (ii) 35% to Purchaser; and

**(c)**    Third, all aggregate Net Proceeds of the Sale greater than $22,250,000 shall be paid (i) 60% to Seller and (ii) 40% to Purchaser.

To the extent the Receivables listed on Schedule 1.1(a) and the Inventory listed on Schedule 1.1(b) are less than the amounts listed in the Purchase Price definition herein and, therefore, lead to a Purchase Price reduction, the thresholds referenced in paragraphs (a) through (c) above will be correspondingly lowered by the amount of any Purchase Price reduction.

For purposes of this Agreement "**Net Proceeds**" means the aggregate amount of all cash payments and proceeds received by Purchaser in respect of the Sale of the Purchased Assets, less

(i) costs, commissions, fees and expenses, in each case payable to third parties, incurred by Purchaser in connection therewith, including but not limited to any amounts paid by Purchaser under the License or to get access to the Facility (other than the rent payments paid at Closing pursuant to Section 1.6 of the Purchase Agreement), in each case payable to third parties, (ii) 100% of the buyer's premium paid by a buyer in an Auction (provided that such percentage shall be reduced to 50% if the License grants Purchaser access to the Facility through November 30, 2018 for the purposes required by Purchaser and such grant remains in effect through such date) and 100% of the amount paid to the online hosting agent for an Auction, (iii) any income or transfer Taxes paid or reasonably estimated by Purchaser to be payable by Purchaser as a result of such disposition, (iv) reasonable costs and expenses incurred by Purchaser in connection with the Bankruptcy Case, and (v) adjustments in favor of buyers in respect of the sale price of any Purchased Assets after the sale of any Purchased Assets.

**1.8.     Other Payments**. Any payments due to the Seller by Landlord pursuant to Section 20.4 of the Lease (the "**Landlord Escrow**"), shall be paid 100% to Purchaser. That portion of the Landlord Escrow due to the Purchaser (the "**Purchaser Escrow**") shall be paid within five (5) business days upon receipt by the Seller along with a detailed accounting detailing the amount received by the Seller and any deduction made to the Landlord Escrow made by the Landlord. The parties hereto acknowledge that the Seller may deduct from the Purchaser Escrow all amounts due to the Seller on account of the Purchaser's indemnification obligations contained in Section 6.3 herein.

**1.9.     Timing of Payments; Reconciliation**. On or before November 30, 2018, the Purchaser shall deliver to the Seller for the Seller's review and approval a reconciliation of all amounts due and owing pursuant to Section 1.7 above (which shall set forth a detailed calculation of Net Proceeds received in connection with the Sale) (the "**Reconciliation**"). To the extent any of the Purchased Assets have not been sold by November 30, 2018, **at the earlier** of forty-five (45) days after the date of the last sale of the Purchased Assets **and June 30, 2019**, the Purchaser shall also deliver to the Seller for the Seller's review and approval an additional reconciliation of all amounts due and owing pursuant to Section 1.7 above for sales that occurred after November 30, 2018 (the "**Additional Reconciliation**"). The Purchaser shall provide the Seller and its representatives with reasonable access to the books and records, underlying and solely related to the Reconciliation or Additional Reconciliation, and personnel of the Purchaser and, if applicable, the outside accountants and other agents of the Purchaser, in each case, who were involved in the preparation of the Reconciliation or Additional Reconciliation, as applicable. The Purchaser and the Seller shall cooperate in good faith to resolve any disputes with respect to such Reconciliation or Additional Reconciliation, as applicable. Within two (2) Business Days of completion of the Reconciliation or Additional Reconciliation, as applicable, the Purchaser shall pay to the Seller any and all amounts due the other pursuant to the Reconciliation or Additional Reconciliation, as applicable.

**1.10.     Abandonment**. The parties acknowledge and agree that (a) the Purchaser has the right in its sole discretion to abandon any of the Purchased Assets at any time, (b) the Purchaser shall have no obligation under this Agreement or otherwise to the Seller with respect to any Purchased Assets that are abandoned by Purchaser, provided that the Seller shall have the right to remove any Purchased Assets abandoned by the Purchaser for purposes of the Landlord Escrow described above in Section 1.8., and (c) the Seller shall have no obligation under this Agreement

or otherwise to the Purchaser for any Purchased Assets subsequently abandoned by the Purchaser.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLER

The Seller represents and warrants to the Purchaser that the following is true and correct:

**2.1.** **Organization, Power and Standing**. NECCO is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own, lease and operate its properties and to carry on its business. NECCO is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do so would not have or be reasonably expected to have a material adverse effect on the Purchased Assets. The Trustee has been duly appointed as trustee for NECCO and has all requisite power and authority to proceed with the Transactions.

