# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is entered into as of April 17, 2018, by and between New England Confectionery Company, Inc., a Delaware corporation (the "**Seller**"), the debtor in In re New England Confectionery Company, Inc., Chapter 11 Case No. 18-11217-MSH (the "**Bankruptcy Case**"), currently pending in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**"), and CI-N Acquisition LLC, a Delaware limited liability company (the "**Purchaser**").

### Introduction

WHEREAS, the Purchaser wishes to purchase from the Seller, and the Seller desires to sell to the Purchaser, certain assets of Seller as set forth herein. The purchase and sale of the assets and the other transactions contemplated hereby are sometimes collectively referred to herein as the "**Transactions**."

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE 1
### THE TRANSACTIONS; CLOSING

**1.1.** **Purchase and Sale of Purchased Assets.** Subject to the terms and conditions of this Agreement, and in reliance upon the representations and warranties contained herein, at the Closing, the Purchaser shall purchase from the Seller, and the Seller shall sell, convey, transfer, assign and deliver to the Purchaser, free and clear of all liens, claims (including, but not limited to, any "claim" as defined in Section 101(5) or "lien" as defined in Section 101(37) of the Bankruptcy Code), security interests, mortgages, encumbrances and restrictions of every kind (collectively, "**Liens**"), all of Seller's right, title and interest in the following assets (collectively, the "**Purchased Assets**") on an **"AS IS" "WHERE IS"** basis with no representations and warranties of any kind except as are specifically provided for herein:

(a) all accounts receivable held by or owed to Seller, including all accounts receivable and charged-off accounts receivable as of the close of business on the date prior to the date hereof, as listed on the attached **Schedule 1.1(a)** (the "**Receivables**") and all books and records relating to such Receivables, whether in tangible or electronic form, including invoices, purchase orders, proof of shipping and delivery, contracts of purchase, warranties, correspondence and customer data (including customer lists, mailing lists, email address lists, sales records, customer files and account histories);

(b) all raw materials, work-in-process and finished goods, and other items of inventory (collectively, "**Inventory**") owned by Seller, including, without limitation, all Inventory listed or described on **Schedule 1.1(b)** attached hereto and incorporated herein by this reference;

(c) all tangible assets, including all machinery, equipment (including but not limited to the cogeneration facility and all related equipment located at the Facility), tools,

vehicles, computer equipment, software, furniture and fixtures, artwork, pictures, tradebooths, office supplies, tools, rolling stock, molds, dies, tooling, leasehold improvements and other property and equipment owned or used by Seller, including, without limitation, all of the foregoing items listed or described on **Schedule 1.1(c)(i)** attached hereto and incorporated herein by this reference but excluding all tangible assets previously sold, whether sold to Hershey or one or more of its Affiliates or otherwise and listed on **Schedule 1.1(c)(ii)**; provided, that, the foregoing shall not include any assets used but not owned by the Seller that arise from contracts included in the Excluded Assets;

(**d**)   all databases, customer lists, mailing lists, documentation and agreements related to offers to purchase the Seller or any of the Seller's assets (including any contact information for such offerees), internet servers, and intellectual property and related rights owned or used by Seller, including patents, trademarks, tradenames, service marks, domain names, copyrights (including but not limited to the registered patents, trademarks, copyrights and domain names set forth on **Schedule 1.1(d)**)), and other similar designations of source or origin (and all applications and registrations for the foregoing), trade secrets, know how, all historic catalogs, engineering, artwork, copywriting, document and data files, images, pictures, photos, creative copy and drafts, brochures, catalogues, brand logos, corporate photographs, recipes, designs, artwork design and copy for current and future catalogs and marketing materials, including the "New England Confectionery Company, Inc." and "NECCO" names and all variations thereof; provided, that, the foregoing shall not include any assets used but not owned by the Seller that arise from contracts included in the Excluded Assets;

(**e**)   to the extent applicable, all certificates of title and other documentation necessary to convey title to the equipment included in the Purchased Assets (the "**Certificate of Title**");

(**f**)   all manufacturer and other warranties relating to the Purchased Assets, to the extent assignable;

(**g**)   bank account number 1010109227 of Seller located at Eastern Bank (the "**Bank Account**");

(**h**)   the licenses, permits, authorizations, franchises and certifications of governmental and non-governmental authorities held by the Seller that are related to the Purchased Assets, as set forth on **Schedule 1.1(h)** (the "**Permits**"); and

(**i**)   all manuals, instructions and other similar documents related to the Purchased Assets, to the extent in the possession and control of the Seller.

**1.2.   Excluded Assets**. The Purchaser expressly understands and agrees that it is not purchasing or acquiring, and the Seller is not selling or assigning the following assets and properties of the Seller (the "**Excluded Assets**"): (a) all cash and cash equivalents, bank accounts (other than the Bank Account, but excluding all cash in the Bank Account immediately prior to the Closing) and securities of the Seller; (b) the corporate seals, organizational documents, minute books, stock books, tax returns or other records primarily having to do with the corporate organization of the Seller, all employee-related or employee benefit-related files or

2

records and any other books and records related to employees which the Seller is prohibited from disclosing or transferring to Purchaser under applicable law and is required by applicable law to retain; (c) all insurance policies of Seller and all rights to applicable claims and proceeds thereunder; (d) all rights to any action, suit or claim of any nature available to or being pursued by the Seller, whether arising by way of counterclaim or otherwise, other than any rights to any action, suit or claim related to the Purchased Assets, (e) all benefit plans and trusts or other assets attributable thereto, (f) the rights which accrue or will accrue to the Seller under this Agreement, any other agreement, document or instrument entered into by the Seller in connection with this Agreement or in connection with the Transactions, (g) all rights arising under any agreement, contract, lease or other commitment of the Seller, whether written or oral, and (h) any sums of money that the Seller has been required to deposit or place with any of its utility providers as additional security (each a "**Deposit**"). The Seller or its bankruptcy estate shall be entitled to the return of all Deposits when so released by such utility providers but no earlier than October 31, 2018, or the date upon which the Seller has ceased all activities at the Facility. At the end of the day immediately preceding the Closing Date, Seller covenants and agrees to sweep all cash in the Bank Account to a separate bank account.