**2.2.** **Due Authorization; No Conflict**. The Seller has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and (subject to entry of the Sale Approval Order) to carry out the terms of this Agreement and the other agreements, instruments and documents of the Seller contemplated hereby. Except as specified on **Schedule 2.2** (the "**Required Consents**") and subject to entry of the Sale Approval Order, no consent, order, authorization, approval, declaration or filing with any Person, is required on the part of the Seller for or in connection with its execution, delivery or performance of this Agreement or any of the other agreements, documents and instruments contemplated hereby. Subject to obtaining the Required Consents specified on **Schedule 2.2** and subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Seller will not result in any violation of, be in conflict with, constitute a default under, or cause the acceleration of any obligation or loss of any rights under, any Legal Requirement or agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document or Permit to which the Seller is a party or by which the Seller or Purchased Assets are bound.

**2.3.** **Validity and Enforceability**. This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Seller is a party shall be when executed and delivered by the Seller, the valid and binding obligations of the Seller enforceable in accordance with its terms, subject only to entry of the Sale Approval Order.

**2.4.** **Reserved**.

**2.5.** **Condition of Purchased Assets**. The condition and status of the Purchased Assets has not materially changed from the condition and status of such assets as of the inspection conducted on Purchaser's behalf on March 7, 2018 and March 8, 2018 (the "**Inspection**"); provided that, subject to the "Purchase Price" definition and Section 5.1(l) hereof, the face amount of accounts receivable and the cost value of inventory, packaging, work-in-process and ingredients may have changed. At the Closing, the Purchaser will acquire from the Seller good and marketable title to the Purchased Assets, free and clear of all Liens.

{7407059:3 }

**2.6.   Reserved**.

**2.7.   Permits**. The Seller is in compliance in all material respects with all of the Permits required to carry on the business through November 30, 2018, all of which are in full force and effect and will be in full force and effect and held by the Purchaser immediately after giving effect to the Transactions. The Seller does not know of any threatened suspension, revocation or invalidation of any such Permits, or any basis therefor.

**2.8.   Litigation**. Except as set forth on **Schedule 2.8** and except for the Bankruptcy Case, no action, arbitration, suit, proceeding or investigation is pending or, to the knowledge of the Seller, threatened against the Seller, or any equity holder, former equity holder, officer, director, manager or employee of the Seller, in each case, regarding the Purchased Assets. Except as set forth on **Schedule 2.8**, the matters disclosed on such Schedule will be covered by the Seller's insurance policies.

**2.9.   Environmental Matters**. There is and will be no liability attaching to the Purchaser or the Purchased Assets as a result of any Hazardous Materials that may have been Released from any premises owned or operated by the Seller (including any predecessors or subsidiaries) or in connection with the Purchased Assets, or disposed of on-site or off-site.

**2.10.   Insurance**. **Schedule 2.10** lists and briefly describes each insurance policy maintained by or on behalf of Seller or otherwise with respect to the Purchased Assets and the monthly costs of the premium associated with each such insurance policy. All of such insurance policies are in full force and effect, and Seller is not and has not been in material default with respect to its obligations under any such insurance policies.

**2.11.   No Other Representations and Warranties**. Except for the representations and warranties contained in this ARTICLE 2, neither the Seller, any equity holder of the Seller, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Seller and the Seller hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated,  or furnished (orally or in writing) to the Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Purchaser by any director, officer, employee, agent, consultant, or representative of the Seller or any of its Affiliates). **The Purchaser acknowledges that, except as otherwise specifically provided for in this Agreement, the Purchased Assets are being sold to the Purchaser on an "AS IS" "WHERE IS" basis with no representations or warranties of any kind.**

**2.12.   Debtor in Possession Budget**. Attached hereto as **Schedule 2.12** is a true, correct and complete copy of the Seller's Debtor in Possession Budget.