**1.3.    Excluded Liabilities.** Neither the Purchaser nor any of its Affiliates shall assume or in any way be responsible for any obligations or liabilities of the Seller or any of its Affiliates (whether or not disclosed) of any kind. Without limiting the generality of the foregoing, neither the Purchaser nor any of its Affiliates will assume: (a) any Taxes of Seller or any of its Affiliates, any sales Tax associated with the transfer of the Purchased Assets from Seller to Purchaser pursuant to this Agreement, or any personal property Tax imposed upon the Purchased Assets through the Closing Date; (b) any liability relating to any benefit plans, employees or contractors of the Seller or any of its Affiliates; (c) any obligation of the Seller under this Agreement or any other agreement, document or instrument entered into by the Seller in connection with this Agreement; (d) any obligation of the Seller incurred in connection with the Transactions, including all amounts in respect of legal, investment banking, financial advisor, broker and other similar fees, costs, expenses and obligations; (e) any Indebtedness; (f) any liability arising out of any action, arbitration, claim, proceeding or litigation of any nature (whether or not disclosed) against the Seller or relating to the operation of its business; (g) any liability arising out of the Seller's violation of any Legal Requirement; (h) any liability arising under any agreement, contract, lease or other commitment of Seller, whether written or oral, and any liability arising out of the failure of the Seller to comply with any such agreement, contract, lease or other commitment; (i) any liability to any stockholder of the Seller or to any Affiliate of the Seller; (j) any liability or obligation of the Seller arising out of or relating to the Bankruptcy Case; or (k) any other liabilities or obligations of the Seller relating to the use of the Purchased Assets prior to the Closing or any other actions or inaction by the Seller prior to the Closing, including but not limited to, leading to the loss of life or loss of property. The liabilities and obligations of the Seller, which shall remain the obligation and responsibility of the Seller following the Closing, are collectively referred to as the "**Excluded Liabilities.**"

**1.4.    Certain Definitions.** For purposes of this Agreement, the following terms shall have the meanings indicated below:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or

investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" means, with respect to a specified Person, any other Person that directly, or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person.

"**Auction**" means a public auction conducted as part of a final wind-down of the Sale of the Purchased Assets (other than the Receivables).

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"**Facility**" means the property locally known and numbered as 153 American Legion Highway, Revere, Massachusetts.

"**Fundamental Representations**" means the representations set forth in Section 2.1, Section 2.2, Section 2.3, the last sentence of Section 2.5, Section 3.1, Section 3.2, Section 3.3 and Section 3.4.

"**Indebtedness**" means all principal, interest, fees, expenses and other amounts in respect of borrowed money, notes, bonds, debentures and other debt securities, guarantees, interest rate, currency or other hedging arrangements, capital leases, letters of credit and/or installment purchases incurred by the Seller or any of its Affiliates, or required to be paid in order to discharge fully all such amounts.

"**Legal Requirements**" means, with respect to any Person, all foreign, federal, state and local statutes, laws, ordinances, judgments, decrees, orders, rules, regulations, policies and guidelines, in each case of any governmental entity, applicable to such Person.

"**Motion for Sale Order**" means the Debtor's Motion For Order Approving Private Sale of Certain of Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests and Granting Related Relief attached hereto as Exhibit 1.4(a).

"**New Inventory**" means inventory produced after the Closing Date and on or prior to the end of the Transition Period (as defined in the TSA).

"**Person**" means any natural person or corporation, limited liability company, partnership, trust, other business entity, governmental authority or non-governmental authority.

"**Purchase Price**" means $13,961,900.19 The Purchase Price shall be reduced (i) to the extent Seller fails to deliver to Purchaser accounts receivable with an aggregate face amount of at least $6,975,447, by an amount equal to $0.70 for each dollar which the face amount of accounts receivable the Purchaser receives from Seller is less than $6,975,447, (ii) to the extent Seller fails to deliver to Purchaser finished inventory held

for sale in the ordinary course of business with a cost value of at least $2,660,196.06, by an amount equal to $0.509 for each dollar of cost value below $2,660,196.06 that the Purchaser receives, (iii) to the extent Seller fails to deliver to Purchaser packaging with a cost value of at least $2,822,904.69, by an amount equal to $0.365 for each dollar of cost value below $2,822,904.69 that the Purchaser receives, (iv) to the extent Seller fails to deliver to Purchaser work-in-process with a cost value of at least $1,415,690.30, by an amount equal to $0.402 for each dollar of cost value below $1,415,690.30 that the Purchaser receives, and (v) to the extent Seller fails to deliver to Purchaser ingredients with a cost value of at least $792,920.21, by an amount equal to $0.365 for each dollar of cost value below $792,920.21 that the Purchaser receives (adjustments made pursuant to clauses (i) through (v) above, collectively, the "<u>Purchase Price Reduction</u>").

"**Sale Approval Date**" means the date on which the Bankruptcy Court enters the order of the Bankruptcy Court approving the Motion for Sale Order.

"**Sale Approval Order**" means the order of the Bankruptcy Court approving the Motion for Sale Order, which order is not subject to stay pursuant to Bankruptcy Rules 3020(c) or 6004 and is in the form attached hereto as Exhibit 1.4(b).

"**Tax**" or "**Taxes**" means all taxes, charges, fees, levies, penalties, additions or other assessments imposed by any foreign, federal, state or local taxing authority, including, but not limited to, income, excise, property, sales, use, transfer, franchise, payroll, withholding, value added, social security or other taxes, charges or assessments, including any interest, penalties or additions attributable thereto.

"**Tax Returns**" means all reports, estimates, declarations of estimated Tax, information statements and returns relating to, or required to be filed in connection with, any Taxes and any schedules attached to or amendments of (including refund claims with respect to) any of the foregoing.

"**TSA**" means a Transition Services Agreement between the Seller and the Purchaser in the form attached hereto as Exhibit 1.4(c).

**1.5.    Closing.** The Transactions contemplated hereby shall take place at a closing (the "**Closing**") to be held remotely by the electronic exchange of documents and signatures (or at such location as the parties may designate in writing) on the date, after the entry by Bankruptcy Court of the Sale Approval Order, that the conditions to Closing specified in Article 5 hereof have been satisfied or waived or such other date as agreed to in writing by the Seller and the Purchaser (the "**Closing Date**").

**1.6.    Payments at Closing.** At the Closing, the Purchaser will make or cause to be made the following payments of the Purchase Price (subject to any Purchase Price Reduction) by wire transfer as follows: (i) first, to Atlantic-Revere Realty LLC ("**Landlord**"), $1,741,734.01 (or such lesser or greater amount as Seller and Purchaser mutually agree is owed to the Landlord) as a prepayment of all rent and additional rent owed to Landlord between April 1, 2018 and October 31, 2018 pursuant to the Indenture of Lease dated April 24, 2017 between Seller and Landlord (the "**Lease**"), provided, however, in the event the Seller does not

pay all rent and additional rent owed to Landlord for the month of April, 2018, by the Closing, the Purchaser will pay the Landlord $2,032,734.01, and (ii) second, the balance to the Seller. The Seller hereby directs that payment of the balance pursuant to clause (ii) above be made to ACAS, LLC, or as directed by the Bankruptcy Court, pursuant to the lien release letter dated as of the date hereof between ASCAS, LLC and the Seller.