**2.13.   Net Sales Report**. Attached hereto as **Schedule 2.13** is a true, correct and complete copy of the Seller's net sales report for the month of May 2018, through May 23, 2018.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

{7407059:3 }

The Purchaser represents and warrants to the Seller that the following is true and correct.

**3.1.    Organization, Power and Standing**. The Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to effect the Transactions. The Purchaser is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do so would not have or be reasonably expected to have a material adverse effect on this Transaction.

**3.2.    Due Authorization**. The Purchaser has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and to carry out the terms of this Agreement and the other agreements, instruments and documents of the Purchaser contemplated hereby.

**3.3.    No Conflict**. No consent, approval or authorization of or declaration or filing with any governmental or non-governmental authority or any party to any contract with the Purchaser is required on the part of the Purchaser for or in connection with its execution, delivery or performance of this Agreement and the other agreements, documents and instruments contemplated hereby. The execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Purchaser will not result in any violation of, be in conflict with, or constitute a default under any Legal Requirement, agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document or permit to which the Purchaser is a party or by which the Purchaser is bound.

**3.4.    Validity and Enforceability**. This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Purchaser is a party shall be when executed and delivered by the Purchaser, the valid and binding obligations of the Purchaser enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

**3.5.    No Other Representations and Warranties**. Except for the representations and warranties contained in this ARTICLE 3, neither the Purchaser, any equity holder of the Purchaser, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Purchaser and the Purchaser hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Seller or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Seller by any director, officer, employee, agent, consultant, or representative of the Purchaser or any of its Affiliates).

**ARTICLE 4**
**COVENANTS**

**4.1.    Personal Property Taxes**. The Seller shall be responsible for all personal

property Taxes imposed upon the Purchased Assets through the Closing Date and to the extent such Taxes do not relate to a Straddle Period (as defined below), Seller shall pay such personal property Taxes directly to the appropriate taxing authority when due. In the case of any  personal property Taxes that are imposed on a periodic basis and are payable for any portion of any taxable period that includes but does not end on the Closing Date (each such taxable period, a "**Straddle Period**"), the portion of such personal property Tax that relates to the portion of the Straddle Period (a) ending on the Closing Date shall be deemed to be the amount of such personal property Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period and (b) beginning on the day immediately following the Closing Date and ending with the last day of the applicable taxable period shall be deemed to be the amount of such personal property Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period beginning with the day immediately following the Closing Date and ending with the last day of the applicable taxable period and the denominator of which is the number of days in the entire taxable period. Any credits relating to a Straddle Period shall be allocated on a basis consistent with the allocations made pursuant to the preceding sentence. The Seller shall be responsible for all personal property Taxes that relate to the portion of any Straddle Period ending on the Closing Date and, to the extent unpaid at Closing, shall pay to (or as directed by) the Purchaser amounts equal to such personal property Taxes and such payments shall be made in each applicable case by no later than five business days prior to the due date for paying such amount of personal property Taxes to the relevant taxing authority. The Purchaser shall be responsible for all personal property Taxes paid by the Seller prior to the Closing that relate to the portion of any Straddle Period beginning on the day immediately following the Closing Date and ending with the last day of the applicable taxable period and shall pay to the Seller amounts equal to such personal property Taxes within five business days of receipt of a copy of the bill for such personal property Taxes from the appropriate taxing authority and evidence of payment of such personal property Taxes by Seller.

4.2.    **Equipment**. The tangible assets that are part of the Purchased Assets and that are not going to be used to produce New Inventory, shall be emptied, cleaned and made ready for sale by the Seller by the Closing Date or within 10 days thereof.

4.3.    **Cogeneration Facility and Utilities**. The Seller covenants and agrees to (a) maintain and continually operate the cogeneration facility located at the Facility in accordance with the terms of the Lease through the earlier of (x) the date upon which the Purchaser sells such cogeneration facility and (y) November 30, 2018, and to provide Purchaser with heat/ air conditioning, steam and electricity in the Facility through such date and (b) make available for Purchaser's use at the Facility through November 30, 2018 internet, telephone, and other utilities as required by the Purchaser. To the extent the Seller maintains and continually operates the cogeneration facility located at the Facility in accordance with the immediately preceding sentence, the Seller shall retain all amounts paid by National Grid in connection with its continued operation of the co-generation facility through such date.