      **1.7.** Once the Purchaser has received an aggregate of $15,546,900.20 of Net Proceeds in cash from its sale or transfer, on arms-length terms, of the Purchased Assets (the "**Sale**"), any additional Net Proceeds from the Sale shall be paid to the Seller in the following order of priority, subject in each case to (x) the exclusion of Adjusted Net Proceeds (as defined in the TSA) received from the sale of New Inventory and (y) any reductions, offsets or adjustments as provided in this Agreement, including without limitation under <u>Section 6.4</u> hereof:

      **(a)** <u>First</u>, all aggregate Net Proceeds of the Sale greater than $15,546,900.20 but less than or equal to $18,750,000 shall be paid (i) 70% to Seller and (ii) 30% to Purchaser;

      **(b)** <u>Seco</u>nd, all aggregate Net Proceeds of the Sale greater than $18,750,000 but less than or equal to $22,250,000 shall be paid (i) 65% to Seller and (ii) 35% to Purchaser; and

      **(c)** <u>Third</u>, all aggregate Net Proceeds of the Sale greater than $22,250,000 shall be paid (i) 60% to Seller and (ii) 40% to Purchaser.

      For purposes of this Agreement "**Net Proceeds**" means the aggregate amount of all cash payments and proceeds received by Purchaser in respect of the Sale of the Purchased Assets, less (i) costs, commissions, fees and expenses, in each case payable to third parties, incurred by Purchaser in connection therewith, including but not limited to any amounts paid by Purchaser under the License or to get access to the Facility (other than the rent payments paid at Closing pursuant to Section 1.6 of the Purchase Agreement), in each case payable to third parties, (ii) 100% of the buyer's premium paid by a buyer in an Auction (provided that such percentage shall be reduced to 50% if the License grants Purchaser access to the Facility through October 31, 2018 for the purposes required by Purchaser and such grant remains in effect through such date) and 100% of the amount paid to the online hosting agent for an Auction, (iii) any income or transfer Taxes paid or reasonably estimated by Purchaser to be payable by Purchaser as a result of such disposition, (iv) reasonable costs and expenses incurred by Purchaser in connection with the Bankruptcy Case, and (v) adjustments in favor of buyers in respect of the sale price of any Purchased Assets after the sale of any Purchased Assets.

      **1.8.** **Other Payments.** Any payments due to the Seller by Landlord pursuant to Section 20.4 of the Lease (the "**Landlord Escrow**"), shall be paid 100% to Purchaser. That portion of the Landlord Escrow due to the Purchaser (the "**Purchaser Escrow**") shall be paid within five (5) business days upon receipt by the Seller along with a detailed accounting detailing the amount received by the Seller and any deduction made to the Landlord Escrow made by the Landlord. The parties hereto acknowledge that the Seller may deduct from the

Purchaser Escrow all amounts due to the Seller on account of the Purchaser's indemnification obligations contained in Section 6.3 herein.

**1.9.    Timing of Payments; Reconciliation.**

On or before October 31, 2018, the Purchaser shall deliver to the Seller for the Seller's review and approval a reconciliation of all amounts due and owing pursuant to <u>Section 1.7</u> above (which shall set forth a detailed calculation of Net Proceeds received in connection with the Sale) (the "**Reconciliation**"). To the extent any of the Purchased Assets have not been sold by October 31, 2018, no proceeds after this date shall be shared with the Seller. The Purchaser shall provide the Seller and its representatives with reasonable access to the books and records, underlying and solely related to the Reconciliation, and personnel of the Purchaser and, if applicable, the outside accountants and other agents of the Purchaser, in each case, who were involved in the preparation of the Reconciliation, as applicable. The Purchaser and the Seller shall cooperate in good faith to resolve any disputes with respect to such Reconciliation, as applicable. Within two (2) Business Days of completion of the Reconciliation, as applicable, the Purchaser shall pay to the Seller any and all amounts due the other pursuant to the Reconciliation, as applicable.

**1.10.    Abandonment.** The parties acknowledge and agree that (a) the Purchaser has the right in its sole discretion to abandon any of the Purchased Assets at any time, (b) the Purchaser shall have no obligation under this Agreement or otherwise to the Seller with respect to any Purchased Assets that are abandoned by Purchaser, provided that the Seller shall have the right to remove any Purchased Assets abandoned by the Purchaser for purposes of the Landlord Escrow described above in Section 1.8., and (c) the Seller shall have no obligation under this Agreement or otherwise to the Purchaser for any Purchased Assets subsequently abandoned by the Purchaser.

**ARTICLE 2**
**REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLER**

The Seller represents and warrants to the Purchaser that the following is true and correct:

**2.1.    Organization, Power and Standing.** Seller is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own, lease and operate its properties and to carry on its business. Seller is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do so would not have or be reasonably expected to have a material adverse effect on the Purchased Assets. The Seller is the debtor in the Bankruptcy Case and no trustee has been appointed in the Bankruptcy Case.

**2.2.** **Due Authorization; No Conflict.** The Seller has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and (subject to entry of the Sale Approval Order) to carry out the terms of this Agreement and the other agreements, instruments and documents of the Seller contemplated hereby. Except as specified on **Schedule 2.2** (the "**Required Consents**") and subject to entry of the Sale Approval Order, no consent, order, authorization, approval, declaration or filing with any Person, is required on the part of the Seller for or in connection with its execution, delivery or performance of this Agreement or any of the other agreements, documents and instruments contemplated hereby. Subject to obtaining the Required Consents specified on **Schedule 2.2** and subject to entry of the Sale Approval Order, the execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Seller will not result in any violation of, be in conflict with, constitute a default under, or cause the acceleration of any obligation or loss of any rights under, any Legal Requirement or agreement, contract, instrument, charter, by-laws, operating agreement, partnership agreement, organizational document or Permit to which the Seller is a party or by which the Seller or Purchased Assets are bound.

**2.3.** **Validity and Enforceability.** This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Seller is a party shall be when executed and delivered by the Seller, the valid and binding obligations of the Seller enforceable in accordance with its terms, subject only to entry of the Sale Approval Order.

**2.4.** **Reserved.**

**2.5.** **Condition of Purchased Assets.** The condition and status of the Purchased Assets has not materially changed from the condition and status of such assets as of the inspection conducted on Purchaser's behalf on March 7, 2018 and March 8, 2018; provided that, subject to the "Purchase Price" definition and Section 5.1(l) hereof, the face amount of accounts receivable and the cost value of inventory, packaging, work-in-process and ingredients may have changed. At the Closing, the Purchaser will acquire from the Seller good and marketable title to the Purchased Assets, free and clear of all Liens.

**2.6.** **Reserved.**

**2.7.** **Permits.** The Seller is in compliance in all material respects with all of the Permits required to carry on the business through October 31, 2018, all of which are in full force and effect and will be in full force and effect and held by the Purchaser immediately after giving effect to the Transactions. The Seller does not know of any threatened suspension, revocation or invalidation of any such Permits, or any basis therefor.