4.4.    **Inspection Rights Pre-Closing**. The Purchaser and its representatives shall have the right to reasonable access to the Facility at any time during normal business hours prior to Closing for the purposes of inspecting the Purchased Assets and preparing for and taking actions

in connection with the marketing and sale of the Purchased Assets (with such reasonable access not including the ability to conduct any invasive environmental actions without the written approval of Seller). In connection with any such inspection undertaken by the Purchaser or its representatives pursuant to this <u>Section 4.4</u>, Seller shall deliver to the Purchaser a copy of any and all documentation relating to or created as a result of the Inspection and/or the condition and status of the Purchased Assets as of the Inspection.

**4.5.** **Further Transfers**. Seller shall, for no additional consideration, execute and deliver such further instruments of conveyance and transfer and take such additional action as Purchaser may reasonably request to effect, consummate, confirm or evidence the transfer to Purchaser of the Purchased Assets and any other transactions contemplated hereby.

**4.6.** **Access to Information**. After Closing, upon reasonable notification from Purchaser, Seller shall make available to Purchaser and its representatives reasonable access to the Facility and the books and records of Seller with respect to the Purchased Assets.

**4.7.** **Discharge of Obligations**. Seller shall pay and discharge all of its obligations of payment under this Agreement and the TSA, including, but not limited, those items listed in Article 4 of the TSA.

## ARTICLE 5
## CLOSING DELIVERABLES; PURCHASE PRICE

**5.1** **Conditions to Obligations of Purchaser**. Unless waived in writing by the Purchaser, at or prior to the Closing, the obligation of the Purchaser hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

**(a)** **Representations and Warranties True**. The representations and warranties of the Seller contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

**(b)** **Covenants Performed**. The Seller shall have performed and complied with the covenants, agreements and conditions required to be performed or complied with by it hereunder on or prior to the date of the Closing.

**(c)** **Purchased Assets**. The condition and status of the Purchased Assets shall be unchanged in any material respect from the condition and status of such assets as of the Inspection; provided that, subject to the "Purchase Price" definition and Section 5.1(l) hereof, the face amount of accounts receivable and the cost value of inventory, packaging, work-in-process and ingredients may have changed.

**(d)** **Required Consents Received.** The Seller shall have obtained and delivered to the Purchaser copies of all Required Consents listed on or required to be listed on Schedule 2.2, and no such Required Consents shall have been withdrawn, suspended or conditioned.

**(e)** **Instrument of Transfer**. The Seller shall have executed and delivered to

{7407059:3 }

the Purchaser a Bill of Sale, in a form reasonably acceptable to the Purchaser (the "**Bill of Sale**"), reflecting the Seller's transfer of the Purchased Assets to the Purchaser free and clear of all Liens and a duly executed non-foreign person affidavit from Seller dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended from time to time (the "**Tax Code**"), stating that Seller is not a "foreign person" as defined in Section 1445 of the Tax Code.

       **(f)**    **Certificates of Title**. The Seller shall have delivered to the Purchaser all certificates of title and other documentation necessary to convey title to the equipment included in the Purchased Assets, duly endorsed and in a form suitable for transfer to Purchaser.

       **(g)**    **No Injunction**. The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

       **(h)**    **License**. The Purchaser shall have received a license for the Facility executed by the owner thereof in the form attached hereto as Exhibit 5.1(h) (the "**License**"), and the Purchaser shall have received an amendment to the License in form and substance satisfactory to Purchaser, in its sole discretion.

       **(i)**    **Bank Account**. Ownership of the Bank Account shall have been transferred to Purchaser free and clear of all Liens pursuant to documentation in form and substance satisfactory to Purchaser.

       **(j)**    **TSA**. The Purchaser shall have received the TSA executed by the Seller, and Seller shall employ the General Employees and Production Employees as defined in and required by the TSA.

       **(k)**    **Sale Approval Order**. The Sale Approval Order approving this Agreement, the TSA, the License and any other agreements related hereto and the Transactions shall have been entered by the Bankruptcy Court, which Sale Approval Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Purchaser.