**2.8.** **Litigation**. Except as set forth on **Schedule 2.8** and except for the Bankruptcy Case, no action, arbitration, suit, proceeding or investigation is pending or, to the knowledge of the Seller, threatened against the Seller, or any equity holder, former equity holder, officer, director, manager or employee of the Seller, in each case, regarding the Purchased Assets. Except as set forth on **Schedule 2.8**, the matters disclosed on such Schedule will be covered by the Seller's insurance policies.

**2.9.     Environmental Matters.** There is and will be no liability attaching to the Purchaser or the Purchased Assets as a result of any hazardous substance that may have been discharged on or released from any premises owned or operated by the Seller (including any predecessors or subsidiaries) or in connection with the Purchased Assets, or disposed of on-site or off-site. For purposes of this Section, "hazardous substance" shall mean oil or any other substance which is included within the definition of a "hazardous substance," "pollutant," "toxic substance," "toxic waste," "hazardous waste," "contaminant" or other words of similar import in any foreign, federal, state or local environmental Legal Requirement.

**2.10.     No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE 2, neither the Seller, any equity holder of the Seller, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Seller and the Seller hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Purchaser by any director, officer, employee, agent, consultant, or representative of the Seller or any of its Affiliates). **The Purchaser acknowledges that, except as otherwise specifically provided for in this Agreement, the Purchased Assets are being sold to the Purchaser on an "AS IS" "WHERE IS" basis with no representations or warranties of any kind.**

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents and warrants to the Seller that the following is true and correct.

**3.1.     Organization, Power and Standing.** The Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to effect the Transactions. The Purchaser is duly qualified and authorized to do business and is in good standing in each jurisdiction where it is required to qualify to do business as a foreign entity, except where the failure to do so would not have or be reasonably expected to have a material adverse effect on this Transaction.

**3.2.     Due Authorization.** The Purchaser has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and to carry out the terms of this Agreement and the other agreements, instruments and documents of the Purchaser contemplated hereby.

**3.3.     No Conflict.** No consent, approval or authorization of or declaration or filing with any governmental or non-governmental authority or any party to any contract with the Purchaser is required on the part of the Purchaser for or in connection with its execution, delivery or performance of this Agreement and the other agreements, documents and instruments contemplated hereby. The execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by the Purchaser will not result in any violation of, be in conflict with, or constitute a default under any Legal Requirement, agreement, contract, instrument, charter, by-laws, operating agreement,

partnership agreement, organizational document or permit to which the Purchaser is a party or by which the Purchaser is bound.

**3.4.**     **Validity and Enforceability.** This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Purchaser is a party shall be when executed and delivered by the Purchaser, the valid and binding obligations of the Purchaser enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

**3.5.**     **No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE 3, neither the Purchaser, any equity holder of the Purchaser, nor any of their respective Affiliates, officers, directors, employees, agents or representatives has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Purchaser and the Purchaser hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the Seller or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to the Seller by any director, officer, employee, agent, consultant, or representative of the Purchaser or any of its Affiliates).

# ARTICLE 4
# COVENANTS

**4.1.**     **Personal Property Taxes.** The Seller shall be responsible for all personal property Taxes imposed upon the Purchased Assets through the Closing Date and to the extent such Taxes do not relate to a Straddle Period (as defined below), Seller shall pay such personal property Taxes directly to the appropriate taxing authority when due. In the case of any personal property Taxes that are imposed on a periodic basis and are payable for any portion of any taxable period that includes but does not end on the Closing Date (each such taxable period, a "**Straddle Period**"), the portion of such personal property Tax that relates to the portion of the Straddle Period (a) ending on the Closing Date shall be deemed to be the amount of such personal property Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period and (b) beginning on the day immediately following the Closing Date and ending with the last day of the applicable taxable period shall be deemed to be the amount of such personal property Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period beginning with the day immediately following the Closing Date and ending with the last day of the applicable taxable period and the denominator of which is the number of days in the entire taxable period. Any credits relating to a Straddle Period shall be allocated on a basis consistent with the allocations made pursuant to the preceding sentence. The Seller shall be responsible for all personal property Taxes that relate to the portion of any Straddle Period ending on the Closing Date and, to the extent unpaid at Closing, shall pay to (or as directed by) the Purchaser amounts equal to such personal property Taxes and such payments shall be made in each applicable case by no later than five business days prior to the due date for paying such amount of personal property Taxes to the relevant taxing authority.  The Purchaser shall be

responsible for all personal property Taxes paid by the Seller prior to the Closing that relate to the portion of any Straddle Period beginning on the day immediately following the Closing Date and ending with the last day of the applicable taxable period and shall pay to the Seller amounts equal to such personal property Taxes within five business days of receipt of a copy of the bill for such personal property Taxes from the appropriate taxing authority and evidence of payment of such personal property Taxes by Seller.

**4.2.    Equipment.** The tangible assets that are part of the Purchased Assets and that are not going to be used to produce New Inventory, shall be emptied, cleaned and made ready for sale by the Seller by the Closing Date or within 10 days thereof.

**4.3.    Cogeneration Facility and Utilities.**    The Seller covenants and agrees to (a) maintain and continually operate the cogeneration facility located at the Facility in accordance with the terms of the Lease through the earlier of (x) the date upon which the Purchaser sells such cogeneration facility and (y) October 31, 2018, and to provide Purchaser with heat/ air conditioning, steam and electricity in the Facility through such date and (b) make available for Purchaser's use at the Facility through October 31, 2018 internet, telephone, and other utilities as required by the Purchaser. To the extent the Seller maintains and continually operates the cogeneration facility located at the Facility in accordance with the immediately preceding sentence, the Seller shall retain all amounts paid by National Grid in connection with its continued operation of the co-generation facility through such date.

**4.4.    Inspection Rights Pre-Closing.** The Purchaser and its representatives shall have the right to reasonable access to the Facility at any time during normal business hours prior to Closing for the purposes of inspecting the Purchased Assets and preparing for and taking actions in connection with the marketing and sale of the Purchased Assets (with such reasonable access not including the ability to conduct any invasive environmental actions without the written approval of Seller).

## ARTICLE 5
## CLOSING DELIVERABLES; PURCHASE PRICE

**5.1    Conditions to Obligations of Purchaser**. Unless waived in writing by the Purchaser, at or prior to the Closing, the obligation of the Purchaser hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

**(a)    Representations and Warranties True**. The representations and warranties of the Seller contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

**(b)    Covenants Performed**. The Seller shall have performed and complied with the covenants, agreements and conditions required to be performed or complied with by it hereunder on or prior to the date of the Closing.

**(c)    Purchased Assets**. The condition and status of the Purchased Assets shall be unchanged in any material respect from the condition and status of such assets as of the inspection conducted on Purchaser's behalf on March 7, 2018 and March 8, 2018; provided that,

subject to the "Purchase Price" definition and Section 5.1(l) hereof, the face amount of accounts receivable and the cost value of inventory, packaging, work-in-process and ingredients may have changed.