       **(l)**    **Inventory and Accounts Receivable**. The Seller shall have delivered to Purchaser at least one day prior to the Closing Date, an AR Invoices Only report (in a form substantially the same as prior versions delivered by Seller to Purchaser) and an Inventory Listing by Item Report (in a form substantially the same as prior versions delivered by Seller to Purchaser), and a closing certificate (in form and substance satisfactory to Purchaser).

       **(m)**    **Documents**. The Purchaser shall have received such other certificates, documents and materials as it shall reasonably request.

       **(n)**    **Schedules and Exhibits**. The Purchaser shall have received all Schedules and Exhibits, that are true, accurate and complete as of the Closing Date, including any updates to the Schedules attached hereto, contemplated by this Agreement in a form acceptable to Purchaser.

**(o)      Lease Extension and License Agreement**. Purchaser shall have received (1) the Landlord's written consent for extension of the Lease on the terms and conditions set forth in the Lease through November 30, 2018 and (2) an executed License Agreement between Landlord and Purchaser.

**(p)      Landlord Consent**. The Seller shall have delivered to Purchaser the Landlord's written consent for occupation and operations in the Facility through the TSA Period.

**5.2      Purchaser Closing Deliverables**. Unless waived in writing by the Seller, at or prior to the Closing, the obligation of the Seller hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

**(a)      Payment of Purchase Price**. At the Closing, the Purchaser will pay (or cause to be paid) the Purchase Price in accordance with Section 1.6 by wire transfer of immediately available funds pursuant to the wire instructions provided by Seller.

**(b)      No Injunction**. The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

**(c)      Representations and Warranties True**. The representations and warranties of the Purchaser contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

**(d)      Covenants Performed**. The Purchasers shall have performed and complied with the covenants, agreements and conditions required to be performed or complied with by it hereunder on or prior to the date of the Closing.

**(e)      Sale Approval Order**. The Sale Approval Order approving this Agreement, the TSA, the License and any other agreements related hereto and the Transactions shall have been entered by the Court in the form approved by the Purchaser, in its sole discretion, which Sale Approval Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Seller.

## ARTICLE 6
## SURVIVAL; INDEMNIFICATION

**6.1.      Survival**. The representations, warranties, covenants and agreements contained herein shall survive until the applicable statute of limitations has expired. No action for a breach of the representations, warranties and covenants contained herein shall be brought more than 12 months following the Closing Date, except for claims (i) relating to Fundamental Representations and claims relating to the covenants set forth in Section 4.1 hereof which shall survive indefinitely, and (ii) of which the Seller has been notified with reasonable specificity by the Purchaser, or claims of which the Purchaser has been notified with reasonable specificity by the Seller, within the applicable period, shall survive until such claims have been resolved. All covenants and agreements of Purchaser and Seller contained in this Agreement or in any agreement, certificate or other document delivered pursuant hereto shall continue in full force

{7407059:3 }

and effect in accordance with their terms without limitation of time, unless otherwise provided therein or by applicable statutes of limitation; it being understood and agreed, for the avoidance of doubt, that there is no time limitation hereunder in respect of bringing a claim or cause of action for breach of and/or failure to comply with any covenant or agreement or with respect to fraud or fraudulent misrepresentation other than any applicable statute of limitation.

**6.2.**    **Indemnification by the Seller**. From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Seller shall indemnify and hold the Purchaser and its Affiliates harmless from and against all claims, liabilities, obligations, costs, damages, losses and expenses (including attorneys' fees and costs of investigation but excluding consequential or punitive damages) of any nature (collectively, "Losses") arising out of or relating to (i) any breach or violation of the representations or warranties of the Seller set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Seller set forth in this Agreement or any certificate delivered by Seller to the Purchaser with respect hereto or thereto in connection with the Closing, (iii) the Excluded Liabilities, (iv) any other obligations or liabilities of Seller as may be detailed in the TSA or a breach by Seller of the TSA, (v) the Bankruptcy Case, (vi) any Liens that attach to or are asserted against the Purchased Assets after the Closing due to any action or inaction by the Seller prior to the Closing, (vii) any Purchase Price Reduction that is not deducted from the Purchase Price by Purchaser at Closing, or (viii) any violation of any bulk sales laws as a result of the consummation of the Transactions, to the extent applicable.