      **(d)**     **Required Consents Received.** The Seller shall have obtained and delivered to the Purchaser copies of all Required Consents listed on or required to be listed on Schedule 2.2, and no such Required Consents shall have been withdrawn, suspended or conditioned.

      **(e)**     **Instrument of Transfer**. The Seller shall have executed and delivered to the Purchaser a Bill of Sale, in a form reasonably acceptable to the Purchaser (the "Bill of Sale"), reflecting the Seller's transfer of the Purchased Assets to the Purchaser free and clear of all Liens.

      **(f)**     **Certificates of Title**. The Seller shall have delivered to the Purchaser all certificates of title and other documentation necessary to convey title to the equipment included in the Purchased Assets, duly endorsed and in a form suitable for transfer to Purchaser.

      **(g)**     **No Injunction**. The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

      **(h)**     **License**. The Purchaser shall have received a license for the Facility executed by the owner thereof in the form attached hereto as Exhibit 5.1(h) (the "License").

      **(i)**     **Bank Account**. Ownership of the Bank Account shall have been transferred to Purchaser free and clear of all Liens pursuant to documentation in form and substance satisfactory to Purchaser.

      **(j)**     **TSA**. The Purchaser shall have received the TSA executed by the Seller.

      **(k)**     **Sale Approval Order**. The Sale Approval Order approving this Agreement, the TSA, the License and any other agreements related hereto and the Transactions shall have been entered by the Bankruptcy Court, which Sale Approval Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Purchaser.

      **(l)**     **Inventory and Accounts Receivable**. The Seller shall have delivered to Purchaser at least one day prior to the Closing Date, an AR Invoices Only report (in a form substantially the same as prior versions delivered by Seller to Purchaser) and an Inventory Listing by Item Report (in a form substantially the same as prior versions delivered by Seller to Purchaser), and a closing certificate (in form and substance satisfactory to Purchaser).

      **(m)**     **Documents**. The Purchaser shall have received such other certificates, documents and materials as it shall reasonably request.

5.2 **Purchaser Closing Deliverables**. Unless waived in writing by the Seller, at or prior to the Closing, the obligation of the Seller hereunder to consummate the Transactions is subject to the satisfaction at or prior to the Closing of the following conditions:

(a) **Payment of Purchase Price**. At the Closing, the Purchaser will pay (or cause to be paid) the Purchase Price in accordance with Section 1.6 by wire transfer of immediately available funds pursuant to the wire instructions provided by Seller.

(b) **No Injunction**. The consummation of the Transactions contemplated hereby shall not violate any order, decree or judgment of the Bankruptcy Court or any other court or governmental body having competent jurisdiction.

(c) **Representations and Warranties True**. The representations and warranties of the Purchaser contained in this Agreement shall be true and accurate on and as of the date of the Closing with the same effect as though made on and as of such date.

(d) **Covenants Performed**. The Purchasers shall have performed and complied with the covenants, agreements and conditions required to be performed or complied with by it hereunder on or prior to the date of the Closing.

(e) **Sale Approval Order**. The Sale Approval Order approving this Agreement, the TSA, the License and any other agreements related hereto and the Transactions shall have been entered by the Court, which Sale Approval Order shall not have been (i) stayed, vacated or reversed (in whole or in part); or (ii) amended or modified in any material respect other than with the consent of the Seller.

## ARTICLE 6
## SURVIVAL; INDEMNIFICATION

6.1. **Survival.** The representations, warranties, covenants and agreements contained herein shall survive until the applicable statute of limitations has expired. No action for a breach of the representations, warranties and covenants contained herein shall be brought more than 12 months following the Closing Date, except for claims (i) relating to Fundamental Representations and claims relating to the covenants set forth in Section 4.1 hereof which shall survive indefinitely, and (ii) of which the Seller has been notified with reasonable specificity by the Purchaser, or claims of which the Purchaser has been notified with reasonable specificity by the Seller, within the applicable period, shall survive until such claims have been resolved.

6.2. **Indemnification by the Seller.** From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Seller shall indemnify and hold the Purchaser and its Affiliates harmless from and against all claims, liabilities, obligations, costs, damages, losses and expenses (including attorneys' fees and costs of investigation but excluding consequential or punitive damages) of any nature (collectively, "Losses") arising out of or relating to (i) any breach or violation of the representations or warranties of the Seller set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Seller set forth in this Agreement, (iii) the Excluded Liabilities, (iv) any other obligations or liabilities of Seller as may be detailed in the TSA or a breach by Seller of the TSA, (v) the Bankruptcy Case, (vi) any

13

Liens that attach to or are asserted against the Purchased Assets after the Closing due to any action or inaction by the Seller prior to the Closing, (vii) any Purchase Price Reduction that is not deducted from the Purchase Price by Purchaser at Closing, or (viii) any violation of any bulk sales laws as a result of the consummation of the Transactions, to the extent applicable.

**6.3.     Indemnification by the Purchaser.** From and after the entry of the Sale Approval Order by the Bankruptcy Court, the Purchaser shall indemnify and hold the Seller harmless from and against all Losses arising out of or relating to (i) any breach or violation of the representations or warranties of the Purchaser set forth in this Agreement (including the schedules) or in any certificate or document delivered pursuant to this Agreement, (ii) any breach or violation of the covenants or agreements of the Purchaser set forth in this Agreement, or (iii) any other obligations or liabilities of Purchaser as may be detailed in the TSA or a breach by Purchaser of the TSA.

**6.4.     Right of Set-Off.** If the Seller has not satisfied in cash any indemnification obligation owed by it hereunder after notice of any such obligation, the Purchaser or any of its Affiliates may, at their discretion, satisfy the unpaid portion of such obligation by, to the extent permitted by law, setting-off against any amounts that may be due and owing from the Purchaser or any of its Affiliates to the Seller or any of its Affiliates. Unless otherwise set-off as provided for in this Section 6.4, all indemnity payments shall be made within seven (7) days of request by the party demanding indemnification.

**6.5     Adjustment to Purchase Price.**   All indemnification payments paid pursuant to this Article shall be adjustments to the Purchase Price.