**6.3.**    **Indemnification by the Purchaser**. From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Purchaser shall indemnify and hold the Seller harmless from and against all Losses arising out of or relating to (i) any breach or violation of the representations or warranties of the Purchaser set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Purchaser set forth in this Agreement or any certificate delivered by the Purchaser to the Seller with respect hereto or thereto in connection with the Closing, or (iii) any other obligations or liabilities of Purchaser as may be detailed in the TSA or a breach by Purchaser of the TSA.

**6.4.**    **Right of Set-Off**. If the Seller has not satisfied in cash any indemnification obligation owed by it hereunder after notice of any such obligation, the Purchaser or any of its Affiliates may, at their discretion, satisfy the unpaid portion of such obligation by, to the extent permitted by law, setting-off against any amounts that may be due and owing from the Purchaser or any of its Affiliates to the Seller or any of its Affiliates. Unless otherwise set-off as provided for in this Section 6.4, all indemnity payments shall be made within seven (7) days of request by the party demanding indemnification.

**6.5.**    **Adjustment to Purchase Price**. All indemnification payments paid pursuant to this Article shall be (i) adjustments to the Purchase Price; and (ii) made in by wire transfer of immediately available funds from the indemnifying party to an account designated by the indemnified party within then (10) days after the determination of such indemnification payment.

**6.6.**    **Impact of Knowledge**. The Seller acknowledges and agrees that no knowledge

the Purchaser may or could have acquired at any time before or after the date of Closing will impact the Purchaser's rights to indemnification or to any other remedy available hereunder.

## ARTICLE 7
## TERMINATION

**7.1.** **Termination**. This Agreement and the Transactions contemplated hereby may be terminated:

**(a)** by mutual written consent of the Purchaser and the Seller;

**(b)** by the Seller, if the Purchaser shall have breached or failed to perform in any of its other obligations, covenants or agreements under this Agreement or if any of the representations and warranties of the Purchaser set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Seller's reasonable satisfaction within three (3) days after the Purchaser is provided notice of such breach, failure or misrepresentation;

**(c)** by the Purchaser, if the Seller shall have breached any of its obligations, covenants, or agreements under this Agreement or if any of the representations and warranties of the Seller set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Purchaser's reasonable satisfaction within three (3) days after Seller is provided notice of such breach, failure or misrepresentation;

**(d)** by the Purchaser, if (i) if the Sale Approval Order is not entered by the Bankruptcy Court on or before May 23, 2018, or (ii) the Sale Approval Order has been entered by the Bankruptcy Court on or before May 23, 2018, but the Closing Date shall not have occurred on or before May 25, 2018, or, in each case, such other date, if any, as the Purchaser and the Trustee may agree in writing;

**(e)** by the Purchaser, if the Sale Approval Order is entered by the Court in a form not acceptable to Purchaser, in its sole discretion;

**(f)** by any party hereto by giving written notice to the other parties if any court of competent jurisdiction or other competent governmental authority shall have enacted or issued a law or decree taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the Transactions and such law or decree or other action shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 7.1(e) shall not be available to a party hereto if the failure to consummate the Closing because of such action by a governmental authority shall be due to the failure of such party to have fulfilled any of its obligations under this Agreement; and

**(g)** Automatically, if Seller accepts a bid relating to a definitive written agreement involving a sale, pursuant to the Order Approving Bid Procedures, of any of the Purchased Assets to a purchaser or purchasers other than Purchaser (an "**Alternative Transaction**");

except that this Agreement may not be terminated under this section by or on behalf of any party that is in breach of any representation or warranty or in violation of any covenant or agreement contained herein.

**7.2.    Effect of Termination**. If this Agreement is terminated under Section 7.1(a)-(f) herein, all rights and obligations of the parties hereto shall terminate upon such termination and shall become null and void (except that Section 1.4, Article 8 , and this Section 7.2 shall survive such termination) and no Party shall have any Liability to the other party hereunder; provided, however, that nothing in this Section 7.2 shall relieve any party to this Agreement from any liability or damages (which the parties hereto agree shall be determined by the courts referred to in Section 8.2 and, to the extent proven, shall not necessarily be limited to reimbursement of expenses or out of pocket costs) for any breach occurring prior to any such termination (but solely to the extent such breach was willful or fraudulent) set forth in this Agreement.