### ARTICLE 7
### TERMINATION

**7.1.     Termination**. This Agreement and the Transactions contemplated hereby may be terminated:

> **(a)**     by mutual written consent of the Purchaser and the Seller;

> **(b)**     by the Seller, if the Purchaser shall have breached or failed to perform in any of its other obligations, covenants or agreements under this Agreement or if any of the representations and warranties of the Purchaser set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Seller's reasonable satisfaction within three (3) days after the Purchaser is provided notice of such breach, failure or misrepresentation;

> **(c)**     by the Purchaser, if the Seller shall have breached any of its obligations, covenants, or agreements under this Agreement or if any of the representations and warranties of the Seller set forth in this Agreement shall not be true and correct as of the Closing Date to the extent set forth herein, and such breach, failure or misrepresentation is not cured to the Purchaser's reasonable satisfaction within three (3) days after Seller is provided notice of such breach, failure or misrepresentation;

**(d)** by the Purchaser, if (i) the Sale Approval Order is not entered by the Bankruptcy Court by May 1, 2018, (ii) a competitive bidding process or auction process starts with respect to the sale of the Purchased Assets, or (iii) the Sale Approval Order has been entered by the Bankruptcy Court on or before May 1, 2018 but the Closing Date shall not have occurred on or before May 1, 2018 or, in each case, such other date, if any, as the Purchaser and the Seller may agree in writing; and

**(e)** by the Seller, if the Sale Approval Order is not entered by the Bankruptcy Court by June 1, 2018;

except that this Agreement may not be terminated under this section by or on behalf of any party that is in breach of any representation or warranty or in violation of any covenant or agreement contained herein.

**7.2. Effect of Termination**.

**(a)** If this Agreement is terminated under Section 7.1(a) herein, the Purchaser shall retain the Work Fee and all further obligations of the Seller to the Purchaser and of the Purchaser to the Seller will terminate without further liability of any party hereto.

**(b)** NOT USED

**(c)** NOT USED

## ARTICLE 8
## MISCELLANEOUS

**8.1. Notices.** All notices, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered in person, by e-mail or fax, by United States mail, certified or registered with return receipt requested, or by a nationally recognized overnight courier service, or otherwise actually delivered:

**(a)** if to the Seller:

New England Confectionary Company, Inc.
135 American Legion Highway
Revere, MA 02151
Attention: Michael McGee
E-mail: mmcgee@necco.com

15

with a copy (which shall not constitute notice) to:

Burns & Levinson, LLP
125 Summer Street
Boston, MA 0211
Attention: Frank A. Segall, Esq.
Fax: (617) 345-3299
E-mail: fsegall@burnslev.com

**(b)**     if to the Purchaser, to:

kgbdeals Shopping, Inc.
655 Madison Ave., 3rd Floor
New York, New York 10065
Attention:  Derek Rieger
Fax:  (617) 422-6538
Email:  derek.rieger@kgb.com

with a copy (which shall not constitute notice) to:
Stephen F. Gordon
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
Main Phone: 617-261-0100 Ext 128
Direct Dial: 617-456-1270
Fax: 617-261-0789
sgordon@gordonfirm.com

or at such other address as may have been furnished by such person in writing to the other parties. Any such notice, demand or communication shall be deemed given on the date given, if delivered in person, e-mailed or faxed or otherwise actually delivered, or on the date received, if given by registered or certified mail, return receipt requested or given by overnight delivery service.

**8.2.     Governing Law; Forum.** This Agreement shall be governed by and construed in accordance with the internal laws of The Commonwealth of Massachusetts applicable to agreements executed and to be performed solely within such State. Any judicial proceeding arising out of or relating to this Agreement shall be brought in the Bankruptcy Court, and, by execution and delivery of this Agreement, each of the parties to this Agreement accepts the exclusive jurisdiction of such court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.

**8.3.     Amendments, Waivers.** This Agreement may be amended or modified only with the written consent of the Purchaser and the Seller. No waiver of any term or provision hereof shall be effective unless in writing signed by the party waiving such term or provision. No failure to exercise or delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder

preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights provided hereunder are cumulative and not exclusive of any rights, powers or remedies provided by law.

**8.4.** **Expenses.** Except as otherwise expressly set forth herein, all legal and other costs and expenses incurred in connection with this Agreement and the Transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**8.5.** **Successors and Assigns.** This Agreement, and all provisions hereof, shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, provided that this Agreement may not be assigned by any party without the prior written consent of the other parties hereto except that (a) the rights hereunder of the Purchaser may be assigned to any assignee or nominee (and the Purchaser may designate different assignees and/or nominees for various rights), so long as the Purchaser remains obligated for the performance of its obligations hereunder and (b) this Agreement may be assigned by the Purchaser to any of its equity holders or Affiliates or to any Person acquiring a portion of the Purchased Assets, or the business or securities of the Purchaser, whether by merger, consolidation, sale of assets or securities or otherwise so long as such assignee assumes all obligations for the performance of the Purchaser's obligations hereunder.

**8.6.** **Entire Agreement.** This Agreement, the attached exhibits and schedules, and the other agreements, documents and instruments contemplated hereby contain the entire understanding of the parties, and there are no further or other agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof unless expressly referred to herein.

**8.7.** **Counterparts.** This Agreement may be executed in one or more counterparts, and with counterpart facsimile signature pages, each of which shall be an original, but all of which when taken together shall constitute one and the same Agreement.

**8.8.** **Headings.** The headings of Articles and Sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.

**8.9.** **Further Assurances.** Following the Closing, the parties will execute and deliver such documents and take such other actions as may be reasonably requested from time to time by the Purchaser or the Seller in order to fully consummate the Transactions in accordance with this Agreement.

**8.10.** **Third Party Beneficiaries.** Nothing in the Agreement shall be construed to confer any right, benefit or remedy upon any Person that is not a party hereto or a permitted assignee or nominee of a party hereto, except as otherwise expressly set forth in this Agreement.

**8.11.** **No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the other agreements and documents contemplated herein. In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any other agreement or documents contemplated herein, this Agreement and such other agreements or documents shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or

17

disfavoring any party by virtue of authoring any of the provisions of this Agreement or any other agreements or documents contemplated herein.

**8.12.  Publicity.** Purchaser and Seller shall have the right to disclose the Transactions contemplated hereby (other than the Purchase Price) in marketing materials, press releases and other announcements following the Closing; provided neither Seller nor Purchaser shall use or disclose the names of Ares Capital Corporation, the investment advisor thereof, American Capital, Ltd., or ACAS, LLC (and each of the foregoing third parties are expressed third party beneficiaries hereto entitled to enforce the provisions of this Section 8.12 as if direct parties hereto); provided further that Purchaser shall have the right to review and approve any such public release by the Seller.

**8.13.  Schedules and Exhibits.** All schedules and exhibits to this Agreement are an integral part of this Agreement and are incorporated herein by reference in this Agreement for all purposes of this Agreement. All schedules and exhibits delivered with this Agreement shall be arranged to correspond with the numbered and lettered sections and subsections contained in this Agreement, and the disclosures in such schedules shall qualify only the corresponding sections and subsections contained in this Agreement, unless otherwise expressly provided herein.

**8.14.  Severability**. This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement. If any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, such provisions shall be construed by limiting and reducing it so as to be enforceable to the maximum extent permitted by applicable law.

**8.15.  Certain Taxes**. All transfer, documentary, sales, use other such Taxes and fees incurred in connection with this Agreement shall be paid by the Seller when due, and the Seller will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use and other Taxes and fees.

[Signature page follows.]

IN WITNESS WHEREOF the parties hereto have executed and delivered this Agreement as a sealed instrument as of the date first above written.