**7.3.    Return of Purchaser Deposit**. If this Agreement is terminated under Section 7.1 herein or otherwise, Seller shall return Purchaser's deposit within two (2) Business Days of Termination.

**7.4.    Other Bids**. Purchaser acknowledges that Seller may receive bids (such prospective bids which are Competing Bids, as defined in the Order Approving Bid Procedures, the "**Competing Bids**") from prospective purchasers (such prospective purchasers who are Competing Bidders, as defined in the Order Approving Bid Procedures, the "**Competing Bidders**") for the sale of all of the Purchased Assets or certain Product Lines and/or Co-Generation Assets (each as defined in the Order Approving Bid Procedures) as provided in the Order Approving Bid Procedures.

## ARTICLE 8
## MISCELLANEOUS

**8.1.    Notices**. All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by e-mail or fax, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered:

    **(a)**    if to the Seller:

        New England Confectionary Company, Inc.
        135 American Legion Highway
        Revere, MA 02151 Attention: Michael McGee
        E-mail: mmcgee@necco.com

        with a copy (which shall not constitute notice) to:
        Burns & Levinson, LLP
        125 Summer Street
        Boston, MA 0211
        Attention: Frank A. Segall, Esq.
        Fax: (617) 345-3299
        E-mail: fsegall@burnslev.com

{7407059:3 }

**(b)**     if to the Purchaser, to:

Spangler Candy Company
400 North Portland Street
Bryan, Ohio 43506
Attention: Bill Martin
Email: bill.martin@spanglercandy.com

with a copy (which shall not constitute notice) to:
McDonald Hopkins LLC
300 North LaSalle Street
Suite 1400
Chicago, IL 60654
Attention: David A. Agay
Fax: (312) 280 8232
E-mail: dagay@mcdonaldhopkins.com

or at such other address as may have been furnished by such person in writing to the other parties. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, e-mailed or faxed or otherwise actually delivered, or on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service.

**8.2.   Governing Law; Forum**. This Agreement shall be governed by and construed in accordance with the internal laws of The Commonwealth of Massachusetts applicable to agreements executed and to be performed solely within such State. Any judicial proceeding arising out of or relating to this Agreement shall be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, each of the parties to this Agreement accepts the exclusive jurisdiction of such court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.

**8.3.   Amendments, Waivers**. This Agreement may be amended or modified only with the written consent of the Purchaser and the Seller. No course of dealing between or among any persons having any interest in this Agreement shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any party hereto under or by reason of this Agreement. No waiver of any term or provision hereof shall be effective unless in writing signed by the party waiving such term or provision. No failure to exercise or delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights provided hereunder are cumulative and not exclusive of any rights, powers or remedies provided by law.

**8.4.   Expenses**. Except as otherwise expressly set forth herein, all legal and other costs and expenses incurred in connection with this Agreement and the Transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**8.5.   Successors and Assigns**. This Agreement, and all provisions hereof, shall be

binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, provided that this Agreement, nor any rights, interests, or obligations hereunder, may not be assigned by any party without the prior written consent of the other parties hereto except that (a) the rights hereunder of the Purchaser may be assigned to any assignee or nominee (and the Purchaser may designate different assignees and/or nominees for various rights), so long as the Purchaser remains obligated for the performance of its obligations hereunder and (b) this Agreement may be assigned by the Purchaser to any of its equity holders or Affiliates or to any Person acquiring a portion of the Purchased Assets, or the business or securities of the Purchaser, whether by merger, consolidation, sale of assets or securities or otherwise so long as such assignee assumes all obligations for the performance of the Purchaser's obligations hereunder.

**8.6.    Entire Agreement**. This Agreement, the attached exhibits and schedules, and the other agreements, documents and instruments contemplated hereby contain the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof unless expressly referred to herein.

**8.7.    Counterparts**. This Agreement may be executed in one or more counterparts, and with counterpart facsimile signature pages, each of which shall be an original, but all of which when taken together shall constitute one and the same Agreement.

**8.8.    Headings**. The headings of Articles and Sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.

**8.9.    Further Assurances**. Following the Closing, the parties will execute and deliver such documents and take such other actions as may be reasonably requested from time to time by the Purchaser or the Seller in order to fully consummate the Transactions in accordance with this Agreement.