Trustee:                                      HAROLD B. MURPHY IN HIS CAPACITY AS CHAPTER 11
                                              TRUSTEE OF NEW ENGLAND CONFECTIONERY
                                              COMPANY INC.

                                              _____

Seller:                                       New England Confectionery Company Inc.

                                              _____

Purchaser:                                    kgbdeals Shopping Inc.

                                              _____

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as a sealed instrument as of the date first above written.

SELLER:

NEW ENGLAND CONFECTIONERY COMPANY, INC.

By: _____
      Name:
      Title:

PURCHASER:

kgbdeals Shopping, Inc.

By: Name:
Title:

[Signature Page to Asset Purchase Agreement]

## SCHEDULES

The Schedules will be finalized as of the Closing Date, and shall be available upon request.

**Exhibit E**

**Transition Services Agreement**

# TRANSITION SERVICES AGREEMENT

This Transition Services Agreement (this **"Agreement"**) is made and entered into as of April 17, 2018 by and between CI-N Acquisition LLC, a Delaware limited liability company (the **"Buyer"**), and New England Confectionery Company, Inc., a Delaware corporation (the "Seller"), the debtor in In re New England Confectionery Company, Inc., Chapter 11 Case No. 18-11217-MSH (the "**Bankruptcy Case**"), currently pending in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**").  The Buyer and the Seller are hereinafter referred to jointly as the **"Parties"**, and each individually as a **"Party"**.

## Introduction

The Seller and the Buyer entered into an Asset Purchase Agreement dated as of April 17, 2018 (the **"Purchase Agreement"**; capitalized terms used herein but not defined shall have the meanings ascribed to them in the Purchase Agreement), pursuant to which the Buyer has agreed to purchase from the Seller the Purchased Assets, upon and subject to the terms and conditions set forth in the Purchase Agreement. As contemplated by Section 5.1 of the Purchase Agreement, the Buyer has determined that it would like the Seller to provide transition services, and the Seller and the Buyer are entering into this Agreement simultaneously with the Closing to set forth the terms upon which the Seller will provide such services.

Now, therefore, in consideration of the agreements and promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## SERVICES

**Section 1.1 Provision of Services**. Subject to the terms and conditions of this Agreement (a) to the extent requested by the Buyer in the exercise of its sole discretion, the Seller agrees to provide those employees of the Seller necessary to assist in the production of New Inventory (as defined below) as reasonably requested by the Buyer within 3 to 5 days of the Closing Date (the "**Production Employees**"), (b) the Seller agrees to provide the employees set forth on Schedule 1.1(b) hereto for the period of time set forth on such Schedule 1.1 (b) (the "**General Employees**"), and (c) the Seller agrees, within 10 days after the Buyer gives written notice to the Seller to commence the process, to empty, clean and make ready for sale the tangible assets that are part of the Purchased Assets and that are used to produce New Inventory (collectively, the "**Services**"). Seller will not terminate any Production Employees or General Employees during the Transition Period other than for cause as part of Seller's employment policies and past practices unless otherwise requested by Buyer, provided that Seller shall provide written notice to Buyer at least 2 days prior to any termination by Seller, unless a shorter period is warranted under the circumstances, and Seller shall provide replacement employees with the same skill set and experience as any terminated employees, unless Buyer notifies Seller otherwise.

**Section 1.2 Manner of Service**. The Seller will cause the Production Employees and the General Employees to perform their work with the degree of care, skill and supervision consistent with past practice and in compliance with applicable laws, rules and regulations. During the Transition Period, the Seller will (i) handle personnel matters the same as the Seller has in the past, and (ii) not implement any change to the existing employment policies of the Seller.

## ARTICLE II
## TERM

**Section 2.1 Transition Period**. As used herein, the term **"Transition Period"** shall mean the period commencing on the date hereof and ending on August 31, 2018.

**Section 2.2 Reimbursement of Expenses during Extended Transition Period**. During the period commencing on May 6, 2018 and ending on the earliest of (a) last day the Buyer requires Production Employees, (b) October 31, 2018 and (c) the date upon which Buyer terminates this Agreement pursuant to the terms hereof (the "**Extended Transition Period**"), the Buyer agrees to reimburse Seller, in advance and on a weekly basis to the extent that the Seller and Buyer have agreed in advance to the amounts to be advanced for such week, for the wages, commissions and written employment benefits in effect on the date hereof (including, written employee benefit plans in effect on the date hereof but excluding retiree benefit plans or programs or severance payments) for the Production Employees requested by the Buyer (in its sole discretion), as well worker's compensation insurance, employment taxes, and other scheduled employer liabilities relating to such Production Employees as required by law to be provided by the Seller during the Extended Transition Period. In the event Buyer and Seller do not agree to the amount of reimbursement as provided above, Seller shall not be obligated to pay for any such costs and expenses and shall not be obligated to continue its performance hereunder, and Seller's non-performance shall not be deemed a breach hereunder.

## ARTICLE III
## COMPENSATION

**Section 3.1 Compensation for Services**. The Seller will provide the Services at no cost or expense to Buyer whatsoever, other than as provided in Section 2.2 above.

**Section 3.2 Sharing of Adjusted Net Proceeds**. Notwithstanding the provisions of Section 1.7 of the Purchase Agreement, Adjusted Net Proceeds from the sale of inventory produced during the Transition Period (the "**New Inventory**") shall be paid (i) 30% to Seller and (ii) 70% to Buyer and shall not count towards the $15,546,900.20 threshold for sharing of Net Proceeds set forth in Section 1.7 of the Purchase Agreement. For purposes of this Agreement "**Adjusted Net Proceeds**" means the aggregate amount of all cash payments and proceeds received by Buyer in respect of the sale of the New Inventory, less (i) costs, commissions, fees and expenses, in each case payable to third parties (expressly agreeing that the Seller shall be deemed a third party for the purpose of this Agreement), incurred by Buyer in connection therewith, including but not limited to any amounts paid by Buyer under the License or to get access to the Facility (other than the rent payments paid at Closing pursuant to Section 1.6 of the Purchase Agreement), in each case payable to third parties, (ii) 100% (provided that such percentage shall be reduced to

Case 18-11217   Doc 337-1   Filed 05/18/18   Entered 05/18/18 15:28:55   Desc Exhibit
E - Transition Service Agreement 26 of 33    Page 4 of 10

2

50% if the License grants Buyer access to the Facility through October 31, 2018 for the purposes required by Buyer and such grant remains in effect through such date) of the buyer's premium paid by a buyer in a Clean-Up Auction and 100% of the amount paid to the online hosting agent for a Clean-Up Auction, (iii) any income or transfer Taxes paid or reasonably estimated by Buyer to be payable by Buyer as a result of such disposition, (iv) reasonable necessary costs and expenses directly incurred after the date of the Sale Approval Order (as defined in the Purchase Agreement) by Buyer in connection with the Bankruptcy Case (as defined in the Purchase Agreement), (v) adjustments in favor of buyers in respect of the sale price of such New Inventory after the sale of such New Inventory and (vi) costs, commissions, fees and expenses incurred by Buyer in connection with the production of the New Inventory, including the cost of the raw materials and ingredients, the cost of funds, employee costs, packaging costs and freight costs.