**8.10.    Third Party Beneficiaries**. Nothing in the Agreement shall be construed to confer any right, benefit or remedy upon any Person that is not a party hereto or a permitted assignee or nominee of a party hereto, except as otherwise expressly set forth in this Agreement.

**8.11.    No Strict Construction**. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other agreements and documents contemplated herein. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any other agreement or documents contemplated herein, this Agreement and such other agreements or documents shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement or any other agreements or documents contemplated herein.

**8.12.    Publicity**. Purchaser and Seller shall have the right to disclose the Transactions contemplated hereby (other than the Purchase Price) in marketing materials, press releases and other announcements following the Closing; provided neither Seller nor Purchaser shall use or disclose the names of Ares Capital Corporation, the investment advisor thereof, American Capital, Ltd., or ACAS, LLC (and each of the foregoing third parties are expressed third party

beneficiaries hereto entitled to enforce the provisions of this Section 8.12 as if direct parties hereto); provided further that Purchaser shall have the right to review and approve any such public release by the Seller.

**8.13.    Schedules and Exhibits**. All schedules and exhibits to this Agreement are an integral part of this Agreement and are incorporated herein by reference in this Agreement for all purposes of this Agreement. All schedules and exhibits delivered with this Agreement shall be arranged to correspond with the numbered and lettered sections and subsections contained in this Agreement, and the disclosures in such schedules shall qualify only the corresponding sections and subsections contained in this Agreement, unless otherwise expressly provided herein.

**8.14.    Severability**. This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

**8.15.    Certain Taxes**. All transfer, documentary, sales, use other such Taxes and fees incurred in connection with this Agreement shall be paid by the Seller when due, and the Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use and other Taxes and fees.

**8.16.    Delivery by Facsimile or Electronic Transmission**. This Agreement and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission (including electronic transmission of a document in portable document format), shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. No party hereto shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

**8.17.    Special Rule for Fraud**. Notwithstanding anything herein to the contrary, in no event shall any limit or restriction on any rights or remedies set forth in this Agreement limit or restrict the rights or remedies of any party hereto for fraud by any other party or any Affiliate or representative of such other party.

**8.18.    Prevailing Party Legal Fees**. In the event that legal proceedings are commenced by the Purchaser against the Seller, or by the Seller against the Purchaser, in connection with this Agreement or the transactions contemplated hereby, the party or parties which do not prevail in such proceedings shall pay the reasonable attorneys' fees and other costs and expenses, including investigation costs, incurred by the prevailing party in such proceedings.

**8.19.    Non-Recourse**. All claims or causes of action (whether in contract or in tort, in

law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement may be made only against (and are expressly limited to) the persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**").  In no event shall any Contracting Party have any shared or vicarious liability for the actions or omissions of any other person.  No person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any causes of action or liabilities arising under, out of, in connection with or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or its  negotiation, execution, performance or breach; and, to the maximum extent permitted by law, each Contracting Party waives and releases all such causes of action and liabilities against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 8.20.

**8.20.    Time of Essence**.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**8.21.    Successor Liability**.  Except where expressly prohibited under applicable law, upon the Closing, Purchaser shall not be deemed to:  (i) be the successor of Seller; (ii) have, de facto, or otherwise, merged with or into Seller; (iii) be a mere continuation or substantial continuation of Seller or the enterprise of Seller; or (iv) be liable for any acts or omissions of Seller arising under or related to the Purchased Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, Purchaser shall not be liable for any claims against Seller or any of its predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing of the Transactions, whether now existing or hereafter arising, or whether fixed or contingent, with respect to any obligations of Seller arising prior to the Closing of the Transactions, except as provided in this Agreement, including, liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operations of Seller prior to the Closing

[Signature page follows.]

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement as of the date first above written

**NECCO:**

NEW ENGLAND CONFECTIONARY
COMPANY, INC.

By: _____
Name: _____
Title: _____

**TRUSTEE:**

_____
Harold B. Murphy, solely in his capacity as Chapter 11
Trustee of NECCO

**PURCHASER:**

SPANGLER CANDY COMPANY

By: _Kirkland B. Vashaw_
Name: _Kirkland V. Vashaw_
Title: _Chairman & CEO_

{7407418: }