**Section 3.3 Timing of Payments; Reconciliation**. Section 1.9 of the Purchase Agreement shall apply to all amounts due and owing pursuant to Section 3.2 above. For purposes of clarity, the Buyer shall provide to Seller a reconciliation of all amounts due and owing pursuant to Section 3.2 above as part of the Reconciliation (as defined in the Purchase Agreement).

**ARTICLE IV**
**PERSONNEL**

**Section 4.1     Compensation; Insurance.**

**(a)**     The Seller shall employ, pay, supervise and direct and discharge all of the Seller's personnel providing Services hereunder. Subject to reimbursement under Section 2.2 hereof, the Seller shall be solely responsible for the payment of all wages, bonuses, commissions, benefits (including, employee benefit plans, programs and arrangements) and any other direct and indirect compensation for its personnel assigned to perform Services under this Agreement, as well as be responsible for its worker's compensation insurance, employment taxes, and other scheduled employer liabilities relating to such personnel as required by law to be provided by the Seller during the Transition Period. For the avoidance of doubt, any Production Employees shall remain employees of the Seller (and not of Buyer). The Buyer shall not be deemed to control the Seller's employees and the Buyer shall not be responsible for any expenses incurred in connection with the employment of such employees.

**(b)**     The Seller has procured, and during the period from the date hereof until the earlier to occur of (i) the expiration of the Transition Period or (ii) the termination of this Agreement in accordance with its terms, will maintain, policies of insurance in the amounts listed below and in such form and with such insurance providers as shall be reasonably satisfactory to the Buyer, provided that unless otherwise expressly agreed all such policies shall be on an "occurrence basis". In the event of a claim under any such policies, Seller shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder. The Buyer shall be named as an additional insured, with waiver of subrogation, under the Seller's insurance policies required under this Section 4.1(b).

(i)     Statutory workers' compensation insurance, including employers' liability insurance, with a limit for each accident not less than the limits in effect on the Closing Date.

(ii)    Comprehensive general liability insurance with limits of not less than the limits in effect on the Closing Date for each occurrence and in the aggregate.  Combined single limit for bodily injury and property damage liability, including personal injury, contractual liability and products/completed operations.

**ARTICLE V**
**TERMINATION**

**Section 5.1 Termination by Either Party**. This Agreement, or any Service provided hereunder, may be terminated by (i) mutual written agreement of the Parties, (ii) by the Buyer upon seven (7) days' prior written notice to the Seller, or (iii) by either Party upon written notice to the other Party if the other Party fails to perform or otherwise breaches an obligation under this Agreement; provided, however, that such Party failing to perform or otherwise breaching shall have three (3) days from the date notice of intention to terminate is received to cure the failure to perform or breach of an obligation, at which time this Agreement or the applicable Service, as the case may be, shall terminate if the failure or breach has not been cured to the reasonable satisfaction of the other Party.

**Section 5.2 Termination Notices**. Any termination notice delivered by either Party shall specify in detail (i) the Service or Services to be terminated, or (ii) if this Agreement is to be terminated as a whole, and, in each case, the effective date of termination.

**ARTICLE VI**
**MISCELLANEOUS**

**Section 6.1 Assignment**. This Agreement may not be assigned by the Seller in whole or in part without the prior written consent of the Buyer. The Buyer shall have the right to assign this Agreement to assignees or nominees of the Buyer. Any assignment, delegation or transfer of this Agreement or any interest herein in violation of the terms of this Agreement is void and cause for termination of this Agreement.

**Section 6.2 Entire Agreement; No Third Party  Beneficiaries**.  This Agreement and the Exhibit and Schedule attached hereto, together with the provisions of the Purchase Agreement (including defined terms) incorporated herein (a) constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and (b) are not intended to confer upon any Person other than the Parties any rights or remedies hereunder.

**Section 6.3 Relationship of the Parties**. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, trust or other association of any kind, each Party being individually responsible only for its obligations as set forth

4

in this Agreement. None of the employees of the Seller performing services in connection therewith shall be deemed employees of the Buyer.

**Section 6.4    GOVERNING LAW; SUBMISSION TO JURISDICTION AND SELECTION OF FORUM; WAIVER OF JURY TRIAL.**

    **(a)**    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS WITHOUT REFERENCE TO THE CHOICE OF LAW PRINCIPLES THEREOF.

    **(b)**    EACH PARTY HERETO AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTAINED IN OR CONTEMPLATED BY THIS AGREEMENT, WHETHER IN TORT OR CONTRACT OR AT LAW OR IN EQUITY, EXCLUSIVELY IN THE BANKRUPTCY COURT (AS DEFINED IN THE PURCHASE AGREEMENT).

**Section 6.5 Notices**. All notices, requests, demands and other communications required by or made under this Agreement must be in writing and shall be deemed given when delivered in accordance with the provisions for delivery of notice contained in the Purchase Agreement.

**Section 6.6 Headings**. Headings of the Articles and Sections of this Agreement are for convenience of the Parties only, and shall be given no substantive or interpretative effect whatsoever.

**Section 6.7 Survival of Provisions**. The representations, warranties and covenants contained herein shall survive the termination or expiration of this Agreement to the full extent necessary to protect the Party in whose favor they run.

**Section 6.8 Waivers**. Except as otherwise expressly provided in this Agreement, any failure of any of the Parties to comply with any obligation, covenant, agreement or condition herein may be waived by the Party or Parties entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**Section 6.9 Amendment and Modification**. This Agreement may only be amended, modified and supplemented by written agreement of the Parties.

**Section 6.10 Counterparts**. This Agreement may be executed in multiple counterparts, including facsimile counterparts, all of which shall together be considered one and the same agreement.

**Section 6.11 Severability**. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid,

void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

[Signature page follows]

IN WITNESS WHEREOF the parties hereto have executed and delivered this Agreement as a sealed instrument as of the date first above written.

Trustee:                                HAROLD B. MURPHY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF NEW ENGLAND CONFECTIONERY COMPANY INC.

                                        _____

Seller:                                 New England Confectionery Company Inc.

                                        _____

Purchaser:                              kgbdeals Shopping Inc.

                                        _____

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first above written.

NEW ENGLAND CONFECTIONERY
COMPANY, INC.


By: _____
    Name:
    Title:


kgbdeals Shopping, Inc.


By:  Name:
    Title:

[Signature Page to Transition Services Agreement]

## Schedule 1.1(b)

This Schedule will be finalized as of the Closing Date, and shall be available upon request.